RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
MARY HOLLAND, ESQ.
(Subject to *pro hac vice* admission)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
mary.holland@childrenshealthdefense.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT, a not-for profit organization, and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER, a California Nonprofit Corporation<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, and<br>ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California ("OMBC")<br><br>Defendants. | **Case No:**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COME NOW Plaintiffs LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT ("PIC"), and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER ("CHD-CA") by their attorneys, and hereby allege against the Defendants as follows:

**JURISDICTION AND VENUE**

**1.** This is a 42 U.S.C. Section 1983 civil rights action for which this Court has jurisdiction under 28 U.S.C. Section 1331. This Court has authority to grant the requested injunctive relief under 28 U.S.C. Section 1343; the requested declaratory relief under 28 U.S.C. Sections 2201 and 2202, supplemental jurisdiction over the state Constitutional Third Claim for declaratory and injunctive relief under 28 U.S.C. Section 1367, and costs and attorneys' fees under 42 U.S.C. Section 1988 (b).

**2.** Venue is proper in the federal Eastern District of California pursuant to 28 U.S.C. Section 1391 (b). Defendant ROB BONTA, the California Attorney General has his principal office in this District as does ERIKA CALDERON, Executive Officer of the Osteopathic Medical Board of California ("OMBC," the "Board" or the "Osteopathic Board"), and as such enforcement of the challenged statute will primarily take place in this district.

**INTRODUCTION**

**3.** This is a pre-enforcement First and Fifth Amendment challenge to the recently passed California bill AB 2098, which adds Section 2270 to the Business & Professional Code. The new law goes into effect on January 1, 2023.[1]

---

[1] Bus. & Prof. Code Section 2270 provides in relevant part:

> "(a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.
>
> (b) For purposes of this section, the following definitions shall apply:
>
> (1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.
>
> (2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
>
> (3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment* or advice.
>
> (4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

**4.**     Section 2270 will make it a Board disciplinable offense for osteopathic physicians to convey information to patients which is deemed to be "Covid misinformation," defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care".

**5.**     Because the law targets the speech by health care professionals on specific content (Covid-19) and only a specific point of view – that which is contrary to "contemporary scientific consensus" and the "standard of care" – the statute should be subject to the strictest scrutiny. However, Section 2270 fails under either level of heightened scrutiny (strict or intermediate) because it stops physicians from providing the latest accurate information to patients which may not be consistent with what, on any particular day, public health officials proclaim to be the "contemporary scientific consensus."  The new law is not the least restrictive means, the means are not "narrowly tailored," nor are they a "reasonable fit." The Legislative History demonstrates compliance with none of these means tests, which in and of itself proves sufficient likelihood of success for the accompanying preliminary injunction motion.

**6.**     California has no legitimate interest in preventing patients from receiving truthful and accurate information just because the information is not consistent with public health authorities' pronouncements about the "contemporary scientific consensus," or because the Board might at some distant future date determine in an administrative proceeding that the information conveyed is not within the "standard of care."  And the Board has no right to declare information false just because it is against the scientific consensus and the "standard of care."

**7.**     The Supreme Court has rejected the notion that the First Amendment free speech rights of professionals are entitled to lesser protection than non-professionals just because the state licenses professionals. The Supreme Court has quite forcefully pushed back on the government's attempt to control what physicians tell patients, likening such efforts to what was done in the Soviet Union,

---

(5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000)."

AB 2098 California Legislative Information, Bill Text,

https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098

\* Plaintiffs submit that there is no such thing as speech or information which is Covid treatment.

Communist China and under the Nazis. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374-2375 (2018) ("*NIFLA*") (quoted in full in the Conclusion at pages 18-19 *infra*.)

**8.** Plaintiffs also maintain that patients have a First Amendment right to receive information even if it is not within the "contemporary scientific consensus" and the "standard of care" as determined by the Osteopathic Board, because it is constitutionally impermissible for the government to restrict access to information merely because the government does not agree with a viewpoint or thinks it is against the "contemporary scientific consensus."

**9.** Plaintiffs also maintain that the statute is unconstitutionally vague under the heightened specificity requirement of the Fifth Amendment Due Process clause for the reasons set out in the Second Claim for Relief.

**10.** Finally, this suit also asserts a state constitutional claim that patients have a right to receive and physicians have the right to provide or prescribe any FDA approved treatment off-label under the California right of privacy,[2] and this privacy right supersedes the Board's right to sanction osteopathic physicians who advise, recommend and even prescribe FDA approved but off-label prescription drugs like Ivermectin and Hydroxychloroquine ("HCQ"). (*See* the Third Claim for Relief.)

## THE PLAINTIFFS AND THEIR STANDING

**11.** Plaintiff LeTrinh Hoang, is a pediatric osteopathic physician. Dr. Hoang has an office in Los Angeles County. She had been licensed by the Board for more than twenty-five years and treats children and sees adults for osteopathic muscular treatments.

**12.** Her practice includes advising her patients (and their families) about the risk versus benefits of Covid vaccines and boosters, based on the patient's age, health status, and co-morbidities. The level of detail or granularity of the information she conveys to patients depends on the patient (or the family member in the case of young children) and can range from just the broad strokes to discussion of the latest literature on vaccines and the reported deficits in the science behind FDA approved or Emergency Use Authorization ("EUA") drugs.

---

[2] Off label use of FDA approved drugs is "common" as a lawful daily practice among physicians in the United States, where up to one-fifth of all drugs are prescribed off-label. See Radley, D, et al. (2006). *Off-label prescribing among office-based physicians.* Arch Intern Med. 2006 May 8;166(9):1021-6. https://pubmed.ncbi.nlm.nih.gov/16682577/

13. Of course, all of her patients are informed of the exact FDA status of the vaccine or drug (in the case of Covid treatment drugs) and the government's recommendation. In the case of the current Pfizer booster, for example, a patient wanting specifics about the booster might be cautioned that the data submitted to obtain Emergency Use Authorization were not reviewed by the FDA's outside vaccine advisory committee, and that one of the panel's leading members, Dr. Paul Offit, does not recommend the booster for children because of the lack of adequate scientific evidence. It might even include reference to and, in some cases, discussion of the actual data Pfizer submitted to the FDA to support its EUA.[3] Under Section 2270, however, she is unclear whether she is permitted to related this information to her patients.

14. Dr. Hoang would like to provide information to her male patients between ages 17-39 of the increased risks of cardiomyopathy and other cardiac serious adverse events of the mRNA shots to this patient subset. This information is evidence based and widely reported in the medical literature.[4] It

---

[3] The evidence submitted to the FDA for EUA consisted of a study of 8 mice that received the actual new booster, clinical and pre-clinical data from the prior booster, and clinical data from Pfizer's original mRNA vaccine. Pfizer's slide presentation to the FDA in support of EUA is reproduced on Pfizer's website, and is available to patients desiring to see it. Here is the Pfizer presentation. https://www.fda.gov/media/159496/download. Recently, Pfizer released some early data from clinical trials of the booster which showed increased titers to the variant after one week, but there was no correlation to any clinical benefit. These new data highlight the problem of trying to extrapolate a scientific consensus from fast moving events and having physicians trying to figure out what they can say about the safety and efficacy of the booster. A patient wishing a very detailed explanation would be provided this new information, limited though it may be. The discussion would also include that flu vaccines can be released before there is human data available. But it depends on Dr. Hoang's judgment about the level of detail she thinks the patient wants or can absorb.

[4] Here are just a few examples:
- Oster et al. performed an investigation, Myocarditis Cases Reported After mRNA-Based COVID-19 Vaccination in the US From December 2020 to August 2021 that found the risk of myocarditis after receiving mRNA-based COVID-19 vaccines was increased across multiple age and sex strata and was highest after the second vaccination dose in adolescent males and young men.
- A study by Lai et al., Myocarditis after COVID-19 Vaccination with a Messenger RNA Vaccine and an Inactivated Virus Vaccine, showed a 13.8-fold increased risk of myocarditis in adolescents receiving the Pfizer mRNA vaccine compared to unvaccinated adolescents.
- Similarly, Massari et al. found the Moderna vaccine has shown a 12 times greater risk of myocarditis in 12 to 39-year-old males in Italy after both the first and second vaccine in their case study, Postmarketing Active Surveillance of Myocarditis and Pericarditis Following Vaccination with COVID-19 mRNA Vaccines in Persons Aged 12 to 39 Years in Italy: A Multi-database, Self-controlled Case Series Study.
- Here is another study from Goddard et al. showing a 14-fold increased risk of myocarditis/pericarditis after the second Pfizer and an 18-fold increased risk after the

may not be consistent with the U.S. infectious disease consensus or the standard of care, but the increased risk is plainly evidence based. Here again, the level of detail would depend on physician judgment (and past experience) with the patient. Assuming Plaintiff Hoang provides this important information (in whatever the level of detail) to a patient and recommends against the vaccine for such a patient, Dr. Hoang believes she might be in violation of Section 2270.

**15.** Another example of the type of questions she receives from patients when they seek her advice is about some of the claims made by the CDC about the success of vaccine, like for example the CDC claim (and this claim is cited in the findings of AB 2098) that the unvaccinated are eleven times more likely to die than the vaccinated.

**16.** Dr. Hoang may point out that, in her opinion, that statistic is misleading. Multiple evidence-based studies show that this statistic is misleading (i.e., old data, unstratified, inaccurate definition of unvaccinated) are provided in the declaration of Sanjay Verma, MD, submitted in support of Plaintiffs' Preliminary Injunction motion (page 13, para. 15, to page 16 para. 55, and appendix 6, page 34).

**17.** Dr. Hoang would like to continue to provide such truthful information and evidence-based advice to her patients, but since this information and advice could be viewed as contrary to the vague and undefined "contemporary scientific consensus" which the law may view as a departure from the standard of care, she is reluctant to do so unless this Court stops the enforcement of the law by the Board, pending the outcome of this case.

**18.** Plaintiff therefore will be faced with either self-censorship and thus violating what she thinks is required under the Hippocratic oath, or risking investigation and Board disciplinary action.

**19.** As of the date of the filing of this Complaint, Plaintiff Hoang intends to provide her patients with the best available information concerning the safety and efficacy of vaccines and Covid 19 treatments, even where such information and recommendations fall within the definition of "Covid misinformation."

---

second Moderna: Risk of Myocarditis and Pericarditis Following BNT162b2 and mRNA-1273 COVID-19 Vaccination. *This paper is co-authored by CDC scientists like Tom Shimabukuro and Eric Weintraub and is based on the CDC's Vaccine Safety Datalink.

    **20.**    As such, she has a "concrete plan" to engage in action which violates the new law. Because of the vagueness of the law, she cannot determine whether providing above or similar information would subject her to professional discipline for she cannot predict the Defendants' whims. Even if she could predict such whims, they will inevitably change with time and personas, rendering AB 2098 facially unconstitutional. And that is the reason she and the other Plaintiffs have filed this lawsuit. Her concrete plan to convey this information to her patients establishes her standing under the relaxed First Amendment standing requirements for this pre-enforcement challenge.

    **21.**    Plaintiff Physicians for Informed Consent (PIC) is a 501(c)(3) not-for-profit group based in California whose mission is, *inter alia*, to advocate for the right of physicians to provide true and evidence-based information to patients concerning the risks and benefits of vaccines. Many of its members are physicians, other health care professionals, and scientists who publish and speak about vaccine safety and efficacy issues.

    **22.**    PIC is deeply involved in identifying, collecting and analyzing the evolving *worldwide* scientific literature on vaccine safety and efficacy. It writes up summaries of these studies and disseminates this information to physicians, so that they can provide their patients with the best available information culled from the US and throughout the world.

    **23.**    The scientific evidence collected and distributed by PIC is sometimes at odds with what is at any given time the view of the U.S. health authorities and what may be considered to be the U.S. scientific consensus. However, all such information is based on the best available worldwide evidence. And frequently, PIC's written summaries have foreshadowed changes subsequently made to the so-called "scientific consensus" (if such a thing exists on all issues relating to the pandemic).

    **24.**    PIC also supports the rights of its members to advise and prescribe the off-label use of drugs such as Ivermectin and HCQ in the treatment of Covid-19. PIC provides its physician members with information about the dozens of studies which support the use of these drugs, and encourages its physician members to discuss these studies (and also the studies which do not show a benefit) with their patients. However, PIC's physician members are uncertain whether providing patients with studies which have found a benefit would violate Section 2270. In fact, some patients ask PIC physician members specifically whether there are any studies which support the use of Ivermectin. Arguably,

1  responding to this question truthfully could be considered spreading Covid misinformation to the
2  patient, but responding in the negative would actually be false. Some physicians respond by advising
3  patients that in fact there are many such studies, but none of those studies are recognized within certain
4  medical communities for many different reasons, and the only studies the FDA currently recognizes for
5  purposes of standard of care are those studies which have not found a benefit. Would conveying this
6  information be sanctionable under the new law? Any answer would be arbitrary and untethered to
7  principle.

8  **25.** In general, if AB 2098 becomes law, many of PIC's osteopathic physician members are faced with choosing between providing accurate and complete information about the risks of the vaccine and the different Covid treatments, putting them at risk of Board investigation and discipline, or reciting the latest FDA and CDC-promulgated edict. Or they can choose to keep silent and refuse to answer questions about vaccines and Covid treatments. This choice is a necessary but completely intolerable result of the new law.

**26.** Moreover, due to the Board's broad power to investigate physicians, many of PIC's physician members are afraid of speaking out in public or even publicly support this case for fear of triggering a Covid misinformation investigation.

**27.** PIC's Osteopathic physician members in California who wish to disseminate information to their patients similar to the information which Plaintiff Hoang seeks to disseminate would have standing to participate in this action.

**28.** PIC's Osteopathic physicians' rights it seeks to assert in this case are germane to and go to the very heart of the organization's educational purpose "to deliver data on infectious diseases and vaccines".

**29.** Neither the claims asserted herein nor the relief requested require the participation of PIC's individual member physicians in this lawsuit. Accordingly, PIC has associational standing to protect the constitutional rights of its Osteopathic physician members in California.

**30.** In addition, all of the same can be said for PIC's lay members in California who wish to receive the information which is or could be deemed "Covid misinformation" from Osteopathic physicians. Many of its lay members would like to be able to receive off-label drugs for Covid-19 if

they contract the virus. Therefore, PIC has associational standing to sue on behalf of its lay members in California on the claims for relief in this case.

**31.** Plaintiff Children's Health Defense, California Chapter ("CHD-CA") is a 501(c)(3) non-profit corporation whose mission is to end childhood health epidemics by working aggressively to eliminate harmful exposures, hold those responsible accountable, and to establish safeguards to prevent future harm. Its mission also includes advocating for medical freedom, bodily autonomy, and an individual's right to receive the best information available based on a physician's best judgment.

**32.** CHD-CA educates and advocates concerning the negative risk-benefit profile of the Covid shots for healthy children, and concerns such as these have caused some of the countries which have had the best pandemic response outcomes to stop recommending Covid vaccination or boosters, or both, for healthy children (see recent recommendations of Denmark, Sweden, the UK, and the European Medicines Agency).

**33.** CHD-CA's members include thousands of California parents of children who want to receive objective, non-coerced information from California physicians about the risk profile of the Covid vaccines, as well as off-label Covid treatments versus standard-of-care treatments if their children contract Covid.

**34.** However, as indicated above, Section 2270 will have a chilling effect and will dissuade many physicians from providing their candid opinions, which creates a risk of self-censorship significantly impairing the ability of CHD-CA's parent members to receive such nonconforming opinions from their osteopathic physicians. An actual and justiciable controversy exists therefore between Plaintiffs and Defendants.

**35.** Even though Section 2270 is not yet in effect, it is already having a chilling effect in that physicians are reluctant to speak out against the law for fear of triggering a Board investigation based on their public opposition to the law and disagreement with whatever the Board might mean by the "contemporary scientific consensus." The chilling effect stemming from Section 2270 is thus already causing direct and concrete injury to CHD-CA's members who are unable to receive from their osteopathic physicians' information from independent sources within the United States and from other countries that have different health policies and have achieved better public health results than those

achieved in the U.S.

36. CHD-CA's members wish to have the ability to receive prescriptions for off-label drugs like Ivermectin and HCQ if they contract Covid.

37. Plaintiff CHD-CA sues in its own capacity and on behalf of its constituent members who have been adversely affected by Defendants' actions.

38. CHD-CA's members would have standing to sue in their own right. The interests which CHD-CA seeks to protect are germane to and go to the heart of CHD-CA's purpose. Neither the claims asserted nor the relief requested requires the participation of CHD-CA's individual members in this lawsuit.

39. Upon information and belief, the Defendants have failed to disavow enforcement of Section 2270 against Osteopathic physicians thus supporting Plaintiffs' standing to bring this pre-enforcement action.

40. As Section 2270 has not yet gone into effect, it would not be possible for there be any prior enforcement activity of the not-yet-in-effect law.

**THE DEFENDANTS**

41. Defendant ROB BONTA is the California Attorney General and is thus the ultimate decision maker in the Attorney General's office who enforces the laws of the State of California, including Bus. & Prof. Code Section 2270. He is a defendant in his official capacity.

42. Upon information and belief, the Attorney General's office represents the Board in administrative actions against its licensees, including preparing the Board's accusation against the licensees and acting as the Board's prosecutor in the Board's disciplinary actions against its licensees. Accordingly, Defendant Bonta has the authority to stop the Attorney General's office from preparing and filing accusations against the Board's licensees, if this Court grants the relief requested.

43. Defendant ERIKA CALDERON is the executive officer of the Osteopathic Medical Board of California, and she is a defendant in this case in her official capacity for the requested declaratory and injunctive relief.

44. Upon information and belief, Defendant CALDERON is the final decision-maker on the Board's decision to investigate physicians for violations Section 2270, or at least she supervises the

1 subordinate Board employee(s) who make such decisions.

2     **45.**    Upon information and belief, Defendant CALDERON has the authority to implement a
3 preliminary and permanent injunction stopping the Board from investigating and filing charges against
4 an osteopathic physician for an alleged violation of Section 2270 after its effective date.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**42 U.S.C. SECTION 1983 VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION ASSERTED AGAINST DEFENDANTS**

    **46.**    Plaintiffs repeat and reallege the allegations set forth above.

    **47.**    The First Amendment provides in relevant part: "Congress shall make no law... abridging the freedom of speech." The First Amendment applies to actions by state agencies such as the Board via the Fourteenth Amendment.

    **48.**    Plaintiff Hoang and PIC's osteopathic physicians have the right of free speech, including the right to freely communicate information to their patients even if the government does not agree with the information conveyed.

    **49.**    Furthermore, the patients of Plaintiff Hoang, PIC's osteopathic physicians (and non-physician members) and CHD-CA's members have the right to receive such information and engage in a genuine free speech dialogue, even if the government does not agree with the information or message conveyed by these physicians.

    **50.**    The information and opinions, i.e., the speech which Plaintiff and PIC's physicians want to convey to their patients, is not accompanied by any separate professional conduct to which the speech is "incidental." (Examples of such speech are listed in the Second Claim at page 15, para. 67 through page 16, para. 73).

    **51.**    Furthermore, Section 2270 is both content and viewpoint restrictive. Accordingly, the constitutionality of the law should be judged by strict scrutiny and is presumptively unconstitutional, notwithstanding that it is speech by a health care professional directed towards a patient.

    **52.**    The state has no compelling interest to hide or shield Plaintiff organizations' members (or the public in general) from information about other countries' responses to the pandemic, or any of

1  the specific information set out in this Complaint, or any of the information contained in the
2  Declaration of Sanjay Verma, M.D. which accompanies Plaintiffs' Motion for a Preliminary Injunction
3  and incorporated herein.

4      **53.**    There are many less restrictive measures the state could implement which would have a
5  more direct impact supporting the public health edicts, including public service announcements by
6  academic physicians who support the mainstream Covid narrative, influential endorsements and other
7  measures geared directly to influence the public. The existence of these less restrictive measures
8  eliminates a finding that AB 2098 is the least restrictive means possible.  The less restrictive measures
9  are also subject to public accountability in the free marketplace of ideas, where information can be
10 freely debated.

11     **54.**    AB 2098 even fails to satisfy intermediate scrutiny, which requires that Defendants
12 <u>prove</u> to this Court that in formulating the law, the lawmakers have "drawn reasonable inferences based
13 on substantial evidence." *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 957 (9th Cir. 2016). Upon
14 information and belief, neither the bill nor the legislative history contains any evidence that California
15 osteopathic physicians have caused any harm to their patients by virtue of what they tell their patients
16 about Covid-19 vaccines or treatments.

17     **55.**    Upon information and belief, there is no actual evidence in the legislative history of AB
18 2098 that California osteopathic physicians have caused or contributed to any increase in Covid
19 infections, transmissions, hospitalizations or deaths.

20     **56.**    Upon information and belief, the findings contained in the bill regarding Covid
21 misinformation are broad declarations and reflect the lack of evidentiary support in the legislative
22 record that California osteopaths are harming their patients by the information being provided to them.

23     **57.**    Upon information and belief, the legislative history of AB 2098 contains nothing but
24 assumptions, naked assertions about causal or influential factors on adverse public health metrics,
25 unsupported opinions conveyed by representatives of medical organizations which is just argument by
26 authority rather by evidence, or are outdated, unstratified and misleading data about the benefit of the
27 vaccines (finding (b) is the prime example of this), all of which are repeated by the media, with the
28 intent and effect that repetition will distract from the lack of actual evidence that sanctioning California

physicians will have any meaningful effect on any parameter of individual or public health. [5]

**58.** Upon information and belief, the origin of AB 2098 is a July 29, 2021, press release by the Federation of State Medical Board asking that its member state boards investigate and sanction physicians for spreading Covid misinformation. It provides:

> "Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including the suspension or revocation of their medical license. Due to the specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society, whether they recognize it or not. They also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factually, scientifically grounded and consensus driven for the betterment of public health. Spreading inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession and thus puts all patients at risk."

*FSMB: Spreading Covid-19 Vaccine Misinformation May Put Medical License At Risk*, Federation of State Medical Boards, News Releases (Jul. 29, 2021), https://www.fsmb.org/advocacy/news-releases/fsmb-spreading-covid-19-vaccine-misinformation-may-put-medical-license-at-risk/.

**59.** The Federation's press release is just a collection of opinions and cites no evidence. There was no white paper, scientific bibliography or references to any consumer study supporting any of the assertions, including and especially that demonstrating that physicians who convey the information referenced in this Complaint put patients at risk.

---

[5] AB 2098 legislative findings: *** "
(b) Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated."
(c) The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC.
(d) The spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk.
(e) Major news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals.
(f) The Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.
(g) In House Resolution No. 74 of the 2021–22 Regular Session, the California State Assembly declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians.

60. AB 2098 references this press release as a basis and a rationale for need for the law. (*See* AB 2098, Section 1 (f). *Assembly 2098* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098.

61. The totality of the information in Sanjay Verma MD's declaration contains proof of the contradictory public health edicts put out by governmental entities. His declaration also presents factually accurate information about how different countries have employed different health measures in dealing with the pandemic (like not recommending vaccines for certain population subsets). His declaration also establishes that some of these health measures have produced better public health metrics than what has been achieved in the US.

62. This all shows that the information sought to be conveyed by the Dr. Hoang, and PIC's osteopathic physician members, and received by the PIC's and CHD-CA's members would put some patient subsets at less risk than the edicts put out by the government, which are often based on the consensus of public health assumptions, rather than an evidence-based scientific consensus.

## SECOND CLAIM FOR RELIEF

**42 U.S.C. SECTION 1983 DUE PROCESS VIOLATION BASED ON THE VAGUENESS OF AB 2098**

63. Plaintiffs repeat and reallege the allegations set forth above.

64. To comply with the Fifth Amendment Due Process clause applicable to the states under the Fourteenth Amendment, state laws have to be clear enough so that a reasonable person can determine what the law allows and prohibits. Otherwise, the law is struck down for vagueness. When a state law infringes the First Amendment right of free speech, there is a "heightened specificity" requirement for the law to be held constitutional.

65. Section 2270 violates the heightened specificity vagueness prohibition of the Due Process Clause. The inherent vagueness of new law primarily arises from the definition at section 2270(b)(4) concerning "Covid misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

66. The most critical flaw in this statutory provision is in the statutorily unanswered connection between "false information" and the other two components, "contradicted by contemporary

scientific consensus" and "contrary to the standard of care." These terms are too vague to be applied with constitutional definiteness to free speech. Moreover, is proof of the falsity of the information a separate elemental requirement, or is information deemed "false" just because it is not consistent with the "scientific consensus and the standard of care"?  Because there is no obvious statutory answer to these questions, any attempt to apply the definition to specific information is arbitrary and capricious, meaning that there are no rules or guidelines by which the Board can make its decision to investigate physicians. Any decision will be *ad hoc* and not based on any previously articulated or ascertainable standard.

67.  Plaintiffs maintain that the information Plaintiff Hoang and PIC's osteopathic physician members provide to their patients is true and evidence-based, i.e., supported by specific adequately controlled published studies. However, the conclusions or implications of these studies, in many cases, may not be consistent with the current "scientific consensus" or the standard of care (assuming arguendo that there can be a constitutionally enforceable standard of care by which the government can censor or compel physicians to adhere to a specific viewpoint on an individual and public health matter).

68.  It is unclear from the statute whether Plaintiff Hoang or any California physician can make recommendations and give advice based on published medical evidence that contradicts the scientific consensus and the so-called standard of care for Covid information (again, assuming arguendo, there can be such a thing.) If falsity is a separate requirement from what is the scientific consensus and the standard of care, physicians may give truthful advice. If, however, information which is contradicted by both is *ipso facto* false, then they cannot.

69.  Would recommending against the vaccine for patients in certain age groups because of the increased risk of myocarditis constitute Covid misinformation, even though the information provided is true? There is no way to answer that question under the statute, because the statute does not answer the basic question about whether there is such a thing as truthful information that is inconsistent with "contemporary scientific consensus" and the "standard of care." That means that any truthful information which is inconsistent with the consensus and standard of care could subject a physician to Board investigation and discipline, and there is no principled way for a physician to know the answer in

advance of a Board investigation.

70. Apart from the general vagueness between the connection between false information and the other two elements in the definition, the previously cited myocarditis studies show that the lack of definition of what constitutes false information renders the Covid misinformation definition too vague to enforce under any vagueness standard, let alone under the heightened specificity standard required in First Amendment vagueness analysis. How does it make sense to characterize informing patients about published scientific studies as false information? The scientific consensus might disagree with the method or meaning of such studies, but the concept of "false information" is simply too imprecise for physicians to predict or the Board to render a principled determination what kinds of statements can be made by physicians in conveying information to patients about Covid-19.

71. Yet another unconstitutional aspect of vagueness in Section 2270 comes from the fact that in many aspects of Covid-19 science, the scientific consensus is unclear. If an Osteopath does not recommend the current booster shot to young children, would it be Covid misinformation and sanctionable? The FDA has not fully approved the booster, but it has been given some Emergency Use Authorization ("EUA") even for the young, despite the fact that the booster was not fully tested in humans (it was given to 8 mice in Pfizer's study). The FDA did not seek the input of its vaccine advisory committee before granting the booster EUA status. This caused Paul Offit, M.D., one of the country's leading pediatric vaccine experts, to advise against it use in children. Shouldn't California osteopathic physicians be able to provide this information to parents, and based on this information, shouldn't they be able to recommend against the booster? The answer is unclear under the new law.

72. This example clearly shows the vagueness of the so called "contemporary scientific consensus." Who sets the consensus? The FDA or the advisory panel scientists, which in this case never reviewed the Covid booster data?

73. There are many other examples of where the state of the scientific consensus is unclear or changes, sometimes rapidly.  The best example of the rapid change in the scientific consensus is that it was "Covid misinformation" to question and not recommend the J&J vaccine due to concerns about life-threatening heart related side effects in some groups of males. Ultimately, the FDA limited the use of the J&J vaccine because of these side effects.

74. It is also unclear how physicians would attempt to document "compliance" with the new law, such as by tape recording patient consults to ensure patients cannot claim information was spoken without the "right" context. Section 2270 causes distrust and confusion, inherently jeopardizing critical doctor-patient relationships.

75. For the reasons set forth herein, Plaintiffs request that the Court issue declaratory relief that AB 2098 violates the Due Process vagueness prohibition, and a permanent injunction prohibiting its enforcement by the Board.

**THIRD CLAIM FOR RELIEF**

**28 U.S.C. SECTION 1367 CALIFORNIA STATE CONSTITUTIONAL CLAIM THAT PIC AND CHD-CA'S NON-PHYSICIAN MEMBERS HAVE A PRIVACY RIGHT TO OBTAIN FDA APPROVED DRUGS OFF-LABEL FOR THE TREATMENT OR PREVENTION OF COVID-19**

76. Plaintiffs repeat and reallege the allegations set forth above.

77. The California Constitution contains a right of privacy (Article 1 Section 1) that has been interpreted to grant California citizens the right to make "intimate personal decisions or conducting personal activities without observation, intrusion, or interference (autonomy privacy)." *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35.

78. Case law has held that the privacy right includes an individual's "freedom to choose to reject, or refuse to consent to, intrusions of his or her bodily integrity" including the right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the personal consequences. *In re Terrazas* (2022) 73 Cal.App.5th 960, 967.

79. Plaintiff PIC and CHD-CA's patient members have a protected privacy interest which should include their ability to access FDA approved prescription drugs for the treatment or prevention of Covid-19. Such privacy interest is protected through the physician-patient relationship as the physician issues the prescription in the physician's professional discretion. Defendants may not invade or impede such privacy interest solely on the basis that the prescription was issued off-label.

80. If Californians have the right to reject medical treatment, irrespective of "personal consequences", meaning that rejection of medical treatment will hasten the person's death, then they should have the right to obtain any treatment for a serious disease, so long as the drug is legally

available by prescription in the United States, which means that the drug has been approved for marketing for at least one labeled use by the FDA.

81. Upon information and belief, prescribing off-label drugs such as Ivermectin and HCQ is or might be considered to be contrary to the scientific consensus, insofar as the FDA has advised against the off-label use of the drug for the treatment and prevention of Covid-19. The same is the case with HCQ. This is notwithstanding the fact that there are many dozens of studies worldwide which have proven the benefit of these drugs for the treatment of Covid-19.

82. In addition, prescribing such drugs off-label for Covid-19 is likely not in accordance with the California standard of care. If so, then the speech/recommendation and the act of writing a prescription for these off-label uses could be considered a departure from the standard of care under the Board's general standard of care section, and possibly Section 2270, if the constitutionality of this new law is upheld.

83. Based on the California constitutional right of privacy, Plaintiffs seek a declaratory judgment that patients have a privacy right to obtain prescriptions for theirs off-label drugs, and that the Board cannot investigate or sanction a physician solely for writing prescriptions for the off-label use of medications for Covid-19. Plaintiffs also seek a permanent injunction against the Defendants enforcing the requested declaratory judgment.

## CONCLUSION

84. AB 2098 is a constitutionally troubling bill because it gives the government the power to limit the information patients can receive from their physicians to the government-endorsed message on important personal and public health matters. Fortunately, the U.S. Supreme Court has directly spoken to this issue and has expressed profound distrust of the government's attempt to do what AB 2098 intends to do. Of all the words written about professional speech in all the cases, this language from the most recent, most important, and most relevant Supreme Court case best sums up the distrust and skepticism which this Court should bring to its strictest scrutiny evaluation of AB 2098.

> "The dangers associated with content-based regulations of speech are also present in the context of professional speech. As with other kinds of speech, regulating the content of professionals' speech "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Turner Broadcasting*, 512 U.S., at 641, 114 S.Ct. 2445. Take medicine, for example. "Doctors

> help patients make deeply personal decisions, and their candor is crucial." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1328 (C.A.11 2017) (en banc) (W. Pryor, J. concurring). Throughout history, governments have "manipulat[ed] the content of doctor-patient discourse" to increase state power and suppress minorities:
>
>> "For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the 'health of the Volk' than to the health of individual patients. Recently, Nicolae Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of preventing the transmission of AIDS." Berg, Toward a First Amendment Theory of Doctor–Patient Discourse and the Right To Receive Unbiased Medical Advice, 74 B.U.L. Rev. 201, 201–202 (1994) (footnotes omitted).
>
>> Further, when the government polices the content of professional speech, it can fail to " 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.' " *McCullen v. Coakley*, 573 U.S. ——, —— – ——, 134 S.Ct. 2518 2529, 189 L.Ed.2d 502 (2014). Professionals might have a host of good-faith disagreements, 'both with each other and with the government, on many topics in their respective fields.'"

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374-2375 (2018).

WHEREFORE the Plaintiffs request that judgment be entered in their favor and against the Defendants as set forth in this Complaint and specifically that the Court:

**A.** Issue a declaratory judgment that AB 2098/Bus. & Prof. Code Section 2270 is unconstitutional on its face and violates Plaintiff Hoang's and PIC's osteopathic physicians' First Amendment rights of Free Speech, and PIC's and CHD-CA's patient members First Amendment rights to hear the protected speech;

**B.** Issue a preliminary and permanent injunction enjoining the Defendants from enforcing Bus. & Prof. Code Section 2270;

**C.** Issue a declaratory judgement that PIC and CHD-CA patient members have a privacy right in their prescriptions for any off-label FDA approved medication, and a permanent injunction barring the Board from investigating or prosecuting a physician solely for prescribing an FDA-approved off-label drug for Covid-19;

**D.** Costs and attorneys' fees as permitted by law; and,

E.  Such other and further relief as the Court deems just and proper.

Dated: December 1, 2022

Respectfully submitted,

*[signature: Richard Jaffe]*

Richard Jaffe, Esq.
SBN 289362
428 J Street, 4th floor
Sacramento, California, 95814
Telephone: 916-492-6038
Facsimile:  713-626-9420
Email:  rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
MARY HOLLAND, ESQ.
(Subject to *pro hac vice* admission)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
mary.holland@childrenshealthdefense.org

Attorneys for Plaintiffs