RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
MARY HOLLAND, ESQ.
(Subject to *pro hac vice* admission)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
mary.holland@childrenshealthdefense.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT, a not-for-profit organization, and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER, a California Nonprofit Corporation <br><br> Plaintiffs, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California and ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California ("OMBC") <br><br> Defendants. | Case No: **2:22-cv-02147-DAD-AC** <br><br> **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW** <br><br> **Date:** January 17, 2023 <br> **Time:** 1:30 PM <br> **Courtroom:** 5, 14th floor (via Zoom) <br> **Judge:** Hon: Dale A. Drozd <br><br> Action Commenced: December 1, 2022 |

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE THAT** on January 17, 2023, at 1:30 p.m. or as soon thereafter as the matter may be heard, at the United States District Court for the Eastern District of California, in

courtroom number 4, 15th Floor (via Zoom), 501 I Street, Sacramento, California, the Plaintiffs will move for an order granting preliminary injunctive relief.

Pursuant to Federal Rules of Civil Procedure 65, Plaintiffs seek a preliminary injunction to enjoin Defendants ROB BONTA and ERIKA CALDERON from investigating, filing an accusation against, or disciplining any osteopathic physician for violating Business and Professions Code Section 2270.

This motion is based on Plaintiffs' Notice of Motion and Motion, the Declarations of Plaintiff LeTrinh Hoang, D.O., Shira Miller, M.D., Debbie Hobel, Jamie Coker-Robertson, Shannen Pousada, and Sanjay Verma, M.D., and all papers and records on file with the Court or which may be submitted prior to the time of the hearing, any oral argument and any further evidence which may be offered.

Dated: December 6, 2022

Respectfully submitted,

RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
MARY HOLLAND
(Subject to *pro hac vice* admission)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
mary.holland@childrenshealthdefense.org

Attorneys for Plaintiffs

Motion for Preliminary Injunction

# TABLE OF CONTENTS

**Page #**

TABLE OF AUTHORITIES ..................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

I.   INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

II.  STATEMENT OF MATERIAL FACTS .................................................................... 4

    A.   The Challenged Law ......................................................................................... 4

    B.   The Plaintiffs' Direct and Deep Interest in Challenging AB 2098 .................. 5

III. REQUIREMENTS FOR A PRELIMINARY INJUNCTION IN A FIRST
    AMENDMENT CASE ............................................................................................. 8

IV.  ARGUMENT ........................................................................................................... 9

    A.   Plaintiffs can Demonstrate a Likelihood of Success on the Merits or at least a
    colorable claim on the First Amendment Free Speech Claim ........................... 9

        1.   *Conant v. Walters*, 309 F.3d. 629 (9th Cir. 2002) ............................... 10

        2.   *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) ................................ 11

        3.   *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018) ........ 13

        4.   *Otto v. City of Boca Raton,* 981 F.3d 854 (11th Cir. 2020) ............................. 16

        5.   *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ............................. 17

    B.   AB 2098 fails under Strict Scrutiny or Even Intermediate Scrutiny ............................. 18

        1.   AB 2098 Fails Strict Scrutiny ............................................................... 18

        2.   AB 2098 does not even survive intermediate scrutiny ....................... 21

V.   AB 2098 FAILS THE HEIGHTENED SPECIFICITY REQUIREMENT OF THE DUE
    PROCESS CLAUSE ............................................................................................... 22

VI.  PLAINTIFFS HAVE SATISFIED THE REMAINING ELEMENTS FOR A
    PRELIMINARY INJUNCTION ........................................................................... 23

    A.   Irreparable Injury ............................................................................................ 23

    B.   Balancing the Equities and The Public Interest .............................................. 23

VII. REQUEST THAT NO BOND BE REQUIRED ...................................................... 24

LOCAL RULE 231 (D)(3) STATEMENT ........................................................................ 26

CERTIFICATE OF SERVICE ........................................................................................... 27

Motion for Preliminary Injunction

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*ACLU v. Ashcroft*,
  322 F.3d 240 (3rd Cir. 2003) ............................................................................... 9

*Am. Bev. Ass'n v. City & Cty. of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ........................................................................... 8, 9

*Ashcroft v. ACLU*
  542 U.S. 656 (2004) ............................................................................................ 8

*Bd. of Trs. of the Glazing Health & Welfare Trust v. Chambers*,
  941 F.3d 1195 (9th Cir. 2019) ........................................................................... 8

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*,
  492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ................................... 21

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520, 546, 113 S.Ct. 2217 (1993) ........................................................ 18

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) .......................................................................................... 21

*Conant v. Walters*,
  309 F.3d. 629 (9th Cir. 2002) ........................................................................... 10

*Dobbs v. Jackson Women's Health Org.*,
  142 S.Ct. 2228 (2022) ....................................................................................... 10

*Elrod v. Burns*,
  427 U.S. 347 (1976) ............................................................................................ 9

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) .......................................................................................... 19

*Flexible Lifeline Sys. Inc. v. Precision Lift, Inc.*
  654 F.3d 989 (9th Cir. 2001) .............................................................................. 8

*Gonzalez v. O Centro Espirita Beneficent Uniao
  do Vegetal*, 546 U.S. 418, 429 (2006) ................................................................. 8

*Jones v. Bonta*,
  34 F.4th 704 (9th Cir. 2022) ............................................................................. 21

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 1997) ............................................................................ 24

Motion for Preliminary Injunction

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ................................................................... 21

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S.Ct. 2361 (2018) ................................................................... 2, *passim*

*Nat'l Inst. Of Family & Life Advocates v. Harris*,
   839 F.3d 823, 832 (9th Cir. 2016) .................................................. 13, 14, 21

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................... 8

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ................................................... 16, 17, 19

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
   475 U.S. 1 (1986) ........................................................................................... 9

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014) ................................................... 3, *passim*

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
   505 U.S. 833 (1992) ........................................................... 10, 12, 14

*R.A.V. v. City of St Paul*,
   505 U.S. 377 (1992) ................................................................. 4, 18, 19

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ............................................................... 3, 14, 18

*Retail Digital Network, LLC v. Appelsmith*,
   810 F.3d 638 (9th Cir. 2016) ................................................................... 21

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) ................................................................................... 17

*S.O.C., Inc. v. County of Clark*,
   152 F.3d. 1136 (9th Cir. 1998) ................................................................... 9

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) ................................................................. 24

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552, 572, 131 S.Ct. 2653 (2011) ............................................... 21

*South Bay Pentecostal Church v. Newsom*
   141 S. Ct 716 (2021) ................................................................................. 18

*Temple Univ. v. White*,
   941 F.2d 201 (3rd Cir. 1991) ................................................................... 24

       Motion for Preliminary Injunction

*Thalheimer v. City of San Diego,*
   645 F.3d 1109 (9th Cir. 2011) ............................................................................ 8

*Tingley v. Ferguson,*
   47 F.4th 1055 (9th Cir. 2022) ............................................................... 12, 17, 18

*United States v. Alverez,*
   567 U.S. 709 (2012) ......................................................................................... 9

*United States v. Playboy Ent Grp. Inc.*
   529 U.S. 803 (2000) ...................................................................................... 20

*United States v. Steven,*
   559 U.S. 460 (2010) ......................................................................................... 9

*United States v. Swisher,*
   811 F.3d 299 (9th Cir. 2016) ........................................................................ 14

*Village of Hoffman Estates,*
   455 U.S. 489 (1982) ...................................................................................... 22

*Welch v. Brown,*
   907 F. Supp. 2d 1102 (E.D. Cal. 2012) ....................................................... 12

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) ............................................................................... 17, 18

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ........................................................................................... 8

**United States Constitution**

First Amendment ................................................................................ 1, *passim*
Fifth Amendment ........................................................................................... 1
Fourteenth Amendment ............................................................................... 10

**California Statutes**

Business & Professions Code
   § 2000 ............................................................................................................ 5
   § 2270 ............................................................................................... 1, 4, 25
   § 2270 (b)(3) .................................................................................................. 2
   § 2270 (b)(4) .................................................................................................. 2

**Legislative Sources**

Assembly Bill No. 2098 ............................................................................ 1, *passim*

Senate Bill 1172 .............................................................................................. 12

iv                         Motion for Preliminary Injunction

**Online Sources**

AB 2098 California Legislative Information, Bill Text,
    https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2
    098...................................................................................................................................... 5

Motion for Preliminary Injunction

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

This lawsuit challenges the constitutionality of AB 2098, which becomes effective January 1, 2023 as Business and Professions Code Section 2270, under the First Amendment free speech clause and as being void for vagueness under the Fifth Amendment Due Process clause. This Motion for Preliminary Injunction seeks to stop the Osteopathic Medical Board of California (the "Board") from investigating, filing charges against, or disciplining osteopathic physicians under Section 2270 pending the final judgment of this Court.

AB 2098 prohibits physicians from conveying information and advice to their patients about COVID-19, which the State of California believes to be inconsistent with the prevailing opinions of the U.S. public health authorities and the majority of the medical community. However, if the pandemic has taught the world anything, it teaches that the views and edicts of the U.S. public health and medical authorities have changed, sometimes quickly, dramatically, and often inconsistently.

This is neither surprising nor fault-worthy considering the rapidity with which the virus has evolved, and the fact that other countries have employed different public health policies, frequently with better outcomes than in the U.S. And that is said acknowledging the fact that the United States is by far the leader in Covid vaccine and treatment development.

The AB 2098-created "contemporary scientific consensus" is surely a moving target, but is often quite blurry, and sometimes even completely false –but only in hindsight. This is explained in the detailed declaration of Sanjay Verma, M.D., which presents a meticulously sourced chronology of the changing, contradictory and often wishful-thinking basis of the U.S. public health authorities' response to the pandemic.[1]

---

[1] The most obvious example of the false (and dangerous) "scientific consensus" was the purported safety of the J&J vaccine, after what critics viewed as the inadequacy of testing. Initial reports of an association between the vaccine and serious clotting adverse events would have been considered under AB 2098 "Covid misinformation" if these reported risks were conveyed to patients. The spread of this "Covid misinformation" which at the time was against both the "scientific consensus" and the "standard of care", caused the public health authorities to take a closer look. Eventually and after countless deaths and hospitalizations from side effects (and it is literally "countless" because there is still is no good data about how many people died from the J&J vaccine), the same public health and

1                                        Motion for Preliminary Injunction

Even though AB 2098 will only take effect on January 1st, the declarations of patients Debbie Hobel and Jamie Coker-Robertson explain how the new law has already made them question whether their osteopathic physicians will give them candid opinions and honestly answer specific questions, because to do so might put these physicians at risk for investigation and sanction by the Board.

Despite all the generalities and argument by medical organizational authority about the need to protect the public from so-called "Covid misinformation" and "disinformation," the idea that the government can limit, on pain of professional discipline, the information and opinions that patients can receive from their physicians is constitutionally appalling. The Supreme Court has expressed the highest degree of skepticism and contempt towards such government efforts, likening them to the state-mandated directives of the most repressive authoritarian and fascist regimes of the 20th century.[2]

For purposes of this motion, there are two critical definitions in the new law. First, "disseminate" (Section 2270 (b)(3)) means "the conveyance of information from a licensee to a patient under the licensee's care in the form of treatment or advice."   It is indisputable that speech by health care professionals to patients <u>is</u> constitutionally protected and subject to some form of heightened scrutiny (almost certainly strict scrutiny), unless the speech is an incidental part of some separate medical procedure (or more vaguely denominated as "professional conduct").

The second important definition in the challenged statute is "misinformation" meaning "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." *Id.* at subsection (b)(4). The legal implications of this definition are that the law is both content based (Covid specifically) and viewpoint restrictive (i.e., making sanctionable conveying information with a particular viewpoint inconsistent with what the State considers true scientific information). Content and viewpoint based First Amendment restrictions are, according to the Supreme Court, subject to strict

_____

scientific consensus authorities which recommended it, rescinded its use as a first line vaccine. *See* the Verma Declaration at page 7, para. 24. Another prominent example is the questionable and misleadingly general claim that the "unvaccinated" have an eleven times greater risk of death than the vaccinated. (Stated as a legislative fact in AB 2098 1 (b), and shown to be based on a flawed analysis of the data (explained in the Verma Decl. at page 13 para. 44 to page 15 para. 54, sourced in Appendix 6, page 34).

[2] *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361, 2374-2375 (2018) ("*NIFLA*"), the language is quoted in full in the Complaint at pages 18 and 19.

scrutiny, and that would include restrictions on professional speech. *NIFLA*, 138 S.Ct. at 2371, *citing Reed v. Town of Gilbert,* 576 U.S. 155 (2015).

Furthermore, the Supreme Court has specifically rejected the notion that physicians' communications to patients are a separate category of speech entitled to less protection than the same speech by non-professionals. *NIFLA*, 138 S.Ct. at 2371 (rejecting *Pickup v. Brown*, 740 F.3d 1208 (9th 2012) which asserted that a professional's speech to a patient was less than fully First Amendment protected and subject to some kind of intermediate scrutiny).

AB 2098 certainly fails strict scrutiny, as do almost all laws adjudged under this standard. We submit that there cannot be a compelling interest to prohibit California patients from receiving information from their physicians just because the State and professional organizations disagree, especially since such information is available to patients in almost every place else in this country. However, due to the bill's profound intrusion into the physician-patient relationship, the bill violates even the lesser heightened standard of intermediate scrutiny. There is no evidence in the legislative record that what California osteopathic physicians tell their patients (or would tell their patients) has caused any public harm, any harm to patients—or would do so. Nor does the record give any other rationale why silencing osteopathic physicians is a reasonable fit to foster the general public interest asserted, or that it would meaningfully contribute a solution to the perceived problem that the bill seeks to address. (Other reasons the law fails either level of scrutiny are set out at pages 18-21 *infra.*)

AB 2098 is also unconstitutionally vague under the heightened specificity requirement of the Due Process vagueness standard because of the inherent ambiguity of the definition of "Covid misinformation." The definition does not provide a reasonable physician with sufficient information to know whether his or her communications about Covid vaccines or other treatments are disciplinable or not. There is no clarity in the relationship between "false information" and the two subsequent terms "contemporary scientific community" and "the standard of care." When truthful and accurate information is contradicted by the "contemporary scientific consensus" and "standard of care", is the truth "Covid misinformation"?

Even if this Court found that truth can *never* be "Covid misinformation", the bill would still be unconstitutionally vague on its face because the bill makes unelected government officials the arbiters

of "truth" upon their changing whims. As indicated, experience during the pandemic has already shown "government truth" changes fast, changes with personas, and is inconsistent from one jurisdiction to the next (i.e., Florida is different than California).  AB 2098 is so vague that physicians cannot even discern whether writing truthful but cutting-edge newsletters to patients constitutes sanctionable "advice". Government officials often claim that true information is actually false unless the "right" context is given simultaneously. This absurd law allows government officials to control not only what is considered "true" but even the *context* in which such "truth" may be spoken. This overreach shocks the conscience.

Because details matter, (especially to establish standing), Plaintiff LeTrinh Hoang's Declaration (pages 2-3, and the Complaint at page 4 para. 11 to page 7, para 20, to which she attested, per her Declaration page 4 para. 17) explains some of the questions she is asked by patients and the information she wants to provide. This information is supported by the medical literature and some of it paints a more nuanced and personalized picture for her patients than if she were merely to robotically repeat the mainstream public health talking points that do not reflect a true evidence-based "scientific consensus."

Despite all the references to science and "contemporary scientific consensus", AB 2098 is a deeply unscientific law. It impermissibly interferes with physicians' free speech rights and their patients' rights to receive important information, even though the State of California and public health authorities disagree with the content and viewpoint of these communications.  If First Amendment free speech means anything, it means that "the majority preferences must be expressed in some fashion other than silencing speech based on its content."  *R.A.V. v. City of St Paul,* 505 U.S. 377, 392 (1992).

## II.    STATEMENT OF MATERIAL FACTS

### A.    The Challenged Law

On September 30, 2022, Governor Newsom signed AB 2098 into law. The newly created Business and Professions Code Section 2270 provides in relevant part:

> "(a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.
> (b) For purposes of this section, the following definitions shall apply:
> (1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

(2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
(3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.
(4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.
(5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000)."

AB 2098 California Legislative Information, Bill Text,

https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098.

The new law is based on a July 29, 2021 press release by the Federation of State Medical Boards asking that its member state boards to investigate and sanction physicians for spreading Covid misinformation.[3]

**B.    The Plaintiffs' Direct and Deep Interest in Challenging AB 2098**

The individual Plaintiff and two organizational Plaintiffs have a deep and direct connection to AB 2098, and a strong interest in challenging its constitutionality.

Plaintiff LeTrinh Hoang, D.O. has been a California licensed osteopathic physician for more than 25 years (Hoang Declaration at page 2 para. 2). She treats pediatric and adult patients. *Id*. A part of her practice is advising patients (and their families) about issues relating to Covid, and that includes providing information about the risks and benefits of the vaccine, as well as labeled and off-label treatments for Covid. The level of specificity of the information she provides depends on the particular patient and her past experience with that person. Some patients receive information about the latest studies as a complete and detailed answer to their questions about vaccines and boosters *Id*. at page 2, para. 3 to page 3, paras. 13, and the Complaint at page 4, para. 12 to page 6 para. 16)

One of the most important things many patients want to discuss with Plaintiff Hoang is the current Pfizer vaccine booster and whether they should take it. In addition to advising patients that the booster has been authorized for use in some ages by the FDA (but not fully approved), she thinks it is necessary to advise them: (1) The data supporting the use of the booster were not reviewed by the FDA's scientific vaccine advisory committee; and (2) Paul Offit M.D., a prominent committee member, does not

---

[3] *See* the Complaint at page 13, para. 58 for the text of this press release.

recommend that children take the booster. Hoang Declaration at page 2, para. 4, Complaint at page 5 para. 13.  The data supporting the booster consisted of a study of eight mice, clinical and pre-clinical data from the prior booster, clinical trial data from the original mRNA vaccine, and other facts relating thereto.  Complaint at page 5 para. 13. However, it is unclear whether speaking facts like these puts Dr. Hoang at risk for professional discipline under the new law. *Id.* at page 6, para. 17-19.  Dr. Hoang's Declaration (and the Complaint) contains other specific information she would like to provide to patients contemplating taking the vaccine or the boosters, but she is similarly concerned that she may be putting her license at risk (Declaration at pages 3-4 and Complaint at page 5, para. 14 to page 5 para. 16.)[4]

Plaintiff Physicians for Informed Consent ("PIC") is a California-based nonprofit group consisting of physicians, other health care practitioners and laymen whose mission includes advocating for physicians' rights to provide true and evidence-based information to patients concerning the risks and benefits of vaccines. Complaint at page 7 para. 21 A core PIC function is collecting and analyzing the evolving *worldwide* scientific literature on vaccine safety and efficacy and providing this information to its members and the public at large. *Id.* at para. 22.   The scientific evidence presented by PIC is sometimes at odds with, what is at any given time, the view of U.S. health authorities and what may be assumed to be the U.S. scientific consensus, but all information PIC's physicians currently provide is based on the best available worldwide evidence. *Id.* at para. 23. Frequently PIC's written summaries have foreshadowed changes subsequently made to the "scientific consensus." *Id.*

Many of PIC's osteopathic physician members are faced with choosing between what they reason is providing accurate and complete information about the risks of the vaccine and the different Covid treatments, which will put them in possible violation of the new law, or keeping silent. Moreover, due to the Board's broad power to investigate physicians, many of its members are afraid to speak in public or even to publicly support this case for fear of triggering a Covid misinformation investigation and prosecution. *Id.* at page 8 paras. 25-26.

PIC has associational standing to represent its osteopathic physicians and its lay members because (1) both sets of PIC's members would have the right to assert these claims, (2) their rights are

---

[4] Dr. Hoang attests to these facts in her Declaration. (Page 3, para. 17).

germane to PIC's educational purpose, and neither the claims nor the relief require the participation of PIC's members individually Complaint at page 8 paras. 27-30.

Plaintiff Children's Health Defense, California Chapter ("CHD-CA") California Chapter is a 501(c)(3) non-profit corporation whose mission is to end childhood health epidemics by working aggressively to eliminate harmful exposures, hold those responsible accountable, and to establish safeguards to prevent future harm. Complaint at page 9 para. 31.

In the vaccine space, CHD-CA educates and advocates concerning the negative risk-benefit profile of the Covid vaccines for California children and is deeply involved in educating about Covid vaccine and treatment issues. CHD-CA's members include thousands of California parents of children who want to receive objective, non-coerced information from California physicians about the risk profile of the Covid vaccines, as well as off-label Covid treatments versus standard-of-care treatments if their children contract Covid. *Id.* at para. 32-33.

Under AB 2098, however, physicians who provide information that is not within the "scientific consensus" and designated "standard of care" risk board prosecution and discipline. AB 2098 will have a chilling effect on physicians as they will have to decide between providing accurate but non-conforming information to parents at the risk of professional investigation and discipline or just reciting by rote their educated guess at so-called scientific consensus that day. This creates a risk of self-censorship, which will significantly impair the ability of CHD-CA's parent members to receive such nonconforming opinions from their osteopathic physicians. An actual and justiciable controversy exists between Plaintiffs and Defendants. *Id.* at page 9-10, para 34-39.

Plaintiff CHD-CA sues in its own capacity and on behalf of its constituent members who have been adversely affected by Defendants' actions. AB 2098 affects children whose parents will be unable to receive accurate information from their doctors. *Id.* CHD-CA has the requisite associational standing. *Id.* at page 10, para. 38.

## III.  REQUIREMENTS FOR A PRELIMINARY INJUNCTION IN A FIRST AMENDMENT CASE

The standard four-part test for a plaintiff to obtain a preliminary injunction is: 1. Likelihood of success on the merits; 2. Irreparable injury in the absence of relief; 3. The balance of equities tips in plaintiff's favor; and, 4. Showing the public interest favors granting the injunction. *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008); *Flexible Lifeline Sys. Inc. v. Precision Lift, Inc.* 654 F.3d 989, 994 (9th Cir. 2001).[5]

However, in a First Amendment free speech preliminary injunction motion, there are three significant modifications to the general test which greatly relax the general preliminary injunction standards because of the jurisprudential policy of protecting First Amendment rights as quickly as possible.

First, the plaintiff only needs to prove a colorable First Amendment violation or threatened violation. *Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) *overruled on other grounds by Bd. of Trs. of the Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019).

Second, if the speech is found to be protected, meaning some form of heightened scrutiny is applicable (either strict or intermediate scrutiny), the burden is on the defendant to show that the challenged statute satisfies that level of scrutiny, which would include proof that less restrictive alternatives were considered and found to be less effective than the statutory solution, *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004), and that is because "the burdens at the preliminary injunction stage track the burdens at trial." *Id.*; *see also Gonzalez v. O Centro Espirita Beneficent Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

Third, in a preliminary injunction seeking to temporarily stop the enforcement of a likely or colorable claim of unconstitutionality, the three latter preliminary injunction elements are either

---

[5] When the State is the defendant, the last two factors merge (balance of equities and public interest merge as the government's interest is the public interest. *Nken v. Holder*, 556 U.S. 418, 435, (2009). *See also Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019), ("[T]he fact that [Plaintiffs] have raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiffs'] favor," and "we have consistently recognized the significant public interest in upholding First Amendment principles." (internal quotation marks and citations omitted)).

Motion for Preliminary Injunction

presumed or carry less importance.  Thus, for irreparable injury, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also S.O.C., Inc. v. County of Clark*, 152 F.3d. 1136, 1148 (9th Cir. 1998) (establishing "probable success on the merits" of a First Amendment claim itself demonstrates irreparable harm).

Third, focusing on balancing the interests, the Supreme Court has expressed reluctance to balance the equities when the government is attempting to suppress content-based speech. *See United States v. Alvarez,* 567 U.S. 709, 717 (2012) ("In light of the substantial and expansive threats to free expression posed by content-based restrictions, this court has rejected as 'startling and dangerous' a 'free floating test for First Amendment coverage … [based on] an *ad hoc* balancing of relative social costs and benefits.'") quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010). *See also*, *Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). Shifting the focus to the public's interest, there is no public "interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3rd Cir. 2003). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8 (1986).

## IV.    ARGUMENT

### A.    Plaintiffs can Demonstrate a Likelihood of Success on the Merits of the First Amendment Free Speech Claim

A reasonable methodology to demonstrate likelihood of success (or lack thereof) on a First Amendment free speech claim is to utilize a decision tree consisting of three questions: 1. Is the speech targeted by the law protected or unprotected? (If unprotected, then the court uses the rational relationship test, which means the law or regulation is (almost always) upheld). 2. If the speech is protected, what level of heightened scrutiny applies? (Either strict or intermediate scrutiny). 3. Can the government meet its burden of proof that the statute satisfies the applicable level of scrutiny? If so, the statute is constitutional and there is no colorable claim, meaning no likelihood of success. If the government cannot meet its burden, the claim is colorable and there is a likelihood of success on the merits. Under the modification to the *Winter* test, the preliminary injunction should be granted.

In short: 1. Heightened scrutiny applies because AB 2098 unquestionably targets information conveyed to patients with a specific content and viewpoint; 2. Based on Supreme Court precedent (and a Ninth Circuit decision directly on point) the strictest of strict scrutiny applies; and, 3. AB 2098 fails under both strict and intermediate scrutiny.

By contrast, here is what is *not* the law: The Ninth Circuit (and other Circuits) had floated the notion that professional speech is less protected because it involves professionals, even if the speech is content and viewpoint based, and despite the fact that the Supreme Court had previously held that content and viewpoint-based restrictions to free speech are adjudged under strict scrutiny. (*See* discussion of *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), starting on page 11, i*nfra*.) The Ninth Circuit's position was in no small part based on the Supreme Court allowing states to regulate information to be given to pregnant women seeking abortion as part of informed consent in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 884 (1992) ("*Casey*").

Current law is the Supreme Court precedent *NIFLA*. The Ninth Circuit's professional speech doctrine was cited and rejected by the Supreme Court in *NIFLA*, 138 S.Ct. 2361. S*ee* pages 13-16 *infra.* And in yet another death-blow to *Pickup, Casey* (the key Supreme Court authority supporting *Pickup*'s professional speech doctrine) was recently overturned by *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022) ("*Dobbs*").[6]

The following discussion of the relevant case law shows that almost certainly, strict scrutiny applies to AB 2098 and that any argument to the contrary by Defendants would have to be based on a legal argument not already presented in *Pickup* or in the Ninth Circuit's decision that was reversed by the Supreme Court in *NIFLA*.  Defendants' task is all the harder in light of *Dobbs'* overturning *Casey*.

### 1.    *Conant v. Walters*, 309 F.3d. 629 (9th Cir. 2002)

*Conant* is the most on-point authority and strongly supports strict scrutiny for AB 2098. It also directly supports Plaintiffs' standing to bring this pre-enforcement case.

*Conant* involved a challenge brought by physicians, a physician group and a patient group to the Drug Enforcement Agency's (DEA) announced policy that it would investigate and deregister physicians

---

[6] "And they [*Roe v. Wade* and *Planned Parenthood v. Casey*] have distorted First Amendment doctrines." *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. at 2276.

(i.e., revoke their DEA registration to write controlled substance prescriptions) for "recommending" medical marijuana to patients.[7]  This, despite the fact that California had passed a referendum allowing physicians to recommend (but not prescribe) the drug.  However, under federal law, *and under the then national "contemporary scientific consensus,"* the drug had no legitimate medical use. This is reflected in the fact that marijuana was a Schedule 1 drug, which by definition means the drug has no national, scientifically recognized medical use.

The Plaintiffs argued that physicians had a First Amendment free speech right to make the recommendation. The district court applied strict scrutiny and granted a preliminary injunction. After trial, another district court judge issued a permanent injunction which was affirmed on appeal by the Ninth Circuit.

*Conant* distinguished the fully protected speech of a physician's "recommendation" of the drug from writing a prescription, which all parties conceded would not be protected by the First Amendment because it was professional conduct (and a violation of federal law).

*Conant* strongly supports the Plaintiffs' position in this case, as it is based on the difference between the fully protected speech of making a recommendation (or giving the physician's opinion) from potentially regulatable professional conduct (rational relationship test) of issuing prescriptions. Plaintiffs' First Amendment challenge to AB 2098 involves the former and not the latter.[8]

### 2. *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)

As indicated, the professional speech doctrine articulated in *Pickup* is no longer good law. However, a detailed discussion of *Pickup* is instructive and indeed necessary for two reasons. First, and to reiterate, *Pickup*'s First Amendment analysis and doctrine were specifically cited, discussed and rejected by the Supreme Court in *NIFLA*.  Therefore, this Court and should reject Defendants' arguments here that were made in *Pickup* to support the continuum-based First Amendment doctrine.

---

[7] Because of the similarities in the make-up of the plaintiffs in *Conant* to this case, *i.e.,* physicians, affected by the law or policy, a doctors' group and a patients' group, and because it was a pre-enforcement case, *Conant* strongly supports Plaintiffs' standing.

[8] As set out in the Complaint, page 3 end of footnote 1 and in Dr. Hoang's Declaration, page 4 para. 16, there is no such thing as Covid treatment consisting solely of speech.

Second, despite being abrogated by the Supreme Court, and its *Casey* underpinning being overruled by *Dobbs*, the Ninth Circuit has recently (and perhaps inexplicably) revived *Pickup* (or at least *Pickup*'s holding) in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (discussed on page 17-18 *infra*.).

*Pickup* involved two groups of mental health professionals who filed separate lawsuits challenging the constitutionality of SB 1172, which made it a board disciplinable offense to provide sexual orientation change therapy to minors. One district court used strict scrutiny and issued a preliminary injunction against the law (*Welch v. Brown*, 907 F. Supp. 2d 1102 (E.D. Cal. 2012), (decision by Shubb, J.). The other district court denied the preliminary injunction applying a rational relationship standard because the law targeted therapy which is professional conduct, not speech, (i.e., facts and opinions about the therapy) and thus does not call for heightened scrutiny.

On the combined appeal, the Ninth Circuit affirmed *Pickup's* denial of the preliminary injunction and reversed this the *Welch* court's granting of a preliminary injunction. The *Pickup* panel acknowledged its earlier decision in *Conant,* but held that more regulation is possible for "conduct necessary to administer treatment itself." *Pickup*, 740 F.3d at 1227 (and that sounds much like speech incidental to conduct).

The court also found that "a professional's speech to patients is somewhat diminished." *Id*. at 1228 *citing Casey*, 505 U.S. at 884 (which upheld a state statute requiring certain "non-controversial" information about abortions be made part of the formal informed consent process which is required prior to a patient receiving the abortion medical procedure). Conceptually, the *Pickup* panel viewed professional speech as on a "continuum". Fully protected speech would encompass a physician's "soapbox" speech to the public. At the other end would be professional speech which performs, in effect, double duty as professional conduct (like the sexual orientation conversion therapy at issue in that case). In the middle was professional speech directed to a patient. That middle of the continuum received lesser protection than soapbox speech, but more than professional speech which is conduct, (presumably intermediate scrutiny).

The *Pickup* panel specifically stated that since the statute

"regulates only treatment while leaving mental health practitioners free to discuss and recommend, or recommend against, SOCE we conclude that any effect it may have on free speech interests is incidental. Therefore, we hold that SB 1172 is subject to only

rational basis review and must be upheld if it bears a rational relationship to a legitimate government interest."

*Id.* at 1231 (*citing Casey v. Planned Parenthood* above).

To further explain its continuum professional speech approach, the *Pickup* court gave other examples of less or unprotected professional speech, like the fact that physicians can be held civilly liable for giving negligent advice or sanctioning professional conduct if there is speech associated with and inseparable from the negligent conduct, or even giving bad advice about quack medicine. *Id.* at 1228. These examples were meant to demonstrate the State's long history of restricting professional speech, presumably to justify its ability to regulate protected speech in support of the Ninth Circuit's view that professional speech directed towards patients is not fully protected.

However, as stated above and demonstrated below, *Pickup* (or at least its professional speech analysis and continuum framework) is no longer good law in light of *NIFLA* and *Dobbs.*

### 3.    *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361 (2018)

*NIFLA* is the leading and most recent Supreme Court precedent on professional speech. Its close review shows where the *Pickup* and *NIFLA* panels went wrong and how this Court can avoid those errors by applying strict scrutiny to AB 2098.

The issue in the case was the constitutionality of a California statute that required pro-life pregnancy clinics to post notices to patients containing information about how the patients could get publicly funded (i.e., free) women's health care, including abortions.

The plaintiffs were several affiliated pro-life pregnancy care clinics, the purpose and function of which was to talk pregnant women out of having an abortion and to provide pregnancy care.  Obviously, the last thing these clinics wanted to do was to be forced by the State to provide their patients with government-authored information about pregnant women's right and ability to obtain free abortions. The clinics sued to strike the law down under the First Amendment and argued that strict scrutiny applied.

The California district court refused to apply strict scrutiny and held, *inter alia*, that state mandated content notices were either professional conduct subject to the rational relationship test or professional speech subject to intermediate scrutiny, and that the law survived under both. As a result, the district court denied the requested preliminary injunction. (As set out in *Nat'l Inst. Of Family & Life*

*Advocates v. Harris,* 839 F.3d 823, 832 (9ᵗʰ Cir. 2016) *rev. Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361.)

The Ninth Circuit affirmed. It found that the mandated notices were content based but refused to follow the Supreme Court's recently decided *Reed v. Town of Gilbert,* 576 U.S. at 163, wherein the Supreme Court held that content based First Amendment restrictions are presumptively unconstitutional and are adjudged under strict scrutiny.

The Ninth Circuit gave two reasons for not following *Reed's* mandate for strict scrutiny. First, it noted that it had already held that content-based restrictions do not always require strict scrutiny. *Nat'l Inst. Of Family & Life Advocates v. Harris,* 839 F.3d at 836-837, *citing United States v. Swisher*, 811 F.3d 299, 311-313 (9ᵗʰ Cir. 2016) (*en banc*). Second, it noted that the Supreme Court had recognized the right of states to regulate the content of physicians' speech on abortion issues in *Casey,* 505 U.S. at 884.

The *NIFLA* Circuit panel also extensively discussed *Pickup,* and consistent with that decision, held that the mandatory information about abortion in the challenged law was subject to intermediate scrutiny because it was physician speech directed to patients and thus fell in the middle of the *Pickup* "continuum." *NIFLA,* 839 F.3d at 838-841. The court then held that the law survived *intermediate scrutiny* (*Id.* at 841-844), and accordingly, it affirmed the district court's denial of the preliminary injunction.[2]

The Ninth Circuit's *NIFLA* opinion would require that AB 2098 be subjected to intermediate scrutiny, but for the fact that the Supreme Court reversed and very specifically criticized *Pickup's* First Amendment analysis as well as other parts of the Ninth Circuit's reasoning in its *NIFLA* opinion.

For example, as indicated a few paragraphs above, the Ninth Circuit decided that it did not have to apply *Reed v. Town of Gilbert*'s presumptively unconstitutional strict scrutiny test to the California statute even though it was content based.  How did the Supreme Court start its First Amendment analysis of the California statute? By citing *Reed v. Town of Gilbert,* and quoting the very language that the Ninth Circuit said it did not have to follow. *See NIFLA*, 138 S.Ct. at 2371.

---

[2] The case actually involved two kinds of pregnancy clinics which were analyzed differently, but that is not material to this analysis.

Motion for Preliminary Injunction

This is a direct rejection of the Ninth Circuit's position that strict scrutiny does not apply to content-based First Amendment restrictions in professional speech to patients. The Supreme Court has thus shown that lower courts are not free to disregard *Reed v. Town of Gilbert*.

The Supreme Court stated that the reason strict scrutiny was not applied by the lower California courts was because "Some Courts of Appeals have recognized 'professional speech' that is subject to different rules." *Id. citing, inter alia, Pickup v. Brown*, 740 F.3d at 1227-1229. But as the Supreme Court declared "this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals. …  This Court's precedents do not permit governments to impose content-based restrictions without 'persuasive evidence. … of a long (if heretofore unrecognized) tradition' to that effect.'" (Citation omitted). *NIFLA,* 138 S.Ct. at 2371-2372.

But while the Supreme Court did *not* recognize professional speech as a separate "category," it did acknowledge that speech uttered by professionals is less protected "in two circumstances—neither of which turned on the fact that professionals were speaking," *Id*. at 2372, those being commercial speech (i.e., advertising, which is accorded much less First Amendment protection, whether or not the advertiser is a professional) and the regulation of "professional conduct, even though that conduct incidentally involves speech." *citing Casey v. Planned Parenthood,  Id.* at 2372.

The Supreme Court then discussed *Casey*, viewing abortion like any other medical procedure performed on a patient that requires informed consent. *Id*. at 2373. The operative point being that if there is a separate and distinct medical procedure, the speech providing the required informed consent for that procedure is incidental to the procedure, is not fully protected, and not subject to strict scrutiny. The converse also seems the likely implication of the Supreme Court's reading of *Casey*, namely, that if the speech is not incidental to a separate and distinct medical procedure, then it is fully protected, i.e., strict scrutiny applies.

At the end of the day, however, the *NIFLA* Supreme Court did not specifically hold that strict scrutiny applied to compelled speech because it found that the statute failed even intermediate scrutiny. And in fairness, the Court did not completely foreclose the possibility that there might be some persuasive reason to treat professional speech as a unique category exempt from ordinary First Amendment principles. *NIFLA*, 138 S.Ct. at 2375. However, having reviewed the Ninth Circuit's

opinion in *NIFLA,* and having considered (and rejected) *Pickup's* rationale for treating physician speech to patients differently from general content and viewpoint strict scrutiny, the Supreme Court remained unconvinced. (And as per page 13 above, *Pickup* referenced other examples where the California courts gave speech by professionals less protection, such as negligent advice and still, the Supreme Court was unconvinced by *Pickup's* continuum professional speech framework analysis, and rejected *Pickup's* call for less scrutiny.)

The takeaway from *NIFLA* is that for anything less than the *Reed* required strict scrutiny to apply to this case, the Defendants would have to make some argument about why professional speech to a patient should be treated as a separate, less protected category that has not already been made (and rejected) in *Pickup* or the Ninth Circuit's NIFLA decision.[10]   And again, there is the not-so-small jurisprudential fact that *Pickup's* underpinning from *Casey* was expressly overturned by *Dobbs.*[11] Based on *NIFLA*, (and *Dobbs*), strict scrutiny should be used on AB 2098.

### 4. *Otto v. City of Boca Raton,* 981 F.3d 854 (11th Cir. 2020)

This Eleventh Circuit case is highly instructive on numerous specific issues in this motion, and also because it is the clearest application of *NIFLA* to date. *Otto* involved the same sexual conversion therapy as in *Pickup* (and in *Tingley* discussed below).

After allowing limited discovery and an extensive hearing with witnesses, the district court applied intermediate scrutiny and denied the motion for a preliminary injunction in a long but muddled opinion. The Eleventh Circuit held that strict scrutiny applied, reversed, and ordered the district court to grant the preliminary injunction.

The Eleventh Circuit rejected the city's attempt to evade the presumption against content-based restrictions by claiming that the speech was conduct. It was skeptical and dismissive of the government's attempt to "relabel" speech as conduct.   *Otto,* 981 F.3d at 861. This is consistent with *NIFLA's*

---

[10] And to reiterate once again, that would include *Pickup's* rationale for lesser heightened First Amendment protection because physicians can be held liable and sanctioned for negligent advice. *See Pickup v. Brown.* 740 F.2d at 1228. That ship has sailed and should be resting silently on the bottom of the deep blue sea.

[11] *See* footnote 6 on page 10 *supra*.

reassertion of *Reed v. Town of Gilbert* after the Ninth Circuit's refusal to apply the presumption of unconstitutionality and strict scrutiny in its overturned *NIFLA* opinion.

The *Otto* panel also found the ordinance was viewpoint based which is "an egregious form of content discrimination." *Id.* at 864, *citing Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995), and noted that there is an argument to be made that the Supreme Court implied that viewpoint regulation is a *per se* violation of the First Amendment.

Arguably, the most important part of *Otto* for this case is its discussion of the parameters of fully regulatable (i.e., rational relationship test) incidental speech to professional conduct. As suggested above, *NIFLA* more or less found that incidental speech had to be a required part of some separate medical procedure. However, the *Otto* panel made this point crystal clear by stating that the challenged ordinances are "direct, not incidental regulations of speech. Moreover, they are not connected to any regulation of *separately identifiable conduct*." *Otto,* 981 F.3d at 865. (Emphasis added).  Because the talk conversion therapy was not part of separately identifiable conduct, the Eleventh Circuit used the strictest of strict scrutiny ("least-restrictive means of furthering a compelling government interest"), *Id.* at 875*, citing, inter alia, Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).

If therapy consisting solely of speech is adjudged under the strictest scrutiny, *a fortiori,* the purely informational (viewpoint discriminatory) speech here should be subjected to the strictest scrutiny.[12]

### 5.   *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022)

*Tingley* involved the same First Amendment challenge to a Washington sexual orientation conversion therapy prohibition for minors that was rejected by the Ninth Circuit in *Pickup v. Brown* for a California statute (and which was successful in *Otto*).  Most of the reported case involves the plaintiffs' standing. The law recited therein, the analogous facts, and the result strongly support Plaintiffs' standing in this case.

On the professional speech issue, the *Tingley* court very narrowly read *NIFLA* (compared to *Otto*) as abrogating "only the part of *Pickup* relating to the professional speech doctrine, and not its central holding that California's conversion therapy was a regulation of conduct that incidentally

---

[12] Other important lessons from *Otto* are discussed in page 18-20 *infra*.

burdened speech." *Id*. at 1077. The panel then held, "*Pickup* remains binding law and controls the outcome of this case." *Id*. As the court poetically said: "States do not lose the power to regulate the safety of medical treatment performed under the authority of a state license merely because those treatments are implemented through speech rather than through a scalpel." *Id*. at 1064.

While *Tingley's* overly narrow reading of *NIFLA* might be questionable, as well as its resulting reaffirmation of the twice death-by-the-Supreme Court *Pickup* conceptual edifice, at least the Ninth Circuit acknowledged that *Pickup's* professional speech doctrine had been abrogated by the Supreme Court in *NIFLA*. That abrogation includes the Ninth Circuit's misguided idea in its *NIFLA* opinion that lower courts can choose to ignore *Reed v. Town of Gilbert's* (and *R.A.V. v. City of St. Paul's*) requirement that content-based restrictions are presumptively unconstitutional and require strict scrutiny.

Based on the above case analysis, AB 2098's restriction of physicians conveying information and opinions to patients is presumptively unconstitutional and subject to the *strictest* of strict scrutiny.

## B.    AB 2098 fails under Strict Scrutiny or Even Intermediate Scrutiny

### 1.    AB 2098 Fails Strict Scrutiny

Since this case involves a fundamental right, strict scrutiny means that the Defendants must *prove* a compelling state interest, and they also must *prove* that the means chosen were narrowly tailored such that the least restrictive means possible were used.  *South Bay Pentecostal Church v. Newsom,* 141 S. Ct 716, 718-719 (2021)[13]; *Williams-Yulee v. Fla. Bar*, 575 U.S. at 444.

Defendants will maintain the Legislature has a strong and compelling state interest to protect the public from COVID-19. However, the state's legitimate authority to protect does not include the "free-

---

[13] "In cases implicating this form of 'strict scrutiny,' courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course, we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217 (1993). Even in times of crisis—perhaps especially in times of crisis—we have a duty to hold governments to the Constitution." *South Bay Pentecostal,* 141 S.Ct. at 718.

floating power to restrict the ideas to which children [people of all ages in our case] may be exposed." *Otto,* 981 F.3d at 869 (while protecting children is a crucial government interest "speech cannot be suppressed solely to protect the young from ideas . . . that a legislative body thinks unsuitable for them"), *quoting Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212-214 (1975). *Otto* thus suggests the government's assertion of a *generalized* compelling interest does not justify shielding patients from ideas with which the legislature (and even experts) do not agree.

*Otto* is also highly instructive on the quality of the expert evidence necessary to sustain a restriction to professional free speech under any heightened scrutiny standard. In reviewing the city's evidence to justify the banning of sexual orientation conversion therapy, the panel found that it consisted of "assertions rather than evidence." *Otto, supra,* 981 F.3d at 868 (11th Cir. 2020).

More specifically, the city argued, and the district court accepted, that it would be "futile" for the city to have to produce actual evidence of harm from the talk therapy "when so many professional organizations have declared their opposition to SOCE [the talk therapy]." Or, as the *Otto* panel characterized the argument, "In other words, evidence is not necessary when the relevant professional organizations are united." *Id.* at 869.

> "But that is, really, just another way of arguing that majority preference can justify a speech restriction. The 'point of the First Amendment' however, 'is that majority preference must be expressed in some fashion other than silencing speech on the basis of its content. *R.A.V. v. City of St. Paul,* 505 U.S. at 392 (1992). Strict scrutiny cannot be satisfied by professional societies' opposition to speech. Although we have no reason to doubt that these groups are composed of educated men and women acting in good faith, their institutional positions cannot define the boundaries of constitutional rights. They may hit the right mark – but they may also miss it. Sometimes by a wide margin, too. It is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes.…"

*Id.*[14]

This language from *Otto* is on point and hits the bullseye for several reasons. As alleged in the complaint, there is no actual evidence in the Legislative record that what California osteopaths tell their patients has caused any harm to them or that they are negatively affecting public health because of viral

---

[14] The Declaration of Sanjay Verma, M.D. contains 18 pages of discussion showing the about-facing by the public health authorities, and another 20 single-spaced pages of the sources proving same.

infections, transmissions, hospitalizations or deaths. Complaint page 12 para. 54-57. (The same might be said about medical doctors).

As evidenced by the findings, the object of the bill as originally filed was the public dissemination of Covid "misinformation" by doctors, not what they tell their patients in response to specific questions and the advice they give patients. Therefore, there was no consideration given to what questions patients have, or what information physicians think needs to be given. The Complaint sets out some detailed true and accurate information which Plaintiff Dr. Hoang and PIC's osteopathic physicians want to convey to patients. Complaint page 4 para. 12 to page 6 para. 16, and page 7 para. 23 to page 8, para. 24.

This itself is fatal to AB 2098, because strict scrutiny requires evidence that the other alternatives would not have been effective. (*See United States v. Playboy Ent Grp. Inc*. 529 U.S. 803, 817 (2000)). In this case, the Defendants would be hard-pressed to point to evidence of an alternative that the Legislature considered, because the purpose of the bill was to stop physicians from speaking out in public against the Covid narrative for fear of increasing the public's vaccine hesitancy. However, the passed version of the bill limited its application to communications between physicians and patients for treatment or advice.   In any event, where in the Legislative record is there any evidence that less restrictive measures would not have been effective—including social media advertising of the efficacy and benefit of the vaccines and boosters, advertising about the efficacy of the FDA approved drugs for COVID-19, or a public statement by the Board conveying its opinion on these issues? And, perhaps more transparency and honesty about the potential dangers of the vaccines, rather than all the efforts at vaccine-injury denialism, might also be a better solution. (*See* the declaration of nurse Shannen Pousada who details how that after she suffered a heart attack after receiving the J&J vaccine, her doctors were initially reluctant to acknowledge that it was likely caused by the vaccine for worker's compensation purposes, and how the State treated the finding like "Covid misinformation.")

Finally, the *Otto* panel's reference to experts and professional societies missing the mark is amply demonstrated by Dr. Verma's Declaration that shows how on almost every major issue related to Covid, the scientific consensus changed, was more aspirational/wishful thinking than evidence based, or was just proven to be plain wrong.

## 2. AB 2098 does not even survive intermediate scrutiny

To survive intermediate scrutiny:

"The State must show ... that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572, 131 S.Ct. 2653 (2011). Intermediate scrutiny is "demanding" but requires less than strict scrutiny. *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 648 (9th Cir. 2016). "What is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.'" *Id.* at 649 (quoting *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, (1989)); *NIFLA*, 839 F.3d 823 (9th Cir. 2016), *rev. on other grounds NIFLA,* 138 S.Ct. 2361 (2018); See *also Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022).   Furthermore, "The existence of 'numerous and obvious less-burdensome alternatives' is relevant to assessing whether the restriction on speech reasonably fits the interest asserted." *Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009), citing *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 417 n.13 (1993).

The lesser burdensome alternatives (which were not proven to be less effective than the statutory restriction to protected free speech) demonstrate that the AB 2098 "solution" was not a reasonable fit. The other facts and arguments in the strict scrutiny analysis apply with equal force here, and show that there is no evidentiary basis to satisfy the Defendants' burden of proof that the means were narrowly tailored to achieve the desired objective.

The government is literally limiting the information that patients are allowed to hear from their physicians. Such extreme government censorship of ideas is exactly what the Supreme Court and the Eleventh Circuit were appalled by in their likening the government's restrictions to free speech to what the Soviets, Communist China and Nazis did. See *NIFLA*, 138 S.Ct. at 2374-2375 (quoted in full in the Complaint at page 18-19).

In short, it does not matter what level of heightened scrutiny is used, the State of California cannot be allowed to stop patients of osteopathic physicians from receiving truthful information about any aspect of the pandemic simply by declaring the information to be false and inconsistent with what the

1   Board may deem to be the scientific consensus at any given point in time and with what the Board might

2   determine to be the standard of care months or years after the advice is given.

3   **V.    AB 2098 FAILS THE HEIGHTENED SPECIFICITY REQUIREMENT OF THE DUE**
        **PROCESS CLAUSE**
4

5          It is black letter constitutional law that "perhaps the most important factor affecting the clarity

6   that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally

7   protected rights. If, for example, the law interferes with the right of free speech or of association, a more

8   stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman, Estates,* 455

9   U.S. 489, 499 (1982).

10         As set out in the Complaint, the vagueness of the new law is primarily the result of the definition

11  of "Covid misinformation" as "false information that is contradicted by contemporary scientific

12  consensus contrary to the standard of care" and the relationship between the three clauses.  Is the

13  information that Dr. Hoang wishes to provide Covid misinformation? (*See* the Complaint at pages 4-6).

14  How about truthful information about the studies that show Ivermectin to be an effective treatment for

15  Covid, together with the disclaimer that the FDA does not consider any of these studies alone or together

16  as authoritative or of the same quality as studies that show no efficacy? There are no principled answers

17  to these questions because of the inherent vagueness of the definition of "Covid misinformation."  Is

18  proof of the falsity of the information a separate elemental requirement, or is information deemed "false"

19  just because it is not consistent with the "scientific consensus and the standard of care"?

20         The complaint sets out many specific questions that are unanswerable under the law on anything

21  other than an unprincipled, ad hoc, arbitrary basis. (*See* the Complaint at pages 4-6, page 7, para. 24, and

22  the Second Claim at pages 15 para. 67 to page 17 para. 74). Because there is no obvious statutory answer

23  to these questions, any attempt to apply this vague definition would be unprincipled, arbitrary and

24  capricious, meaning that there are no rules or guidelines by which a decision by the Board can be made.

25  Any decision will be *ad hoc* and not based on any pre-existing, articulated or ascertainable standard.

26  And that means reasonable osteopathic physicians cannot know from the law what they can say and what

27  information they must withhold from their patients on penalty of Board's investigation and discipline.

28

And that makes AB 2098 unconstitutional under the heightened specificity required by Due Process case law cited above.

## VI.   PLAINTIFFS HAVE SATISFIED THE REMAINING ELEMENTS FOR A PRELIMINARY INJUNCTION

### A.   Irreparable Injury

As indicated in Section III above, irreparable injury is presumed if there is strong evidence of a First Amendment freedom of speech violation, as there is in this case. However, the Complaint and Declarations of Plaintiff Hoang and PIC President Shira Miller demonstrate that physician speech is and will be chilled by the new law in large part because of the statute's vagueness and uncertainty about how undefined terms may apply to information physicians want to convey to patients.

Further, the Declarations of Debbie Hobel, and Jamie Coker-Robertson show that even though the law is not yet in effect, it is already having an actual negative impact in the doctor-patient relationship due to the conflict between providing truthful information that may or may not be consistent with the prevailing medical consensus and withholding information to the possible detriment of the patient. Such damage to the trust between physicians and patients is irreparable and can lead to patients simply not consulting with physicians on these important matters, as shown by patients such as Ms. Hobel and Ms. Coker-Robertson who question whether their doctors will tell the truth. This is actual injury.

### B.   Balancing the Equities and The Public Interest

As indicated, when the state is the defendant, the last two *Winter* preliminary injunction factors merge. The balance of equities favors protected free speech, favoring the free marketplace of ideas, and it also favors recognition that patients have a fundamental right to receive information from their physicians even if government authorities and professional organizations do not agree with it.  The Board cannot demonstrate that investigation or even sanctioning a few or even many California osteopathic physicians would have a meaningful impact on the public health discussion of the government's pandemic response. Thus, AB 2098's investigative and sanctioning authority targeting protected speech is not only unconstitutional, it is futile.

The public has no interest in the Board acting in violation of the constitutional rights of its licensees and their patients. In an evolving pandemic, the public's interest is best served by having

medically trained people speak candidly to their patients, even if all the information they convey is not in accord with government views.

Dr. Verma's expert declaration presents numerous examples where the public health authorities had to walk back their recommendations. As wisely stated by the *Otto* panel, sometimes experts and professional associations get it wrong. That is the fundamental truth of this case and why the Court should stop the Board from targeting viewpoint speech between a doctor and a patient during an evolving pandemic.

**VII.    REQUEST THAT NO BOND BE REQUIRED**

This case seeks to protect the First Amendment rights of physicians and their patients. The Defendants will suffer no monetary harm if the temporary relief is granted. See *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 1997). Plaintiffs have a strong likelihood of success on the merits, see *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972), and the "equities of potential hardships to the parties" weigh in favor of Plaintiffs. See *Temple Univ. v. White*, 941 F.2d 201, 220 (3rd Cir. 1991). Therefore, Plaintiffs request that no bond be required.

//

//

//

//

//

//

//

//

//

//

//

For the foregoing reasons, Plaintiffs respectfully request that the Motion for Preliminary Injunction be granted and that the Osteopathic Medical Board of California be prohibited from investigating or sanctioning any osteopathic physician under Bus. & Prof. Code Section 2270 pending the final judgment in this case.

Dated: December 6, 2022

Respectfully submitted,

RICHARD JAFFE, ESQ.
SBN 289362
428 J Street, 4th floor
Sacramento, California, 95814
Telephone: 916-492-6038
Facsimile:  713-626-9420
Email:  rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
MARY HOLLAND, ESQ.
(Subject to *pro hac vice* admission)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
mary.holland@childrenshealthdefense.org

Attorneys for Plaintiffs

Motion for Preliminary Injunction

## LOCAL RULE 231 (D)(3) STATEMENT

1. Plaintiffs request an evidentiary hearing and would call Sanjay Verma, MD and the Board's Executive Officer, Defendant Erika Calderon.

2. Plaintiffs anticipate that the hearing will take two hours.


_____

Richard Jaffe, Esq.

Motion for Preliminary Injunction

**CERTIFICATE OF SERVICE**

I, Richard Jaffe affirm as follows:

1. I am an attorney at law admitted to practice in this court. I am not a party to this action and am over the age of 18. I am counsel of record for the Plaintiffs in this case. I submit this Certificate of Service under penalties of perjury.

2. This Motion and all the declarations are being served on the Defendants together with the summons, complaint and the various court documents in this matter. A proof of service from the process server will be separately filed.

_____

Richard Jaffe, Esq.

27                                    Motion for Preliminary Injunction