ROB BONTA
Attorney General of California
ANYA M. BINSACCA, State Bar No. 189613
EDWARD KIM, State Bar No. 195729
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT, State Bar No. 229094
KRISTIN A. LISKA, State Bar No. 315994
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3916
 Fax:  (415) 703-5480
 E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT, a not-for profit organization, and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER, a California Nonprofit Corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California, and ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California ("OMBC"),**<br><br>Defendants. | Case No. 2:22-cv-02147-WBS-AC<br><br><br>**OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:        January 23, 2023<br>Time:       1:30 p.m.<br>Dept:        5<br>Judge:      Honorable William B. Shubb<br>Trial Date:  Not scheduled<br>Action Filed:  12/01/2022 |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 1

    I.     Regulation of Medicine in California .................................................... 1

    II.    AB 2098 .............................................................................................. 4

    III.   Plaintiffs' Challenge to AB 2098 ........................................................ 5

Legal Standard ...................................................................................................... 6

Argument ............................................................................................................... 6

    I.     Plaintiffs Have Not Demonstrate a Likelihood of Success ................... 6

         A.    Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim ............... 7

               1.    AB 2098 Is a Permissible Regulation of Professional Conduct ........................................................................................ 7

               2.    AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals ................................................ 14

               3.    AB 2098 Withstands Strict Scrutiny ........................................... 15

                    a.    AB 2098 Furthers a Compelling Interest ......................... 16

                    b.    AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests ......................................................... 17

         B.    Plaintiffs Are Unlikely to Succeed on their Vagueness Claim ................. 19

    II.    The Remaining Factors Weigh Against Injunctive Relief .................................... 22

Conclusion ........................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

CASES

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015)................................................................................. 19

*Arnett v. Dal Cielo*
14 Cal. 4th 4 (1996) ......................................................................................... 1, 2

*Avivi v. Centro Medico Urgente Med. Ctr.*
159 Cal. App. 4th 463 (2008)............................................................................... 20

*Brown v. Colm*
11 Cal. 3d, 639, 644-47 (1974) ............................................................................ 3

*Collins v. Texas*
223 U.S. 288 (1912)......................................................................................... 14

*Conant v. Walters*
309 F.3d 629 (9th Cir. 2002)........................................................................ 10, 11, 12

*Dent v. West Virginia*
129 U.S. 114 (1889) ......................................................................................... 15

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014)................................................................................ 20

*Dobbs v. Jackson Women's Health Organization*
142 S. Ct. 2228 (2022) .................................................................................... 7, 8

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)............................................................................... 22

*Eastman v. State*
10 N.E. 97 (Ind. 1887) ...................................................................................... 14

*Ettinger v. Bd. of Med. Quality Assurance*
135 Cal. App. 3d 853 (1982)................................................................................ 21

*Flowers v. Torrance Mem. Hosp. Med. Ctr.*
8 Cal. 4th 992 (1994) ........................................................................................ 3

*Frisby v. Schultz*
487 U.S. 474 (1988).......................................................................................... 17

*Fuller v. Bd. of Med. Exam'rs*
14 Cal. App. 2d 734 (1936).................................................................................. 2

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Garcia v. Google. Inc.*
786 F.3d 733 (9th Cir. 2015).......................................................................... 6

*Goldfarb v. Virginia State Bar*
421 U.S. 773 (1975)....................................................................................... 17

*Gore v. Board of Med. Quality Assurance*
110 Cal. App. 3d 184 (1980)........................................................................... 3

*Hill v. Colorado*
530 U.S. 703 (2000)............................................................................... 8, 21, 22

*Kearl v. Bd. of Med. Quality Assurance*
189 Cal. App. 3d 1040 (1986).......................................................................... 3

*Kenneally v. Medical Bd.*
27 Cal. App. 4th 489 (1994)............................................................................ 14

*Klein v. San Clemente*
584 F.3d 1196 (9th Cir. 2009)........................................................................... 6

*Kolender v. Lawson*
461 U.S. 352 (1983)....................................................................................... 19

*Lambert v. Yellowley*
272 U.S. 581 (1926)....................................................................................... 14

*Legal Services Corp. v. Velazquez*
531 U.S. 533 (2001)................................................................................. 10, 11

*Lewis v. Superior Court*
3 Cal. 5th 561 (2017) ..................................................................................... 16

*Maryland v. King*
567 U.S. 1301 (2013)..................................................................................... 22

*Mazurek v. Armstrong*
520 U.S. 968 (1997)......................................................................................... 6

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012)........................................................................... 22

*Nat'l Institute of Family & Life Advocates v. Becerra*
138 S. Ct. 2361 (2018) ............................................................................ 7, 9, 14

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Pickup v. Brown*
740 F.3d 1208 (9th Cir. 2014) ....................................................................... *passim*

*Planned Parenthood of Southeastern Pennsylvania v. Casey*
505 U.S. 833 (1992) ........................................................................... 7, 11

*Recht v. Morrisey*
32 F.4th 398 (4th Cir. 2022) ................................................................ 16

*Reed v. Town of Gilbert*
576 U.S. 155 (2015) ........................................................................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*
141 S. Ct. 63 (2020) .......................................................................... 16

*State ex rel. Powell v. State Med. Examining Bd.*
20 N.W. 238 (Minn. 1884) ................................................................. 14

*Tingley v. Ferguson*
47 F.4th 1044 (9th Cir. 2022) .................................................... *passim*

*Trowbridge v. United States*
703 F. Supp. 2d 1129 (D. Idaho 2010) ............................................... 20

*Truman v. Thomas*
27 Cal. 3d 285 (1980) ................................................................... 15, 16

*Tunkle v. Regents of the Univ. of California*
60 Cal. 2d 92 (1963) ........................................................................... 3

*Valle del Sol, Inc. v. Whiting*
732 F.3d 1006 (9th Cir. 2013) ........................................................... 20

*Watson v. Maryland*
218 U.S. 173 (1910) ........................................................................... 17

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......................................................................... 6, 22

*Wollschlaeger v. Governor of Florida*
848 F.3d 1293 (11th Cir. 2017) ......................................................... 11

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

Ala. Code § 34-24-360 ................................................................................................. 8

2022 Cal. Stat., ch. 938 (Assembly Bill 2098) ................................................... *passim*
    § 1(a) ........................................................................................................... 4.
    § 1(b) ........................................................................................................... 4
    § 1(d) .................................................................................................... 4, 16
    § 1(e) .................................................................................................... 4, 16
    § 1(f) ........................................................................................................... 4
    § 2(a) ................................................................................................ 5, 8, 20
    § 2(b)(2) ...................................................................................................... 5.
    § 2(b)(3) ............................................................................................ 5, 9, 20
    § 2(b)(4) ............................................................................................ 5, 9, 20

1876 Cal. Stat., ch. 518
    § 1 ............................................................................................................... 1
    § 10 ............................................................................................................. 2

California Business and Professions Code
    § 741(a)(1) ................................................................................................. 8
    § 741(a)(2) ................................................................................................. 8
    § 2220(a) ................................................................................................... 2
    § 2234 ................................................................................................... 2, 3
    § 2234.1 ..................................................................................................... 8
    § 2234(b) ............................................................................................. 3, 23
    § 2234(c) ............................................................................................. 3, 23
    § 2234(d) ............................................................................................. 3, 23
    § 2234(e) ................................................................................................... 3
    § 2236 ....................................................................................................... 3
    § 2241.5(c)(5) ........................................................................................... 8
    § 2241.5(c)(6) ........................................................................................... 8
    § 2249(a) ................................................................................................... 3
    § 2250 ....................................................................................................... 3
    § 2266 ....................................................................................................... 3
    § 3600 ....................................................................................................... 2
    § 3600-2 .............................................................................................. 2, 18
    § 2737 ....................................................................................................... 7

Nev. Rev. Stat. § 630.304 ........................................................................................... 8

Or. Rev. Stat. § 677.190 .............................................................................................. 8

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

**CONSTITUTIONAL PROVISIONS**

4

United States Constitution
    First Amendment........................................................................................ *passim*

5

    Fourteenth Amendment..................................................................... 1, 6, 19, 22

6

California Constitution................................................................................ 6

7

**OTHER AUTHORITIES**

8

CACI 501 ................................................................................................ 20

9

"Andrew Taylor Still: The Father of Osteopathic Medicine,"
    https://www.atsu.edu/museum-of-osteopathic-medicine/museum-at-still............................. 2

10

11

Robert Post, "Informed Consent to Abortion: A First Amendment Analysis of
    Compelled Speech Cases," 2007 U. Ill. L. Rev. 939, 950-951 (2007) .............................. 8, 13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Motion for a Preliminary Injunction (2:22-cv-02147-WBS-AC)

**INTRODUCTION**

Assembly Bill (AB) 2098 is a limited but important statute.  The California Legislature enacted AB 2098 to address concerns about the spread of disinformation and misinformation about COVID-19 and COVID-19 vaccines by medical practitioners, which has placed lives at serious risk.  AB 2098 applies *only* to medical treatment or advice within the doctor-patient relationship.  It leaves untouched all other speech by doctors, including private conversations with family or non-patient friends, social media posts, and publications.  And it does not impact any patient advice or treatment that contradicts mainstream opinion but still falls within the range of treatments that comply with the requisite standard of care.  The statute therefore fits well within the long history of regulating the practice of medicine while still leaving room for doctors to exercise their medical judgment and for medical research and development.

Plaintiffs contend that AB 2098 violates their First Amendment rights and is unduly vague under the Fourteenth Amendment.  They seek a preliminary injunction that would prohibit the enforcement of AB 2098 against osteopathic physicians and surgeons.  But plaintiffs have not met their burden to establish their entitlement to such relief.  First and most importantly, plaintiffs have not shown a likelihood of succeeding in their suit.  AB 2098 is permissible under the First Amendment as a regulation of physician-provided care, and it is not impermissibly vague.  Nor have plaintiffs demonstrated any irreparable harm that would result from allowing AB 2098 to go into effect or that the equities and public interest favor an injunction, since AB 2098 only protects patients from receiving inaccurate medical advice and substandard care.  This Court should deny the motion.

**BACKGROUND**

**I.   REGULATION OF MEDICINE IN CALIFORNIA**

California has long regulated the practice of medicine to protect the public.  *Arnett v. Dal Cielo*, 14 Cal. 4th 4, 7 (1996).  Since at least 1876, California has regulated the practice of medicine by imposing licensing and training requirements on medical practitioners.  *See* 1876 Cal. Stats., ch. 518, p. 792, § 1.[1]  The 1876 Act also permitted licenses to be refused or revoked

---

[1] The 1876 Act is included as Exhibit A to Defendants' Motion for Judicial Notice.

for unprofessional conduct.  *Id.*, § 10.  Thus, "[s]ince the earliest days of regulation," the State has sought to "protect the public against incompetent, impaired, or negligent physicians, and, to that end," regulators have "been vested with the power to revoke medical licenses on grounds of unprofessional conduct."  *Arnett*, 14 Cal. 4th at 7.  And since the earliest days, such unprofessional conduct has encompassed, in some circumstances, a practitioner's speech to patients.  *E.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936) (upholding sanctions on physician who made false claims about his ability to treat hernias), *abrogated on other grounds by Webster v. Board of Dental Examiners*, 17 Cal. 2d 534 (1941).

More than 130 years ago, Andrew Taylor Still developed osteopathic medicine, whose unique philosophy resulted in some differences from traditional medicine.[2]  The Osteopathic Medical Board of California ("Board") regulates osteopathic physicians and surgeons in California by issuing or denying licenses, imposing discipline for unprofessional conduct, and effectuating the enforcement of laws and regulations governing osteopaths' practice.  *See* Cal. Bus. & Prof. Code § 3600 *et. seq*.  The statutory scheme governing the Board's enforcement program is the same as that which governs the Medical Board's oversight of the practice of non-osteopathic physicians and surgeons.  *See* Cal. Bus. & Prof. Code §§ 3600, 3600-2.  Thus, the Board is required to investigate all complaints of osteopaths' professional misconduct "from the public, other licensees, from health care facilities or from the board [itself]," including anonymous complaints.  *Id.* § 2220(a).  Board investigations involve the gathering of facts and consulting with a medical expert who opines on whether there has been a departure from the standard of care.  *See* Calderon Decl. ¶¶ 5-6.  The Board must maintain confidentiality during its investigations. *See id.* ¶ 7.

California law provides that the Board "shall take action against any licensee who is charged with unprofessional conduct."  Cal. Bus. & Prof. Code § 2234.[3]  Section 2234 provides

---

[2] *See* "Andrew Taylor Still: The Father of Osteopathic Medicine," https://www.atsu.edu/museum-of-osteopathic-medicine/museum-at-still (last accessed Dec. 23, 2022).

[3] Business and Practices Code § 3600-2 provides that the Board enforces these statutory sections governing non-osteopathic doctors and surgeons as to osteopathic practitioners.  Thus while these statutory codes may be framed in reference to "doctors and surgeons," they apply equally to osteopathic practitioners.

an illustrative list of examples of unprofessional conduct, including: "[t]he commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon" and incompetence.  *Id*. § 2234(d), (e).  In addition to section 2234, other sections of law provide additional specific examples of unprofessional conduct, such as failure to maintain adequate and accurate records, *id*. § 2266; failure to obtain proper informed consent prior to a sterilization procedure, *id*. § 2250; failure to provide a standardized summary describing in layperson's terms symptoms and methods of diagnoses for gynecological cancer, *id*. § 2249(a); and conviction of a crime substantially related to the practice of medicine, *id*. § 2236.

California law also considers "gross negligence," "repeated negligent acts," and "incompetence" to be unprofessional conduct.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  "Gross negligence" is defined as "the want of even scant care" or "an extreme departure from the standard of care," *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 196 (1980), while negligence is a "simple departure" from the current standard of care, Lim Decl. ¶ 4.  The "standard of care" for medical practitioners is that reasonable degree of skill, knowledge, and care in diagnosis and treatment ordinarily possessed and exercised by practitioners under similar circumstances at or about the time in question.  *See, e.g.*, *Flowers v. Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).  Typically, the standard of care is established through expert testimony.  *See id.* at 1001.  Incompetence is defined as "an absence of qualification, ability or fitness to perform a prescribed duty or function."  *Kearl v. Bd. of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) (citation omitted).

The standard of care is determined by the medical standard prevailing in the community at the time that medical treatment is rendered.  *See Brown v. Colm*, 11 Cal. 3d, 639, 644-47 (1974).  Established law has long rejected the argument that physicians can be relieved of their obligation to comply with the current standard of care because the standard is evolving.  *See Tunkle v. Regents of the Univ. of California*, 60 Cal. 2d 92, 104 (1963) (holding a patient's waiver of liability in exchange for admission to a charitable research hospital void as a matter of public policy despite hospital's claim that the standard of care in a research facility will evolve quickly).  Rather, the medical community must be trusted "to treat our ailments and update their

3

1   recommendations on the governing standard of care" as knowledge evolves.  *Tingley v. Ferguson*,

2   47 F.4th 1044, 1081 (9th Cir. 2022); *see also* Lim Decl. ¶ 3.

3   **II.   AB 2098**

4          AB 2098 was enacted against this long history of regulation and the more recent backdrop

5   of the COVID-19 pandemic.  As the Legislature found, "[t]he global spread of . . . COVID-19

6   ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000

7   Californians," at the time of AB 2098's enactment.  2022 Cal. Stat., ch. 938 ("AB 2098"), § 1(a).

8   Thankfully, COVID-19 vaccines have played a critical role in helping to stem the spread of the

9   disease and prevent its severity: the Legislature cited data from the Federal Centers for Disease

10  Control and Prevention showing that "unvaccinated individuals are at a risk of dying from

11  COVID-19 that is 11 times greater than those who are fully vaccinated."  AB 2098, § 1(b); *see*

12  *also* Defendants' Request for Judicial Notice ("RJN"), Ex. B, p. 6.  Yet, as the Legislature

13  recounted, as of July 21, 2022, a quarter of those over age five were not vaccinated.  RJN, Ex. E,

14  p. 3.  The Legislature cited research estimating that "2 million to 12 million people in the US

15  were unvaccinated against COVID-19 because of misinformation or disinformation."  RJN, Ex.

16  E, p. 3; *see also* AB 2098, § 1(d); RJN, Ex. D, p. 4.  Such misinformation includes myths, for

17  instance, that the vaccines contain microchips, would make a person magnetic, or would change

18  someone's DNA.  RJN, Ex. D, p. 4.

19         The Legislature found it particularly concerning that some of this medically inaccurate

20  information came from physicians themselves.  The legislative findings for AB 2098 note that

21  "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate

22  information regarding the COVID-19 vaccines are licensed health care professionals."  AB 2098,

23  § 1(e); *see also* RJN, Ex. D, pp. 4-5; Ex. B, p. 7.  This behavior, the Legislature noted, would run

24  contrary to a doctor's "duty to provide their patients with accurate, science-based information."

25  AB 2098, § 1(f).  In addition, as the Legislature explained, "[p]hysicians and healthcare

26  professionals play a critical role in keeping communities healthy," and "[a] physician's

27  recommendation and information sharing will educate and inform decisions made by their

28

patients." RJN, Ex. D, p. 5.  For this reason, whether a doctor provides accurate information "will ultimately impact patient's health."  *Id.*

As the Legislature noted, doctors already face sanctions for repeated instances of negligence or for even a single instance of gross negligence.  *E.g.*, RJN, Ex. D, p. 6.  Some instances of spreading misinformation about COVID-19 would already arguably fall within these existing provisions, the Legislature explained.  RJN, Ex. B, p. 8.  The Legislature enacted AB 2098, however, to "confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation" to their patients would be subject to formal discipline.  *Id.*

AB 2098 provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  AB 2098, § 2(a) (to be codified at Cal. Bus. & Prof. Code § 2270).  It defines "disseminate" as the "conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  AB 2098, § 2(b)(3).  "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  *Id.*, § 2(b)(4).  And "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."  *Id.*, § 2(b)(2).

### III.   PLAINTIFFS' CHALLENGE TO AB 2098

Plaintiff Letrinh Hoang is a pediatric osteopathic physician currently licensed by the Board who practices in Los Angeles County.  Compl. ¶ 11.  Plaintiff Physicians for Informed Consent is a nonprofit group whose stated mission is "to advocate for the right of physicians to provide true and evidence-based information to patients concerning the risks and benefits of vaccines."  *Id.* ¶ 21.  Plaintiff Children's Health Defense is a nonprofit whose stated missions are "to end childhood health epidemics" and "advocat[e] for medical freedom, bodily autonomy, and an individual's right to receive the best information available based on a physician's judgment."  *Id.* ¶ 31.

1    On December 1, 2022, plaintiffs brought suit challenging AB 2098.  They sued Attorney

2    General Rob Bonta and Head of the Osteopathic Medical Board Erika Calderon in their official

3    capacities.  *Id.* ¶¶ 41-44.  Plaintiffs allege that AB 2098 violates their First Amendment rights, *id.*

4    ¶¶ 46-62, and is unconstitutionally vague under the Fourteenth Amendment, *id.* ¶¶ 63-75.  They

5    also contend that AB 2098 violates their free speech rights under the California Constitution.  *Id.*

6    ¶¶ 76-83.  On December 6, 2022, plaintiffs filed the instant motion seeking a preliminary

7    injunction.

8                              **LEGAL STANDARD**

9        "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v.*

10   *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The party seeking a preliminary

11   injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to

12   suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor;

13   and (4) an injunction is in the public interest.  *Id.* at 20.  If a movant fails to establish a likelihood

14   of success, the court generally need not consider the other factors.  *Garcia v. Google. Inc.*, 786

15   F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs, as the movants here, bear the burden to prove

16   each element.  *Klein v. San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  They must do so by a

17   "clear showing."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed

18   that a preliminary injunction is an extraordinary and drastic remedy, one that should not be

19   granted unless the movant, by a clear showing, carries the burden of persuasion." (citation and

20   emphasis omitted)).

21                                **ARGUMENT**

22   **I.    PLAINTIFFS HAVE NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS**

23       First and foremost, plaintiffs' motion should be denied because they have failed to establish

24   a likelihood of success on their First Amendment or Fourteenth Amendment claims.[4]

25

26

27   _____

     [4] While plaintiffs also raise a claim under the California Constitution in their complaint,
28   *see* Compl., ¶¶ 76-83, they do not seek injunctive relief on the basis of that claim, *see* Pl. Mot. for
     Prelim. Inj. at 1 (arguing AB 2098 violates the First Amendment and is void for vagueness).

                                            6

### A.   Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim

Plaintiffs contend that AB 2098 is unconstitutional under the First Amendment because it "targets information conveyed to patients with a specific content and viewpoint."  Plaintiffs' Mot. for a Prelim. Inj. ("PI Mot.") at 10.  This means the statute faces strict scrutiny, they argue, a standard it allegedly fails.  *Id.*  But plaintiffs err in their argument that strict scrutiny applies.  As plaintiffs recognize, states may permissibly regulate speech that is incident to professional conduct.  PI Mot. at 15.  AB 2098 does precisely that and therefore is subject only to rational basis review (a standard it easily meets).  Alternatively, AB 2098 is not subject to strict scrutiny because it is part of the long-standing tradition of regulating the practice of medicine and care provided by medical practitioners.  Finally, even if strict scrutiny applies, AB 2098 meets that standard.  Plaintiffs have therefore failed to demonstrate a likelihood of success on their First Amendment claim.

### 1.   AB 2098 Is a Permissible Regulation of Professional Conduct

Although speech by professionals is protected by the First Amendment, states may still "regulate professional conduct, even though that conduct incidentally involves speech."  *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018).  The Supreme Court in *NIFLA* recognized that "[l]ongstanding torts for professional malpractice, for example, 'fall within the traditional purview of state regulation of professional conduct.'"  *Id.* at 2737 (citation omitted).  It also cited to its prior decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), *abrogated on other grounds by Dobbs v. Jackson Women's Health Clinic*, 142 S. Ct. 2228 (2022), as an example of a permissible regulation of professional conduct.  In *Casey*, the Court upheld a law requiring certain disclosures by physicians as part of obtaining informed consent to an abortion.  *NIFLA*, 138 S. Ct. at 2373 (discussing *Casey*, 505 U.S. at 884).  The Court in *NIFLA* explained that this requirement "regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'"  *Id.* (quoting *Casey*, 505 U.S. at 884) (emphasis added in *NIFLA*).[5]

---

[5] Plaintiffs state that *Casey*'s discussion of First Amendment principles is no longer valid in light of the recent *Dobbs* decision.  PI Mot. at 10.  However, *Dobbs* only abrogated *Casey*'s

Regulations of medical practitioners' professional conduct and the practice of medicine that also incidentally regulate speech are widespread and longstanding.  They include, as *NIFLA* noted, "state regulation of malpractice" and informed consent requirements.  *Tingley*, 47 F.4th at 1074.  For instance, "[d]octors commit malpractice for failing to inform patients in a timely way of an accurate diagnosis, for failing to give patients proper instructions, for failing to ask patients necessary questions, or for failing to refer a patient to an appropriate specialist."  Robert Post, "Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech," 2007 U. Ill. L. Rev. 939, 950-951 (2007) (compiling cases).  And "doctors are routinely held liable for giving negligent advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care."  *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), *abrogated on other grounds by NIFLA*, 128 S. Ct. 2361.  A doctor "may not counsel a patient to rely on quack medicine.  The First Amendment would not prohibit the doctor's loss of license for doing so."  *Id.* (citation omitted).  California is no different from other states in generally regulating the professional conduct of medical practitioners in ways that govern the practice of medicine and the medical care provided to patients while also impacting practitioners' speech.  *See, e.g.*, Cal. Bus. & Prof. Code § 741(a)(1), (2) (requiring disclosures when prescribing certain high doses of opioids); *id.* § 2234.1 (requiring disclosures for complementary or alternative medicine); *id.* § 2241.5(c)(5), (6) (requiring providers prescribing opiates to create certain records); *see also supra* at p. 3[6]

AB 2098 fits into this longstanding tradition of regulating the practice of medicine and the professional conduct of medical practitioners.  It makes it unprofessional conduct for a physician to "disseminate misinformation or disinformation related to COVID-19."  AB 2098, § 2(a).  But

holding regarding the right to an abortion, not its First Amendment holding.  *E.g.*, *Dobbs*, 142 S. Ct. at 2242, 2284.  Insofar as *Dobbs* discusses the First Amendment at all, it does so in one sentence and cites to a single case as an example of "distort[ing] First Amendment doctrines," *Hill v. Colorado*, 530 U.S. 703 (2000).  *Dobbs*, 142 S. Ct. at 2276 n.65.  It would be an overreading of *Dobbs* to infer from this one sentence and citation that that case intended to alter or overturn *NIFLA* or *Casey*'s rulings on the First Amendment.

[6] *See, e.g.*, Ala. Code § 34-24-360 (doctor may be sanctioned for untruthful statements concerning qualifications or effect of proposed treatment); Nev. Rev. Stat. § 630.304 (doctor may be sanctioned for discouraging second opinion); Or. Rev. Stat. § 677.190 (doctor may be sanctioned for representing that an incurable disease can be cured or for making false or misleading statements about the efficacy of a drug or treatment).

8

1   this provision does not address physician speech in the abstract; the definitions of "disseminate"

2   and "misinformation" make clear that the prohibition is directed at the *care* that a physician

3   provides her patient.  The statute defines "disseminate" as "the conveyance of information *from*

4   *[a practitioner] to a patient under the [practitioner's] care* in the form of *treatment or advice*."

5   *Id*. § 2(b)(3) (emphasis added).  It defines "misinformation" as "false information that is

6   contradicted by contemporary scientific consensus *contrary to the standard of care*."  *Id*.

7   § 2(b)(4) (emphasis added).  AB 2098 thus circumscribes the care a physician recommends or

8   provides to their patients for a specific health issue.  By regulating the care that physicians

9   provide, AB 2098 is a regulation of professional conduct and the speech incident to such

10   conduct—it is a regulation of speech as *part of the practice of medicine*, not "speech as speech,"

11   *NIFLA*, 138 S. Ct. at 2373.

12       AB 2098 is thus analogous to the statutes upheld by the Ninth Circuit in *Tingley* and *Pickup*

13   as permissible regulations of professional conduct even though they also regulated physician

14   speech.  In those cases, the Ninth Circuit addressed the validity of state statutes prohibiting

15   conversion therapy—that is, efforts to change a person's sexual orientation—performed on

16   minors.  *See Tingley*, 47 F.4th at 1071-72.  Both statutes regulated professional conduct, the Ninth

17   Circuit concluded, because they regulated the kind of care a practitioner could provide their

18   patients.  The fact that such care was "performed through speech alone" made no difference.

19   *Pickup*, 740 F.3d at 1230; *see also Tingley*, 47 F.4th at 1077-79.

20       AB 2098 similarly regulates professional conduct.  As under the statutes in *Tingley* and

21   *Pickup*, providers remain free under AB 2098 to generally discuss different treatment options for

22   COVID-19, weigh the pros and cons of a patient obtaining a vaccine for COVID-19, provide

23   patients with information that will ensure they receive informed consent, or advise a specific

24   treatment for COVID-19.  They also remain free to engage in public debate, share opinions with

25   family members, or post online on social media; they face no restrictions under AB 2098 on their

26   ability to express their views on COVID-19 outside the context of treating a patient.  All they

27   must do is act competently within the standards of their profession when they treat a patient.  Just

28

1   as with the statutes banning conversion therapy, this is a regulation of the practice of medicine

2   and patient care, and thus a regulation of professional conduct.

3        Plaintiffs resist the application of *Tingley* and *Pickup*, arguing instead that the proper

4   analogue is the decision in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).  In *Conant*, the Ninth

5   Circuit upheld an injunction that precluded the federal government from investigating physicians

6   for violation of federal criminal drug laws "solely on the basis of a recommendation of marijuana

7   within a bona fide doctor-patient relationship, unless the government in good faith believes that it

8   has substantial evidence of criminal conduct."  309 F.3d at 636; *see also id.* at 637 (policy

9   sanctioned doctors for the "discussion of the medical use of marijuana").  The court analogized

10  the enjoined policy to the funding restriction held unconstitutional in *Legal Services Corp. v.

11  Velazquez*, 531 U.S. 533 (2001), which had prohibited legal aid attorneys receiving federal funds

12  "from challenging existing welfare laws."  *Conant*, 309 F.3d at 638.  In both cases, the Ninth

13  Circuit explained, the government's challenged policy "'alter[ed] the traditional role'" of

14  professionals "by 'prohibit[ing] speech necessary to the proper functioning'" of the profession.

15  *Id.* (citation omitted).  The court in *Conant* rejected the government's argument that its

16  challenged policy was necessary to enforce criminal prohibitions on the possession of drugs.  *Id.*

17  And it explained that its conclusion was buttressed the fact that states are "the primary regulators

18  of professional conduct" and California—where the plaintiffs were practitioners—permitted

19  medical use of marijuana upon a physician recommendation.  *Id.* at 640; *see also id.* at 645

20  (Kozinski, J., concurring) ("second important interest impaired by the federal government's

21  policy" was "California's interest in legalizing the use of marijuana in certain limited

22  circumstances").

23        Plaintiffs argue that under *Conant* "making a recommendation" is categorically protected

24  from any regulation whatsoever.  PI Mot. at 11.  But that overreads the decision.  Whatever

25  *Conant* says about whether physician speech and recommendations are generally protectable, it

26  does not hold that states cannot permissibly regulate the spoken components of professional

27  conduct, including at times regulating the advice or recommendations of medical professionals.

28  The policy that the Ninth Circuit disproved of in *Conant* prohibited, on criminal sanction, *any and*

*all* recommendations of marijuana use between doctors and patients—including a situation where a doctor "recommend[ed] medical marijuana to patients after complying with accepted medical procedures" and was "acting in their professional role in conformity with the standards of the state where they are licensed to practice medicine." *Conant*, 309 F.3d at 647 (Kozinski, J., concurring).  By removing the ability to ever recommend a potential medical treatment, the enjoined policy "prevent[ed] the physician from exercising his or her medical judgment," *id.* at 638 (majority op.) (quoting *Casey*, 505 U.S. at 883), and "prohibit[ed] speech necessary to the proper functioning" of the medical system, *id.* (quoting *Velazquez*, 531 U.S. at 544) (alteration in original).

But there is a difference between the state sanctioning *any* recommendations or discussions of a particular treatment and the state simply requiring recommendations or discussions to abide by the standard of care.   In the first instance, the state has kept medical professionals from utilizing their otherwise acceptable professional judgment to determine the best course of treatment for a patient or to obtain informed consent thereto.  *Cf. Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1317 (11th Cir. 2017) (striking down statute that prohibited doctors from asking certain questions even when consistent with the standard of care and when there was no evidence the prohibited questions were "medically inappropriate, ethically problematic, or potentially ineffective").  In the latter, the state leaves doctors generally free to exercise this professional judgment and only takes certain options—namely, those that are below the standard of care—off the table.  It is the same as the distinction between the requirement struck down in *Velazquez* that prohibited *any* argument challenging an existing welfare law by a government-funded attorney and an ordinary malpractice regulation that would prohibit such an argument *when it is frivolous*.  Completely silencing any recommendations of a treatment looks more like the government regulating speech as speech; requiring medical professionals adhere to the standard of care when treating patients—even when speaking—is regulating the *practice of medicine* instead.

It is this difference that makes AB 2098 akin to the statutes upheld in *Tingley* and *Pickup* rather than the policy enjoined in *Conant*. [7]  The statute challenged in *Pickup*, in contrast to the policy at issue in *Conant*, "allowe[ed] discussions about treatment, recommendations to obtain treatment, and expressions of opinion about [sexual orientation conversion therapy]."  *Pickup*, 740 F.3d at 1229 (emphasis removed); *see also Conant*, 309 F.3d at 647 (Kozinski, J., concurring) (distinguishing enjoined policy from when the state sanctions a doctor who "recommend[ed] marijuana without examining the patient, without conducting tests, without considering the patient's medical history or without otherwise following standard medical procedures").

AB 2098 likewise allows such discussions.  It does not preclude a physician from asking questions to gather information about potential COVID-19 treatment or advice, from discussing the pros and cons of any potential treatment, from recommending a particular treatment, or from providing specific advice—as long as doing so is consistent with the standard of care.  It thus minimizes the intrusion into the doctor-patient relationship by solely restricting treatment and advice that falls below that standard.  And by generally preserving speech on COVID-19 related subjects when the advice or treatment given is not below the standard of care, AB 2098 ensures that doctors can exercise their medical judgment in responsible ways consistent with protecting patients' health and safety.  It is a restriction that helps to further the proper functioning of the medical profession by protecting patients from harmful substandard advice and care, *see infra* at pp. 14-15 (discussing role of requiring adequate care in protecting doctor-patient relationship). It is analogous not to the governmental regulation disapproved of in *Conant* but rather to those held permissible in *Pickup* and *Tingley*, and is thus a regulation of professional conduct.

Plaintiffs also read *NIFLA* as requiring that any regulated speech be tied to "a separate and distinct medical procedure" for the regulation to be considered one of professional conduct.  PI Mot. at 15.  But such a narrow understanding of *NIFLA* ignores the practical reality of how

---

[7] In addition, the federalism concerns animating the decision in *Conant* are absent here since AB 2098 is a *state* regulation of the medical practice.  Nor did *Conant* involve any argument that the challenged policy was needed to protect patients from substandard care, unlike this case.

1   doctors treat patients.  "Most, if not all, medical and mental health treatments *require speech*."

2   *Pickup*, 740 F.3d at 1229.  That is the case, for instance, when an endocrinologist advises a

3   diabetic about which foods to eat, a neurologist advises a migraine sufferer about potential

4   migraine triggers to avoid, or a general practitioner advises a patient with back pain to perform

5   particular stretches.  In these situations, as in innumerable others, the care and treatment a

6   physician provides comes in the form of speech.  Indeed, in many situations, the regulation of a

7   doctor's speech "is theoretically and practically inseparable from the regulation of medicine."

8   Post, *supra*, at 751.  Circumscribing the view of "professional conduct" in the medical field to

9   *only* hands-on, physical interventions like surgery would ignore a large swath of how doctors treat

10  and care for patients.  And when speech and treatment are intertwined, regulating the provision of

11  care—and thus physician conduct and the practice of medicine—necessarily involves regulating

12  the speech of practitioners.  AB 2098 is therefore a regulation of professional conduct.

13          Under *Tingley* and *Pickup*, the applicable standard for reviewing the constitutionality of AB

14  2098's regulation of conduct is rational basis.  *Tingley*, 47 F.4th at 1077.  That standard requires

15  only that AB 2098 "bear[] a rational relationship to a legitimate state interest."  *Pickup*, 740 F.3d

16  at 1231.  AB 2098 readily meets this standard.  As discussed in more detail below, *see infra* at pp.

17  16-17, AB 2098 furthers the government's legitimate interests in public health and patient safety.

18  The Legislature was concerned that physicians were spreading misinformation and disinformation

19  to patients that could dissuade patients from receiving critical or necessary care to prevent

20  COVID-19 (such as vaccinations) or to treat COVID-19.  *E.g.*, RJN Ex. C, p. 3; Ex. D, pp. 4-5.

21  Protecting public health and patient safety certainly is a legitimate state interest; indeed, it is a

22  compelling interest.  *See infra* at pp. 16-17.  Recommendations that fall below the standard of

23  care can harm patients individually and public health generally.  Prohibiting doctors from

24  providing inaccurate information in a way that renders their care below the requisite standard of

25  care furthers the State's legitimate interest in patient safety and public health.  AB 2098 is

26  therefore constitutional as a reasonable regulation of professional conduct.

27

28

### 2.   AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals

Even if the Court were to conclude that AB 2098 is not a regulation of professional conduct, plaintiffs still do not show a likelihood of success on their First Amendment claim.  In their brief, plaintiffs do not discuss *Tingley*'s second basis for its holding: that states may regulate physician speech when regulating the care provided by medical professionals without running afoul of the First Amendment.  AB 2098 is constitutional (and not subject to strict scrutiny) because it falls within this longstanding tradition of regulating medical care.

"The Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny."  *Tingley*, 47 F.4th at 1079 (quoting *NIFLA*, 138 S. Ct. at 2372).  And there is indeed a long tradition of "regulation governing the practice of those who provide health care within state borders."  *Id.* at 1080.  Since the birth of modern medicine, states have imposed restrictions on who can practice medicine and on the care medical practitioners provide.  *See id.* at 1080-81 (discussing, *inter alia*, *Collins v. Texas*, 223 U.S. 288 (1912), and *Lambert v. Yellowley*, 272 U.S. 581 (1926)); *see also, e.g.*, *State ex rel. Powell v. State Med. Examining Bd.*, 20 N.W. 238, 240 (Minn. 1884) (statutes imposing requirements on the right to practice medicine "have been very common").  This has included restrictions on the provision of care that involves the speech of practitioners:  "[C]enturies-old medical malpractice laws," for instance, "restrict treatment *and the speech* of health care providers."  *Tingley*, 47 F.4th at 1082 (emphasis added); *see also, e.g.*, *Eastman v. State*, 10 N.E. 97, 97 (Ind. 1887) ("For centuries the law has required physicians to possess and exercise skill and learning, for it has mulcted in damages those who pretend to be physicians and surgeons, but have neither learning nor skill.").

This history of regulation arises out of important concerns.  "The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients."  *Tingley*, 47 F.4th at 1083.  "The work of physicians has life and death consequences for their patients."  *Kenneally v. Medical Bd.*, 27 Cal. App. 4th 489, 500 (1994).  While the doctor-patient relationship requires physicians to speak

14

candidly about their professional opinions and judgments, such candor must be counterbalanced by a patient's ability to trust that their doctor is providing them with *competent and adequate care*.  After all, "the knowledge of patient and physician are not in parity," and a patient "has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process." *Truman v. Thomas*, 27 Cal. 3d 285, 291 (1980) (citation omitted).  While "[e]very one may have occasion to consult" a doctor, "comparatively few can judge of the qualifications of learning and skill which he possesses." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).  Rather, "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possess the requisite qualifications." *Id.* at 122-123.  Thus, "[w]hen a health care provider acts or speaks about treatment with the authority of a state license, that license is an 'imprimatur of a certain level of competence.'" *Tingley*, 47 F.4th at 1083 (citation omitted).  Patients need to know that their doctors can be trusted, and regulating the care that medical professionals provide plays a key role not only in protecting health and safety but also in assuring the trust necessary for the doctor-patient relationship to work.  Because medical care frequently involves the provision of professional advice, effective protection for patients must encompass the ability to regulate such speech.

AB 2098 falls within the category of laws recognized as permissible under *Tingley*.  The advice and treatment physicians provide—and the information conveyed in such advice and treatment—is patient care.  *See, e.g.*, *Tingley*, 47 F.4th at 1082-83; *see also supra* at pp. 12-13.  It is that context of patient care, and that alone, that AB 2098 regulates.  It does not tell doctors what specifically they must say or even require them to say anything at all.  Rather, to the extent a provider chooses to discuss COVID-19, AB 2098 simply prohibits doing so in a manner that violates the standard of care.  This has long been a requirement for doctors in order to protect their patients.  A contention that California cannot require that much of its medical practitioners would "endanger centuries-old medical malpractice laws that restrict treatment and the speech of healthcare providers." *Tingley*, 47 F.4th at 1082.

### 3.  AB 2098 Withstands Strict Scrutiny

Finally, even if the Court were to conclude that AB 2098 is subject to strict scrutiny,

15

1    plaintiffs still cannot show a likelihood of success on the merits.  To survive strict scrutiny, a

2    statute must be narrowly tailored to serve a compelling government interest.  *See, e.g.*, *Reed v.*

3    *Town of Gilbert*, 576 U.S. 155, 163 (2015).  AB 2098 meets this standard.

                        a.    **AB 2098 Furthers a Compelling Interest**

4

5            AB 2098 serves several interests that are not only legitimate, but compelling.  First, AB

6    2098 furthers the State's compelling interest in "protect[ing] patients from negligent or

7    incompetent physicians."  *Lewis v. Superior Court*, 3 Cal. 5th 561, 572 (2017).  States

8    "unquestionably ha[ve] a 'compelling interest in assuring safe health care for the public.'"  *Recht*

9    *v. Morrisey*, 32 F.4th 398, 413 (4th Cir. 2022) (citation omitted).  As the Legislature explained,

10   "[p]hysicians and healthcare professionals play a critical role in keeping communities healthy.  A

11   physician's recommendation and information sharing will educate and inform decisions made by

12   their patients."  RJN, Ex. D, p. 5; *see also* Lim Decl. ¶ 6.  Because medical decisions that patients

13   make under doctor advice are by definition matters of health—and frequently life and death—the

14   State has a compelling interest in ensuring the care provided is not substandard.  This is certainly

15   true with respect to COVID-19, where interventions like vaccinations have helped to protect

16   health and save lives.  *See supra* at pp. 4-5.  Like malpractice law and other prohibitions on

17   treatment below the standard of care, AB 2098 guards and protects patients' health and safety.

18           Second, AB 2098 furthers the compelling interest of ensuring patient access to accurate,

19   complete, and truthful information about healthcare.  Misinformation from a doctor during

20   medical treatment presents a real danger of harm to a patient.  Lim Decl. ¶ 6; *cf. Truman*, 27 Cal.

21   3d at 293-94 (patient declined pap smear test due to advice below the standard of care and

22   subsequently died of cervical cancer).  In addition to furthering this interest generally, AB 2098

23   does so in a way that also helps limit the spread and severity of the deadly COVID-19 pandemic.

24   The Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a

25   compelling interest."  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)

26   (per curiam).  Vaccines have played a crucial role in helping stem the spread of COVID-19 and

27   limiting the severity of the disease.  *See supra* at pp. 4-5.  However, as the Legislature found,

28   "misinformation and disinformation about COVID-19 vaccines"—including misinformation from

                                                    16

1   medical practitioners—have "placed lives at serious risk" by precluding patients from receiving

2   such vaccines due to factually incorrect information.  AB 2098, § 1(d), (e); *see also* RJN, Ex. B.,

3   p. 6; Ex. D, p. 4.  While ensuring that patients receive accurate information—as AB 2098 does—

4   is a compelling interest, it is doubly so here, insofar as AB 2098 could also help bolster COVID-

5   19 vaccination rates and stem the spread and harm of that disease.

6          Third, AB 2098 furthers the State's "compelling interest in regulating the practice of

7   professions within their boundaries." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).

8   The Supreme Court has noted that among the professions, "[t]here is perhaps no profession more

9   properly open to [state] regulation than that which embraces the practitioners of medicine,"

10  "dealing as its followers do with the lives and health of the people." *Watson v. Maryland*, 218

11  U.S. 173, 176 (1910); *see also Tingley*, 47 F.4th at 1082-83 ("'[f]ew professions require more

12  careful' scrutiny than 'that of medicine'" (citation omitted)).  AB 2098, acting in harmony with

13  other similar and long-standing regulations, furthers this compelling interest.  It is critical that

14  patients can trust the medical judgment, advice, and recommendations of their state-licensed

15  medical providers.  Without such trust, patients may well avoid acting on medically appropriate

16  advice and suffer serious, if not life-threatening, health consequences.  This is no less true in the

17  COVID-19 arena than in other areas of health care.  By holding medical practitioners to the

18  standard of care in providing medically accurate advice and recommendations about COVID-19

19  to their patients, AB 2098 helps ensure patient trust in their doctors and thereby furthers a

20  compelling government interest.

21                 **b.    AB 2098 Is Narrowly Tailored to Serve Those Compelling**
                          **Interests**
22

23         Finally, AB 2098 meets the requirements for narrow tailoring.  "A statute is narrowly

24  tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."

25  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Here, the Legislature's primary concern in enacting

26  AB 2098 was to stop doctors from conveying to patients medically inaccurate information about

27  COVID-19 that is below the standard of care.  The Legislature recounted evidence of medical

28  practitioners spreading such medically inaccurate information.  *See, e.g.*, RJN Ex. B, pp. 6-7; Ex.

1   D, pp. 4-5 (e.g., vaccines contain microchips or make people magnetic).  It explained that doctors

2   play a key role in guiding patient decisions about healthcare, making it particularly concerning

3   when they violate the standard of care by failing to provide medically accurate information.  *See,*

4   *e.g.*, RJN, Ex. B, pp. 6-7; Ex. D, pp. 4-5.

5          The Legislature acted to limit this harm in the narrowest possible way: by clarifying that

6   when doctors provide advice or treatment about COVID-19, they must do so consistently with the

7   standard of care.  AB 2098 leaves practitioners free to express themselves in innumerable other

8   forums outside of patient care.  And within the context of patient care, it does not limit advice that

9   meets the standard of care.  *See supra* at pp. 12-13 (distinguishing AB 2098 from policy at issue

10  in *Conant*).  It thus specifically targets the precise category of conduct or speech where the State's

11  interest is highest and that poses the greatest risk of harm: conduct or speech by doctors that

12  comes in the form of advice or treatment to patients within their care.[8]

13         Considering AB 2098's place within the larger system of medical regulation also reinforces

14  its narrow tailoring.  As the legislative history notes, doctors are already subject to discipline for

15  repeated negligent acts, gross negligence, or incompetence.  RJN, Ex. B, p. 8; *see also supra* at p.

16  3.  Thus, a physician who repeatedly provides treatment or guidance concerning COVID-19 that

17  falls below the requisite standard of care—or a physician who does so only once in a manner

18  constituting gross negligence or incompetence—already faces the possibility of discipline or

19  liability.  All that AB 2098 does is clarify that, with respect to advice and treatment concerning

20  COVID-19, a single instance of substandard care can suffice for discipline.  That clarification is

21  narrowly tailored to further the State's compelling interests in public health and patient safety.

22         Plaintiffs first contend that AB 2098 is not narrowly tailored because there is no evidence

23  that osteopathic physicians *specifically* are spreading misinformation and causing harm to

24  patients.  PI Mot. at 20.  But osteopathic and non-osteopathic doctors are subject to the same

---

25

26         [8] That AB 2098 is narrowly tailored is further illustrated by looking to the legislative
history of the enactment.  As originally introduced, AB 2098 did not include a definition of
27  "dissemination."  RJN, Ex. B, p. 12.  The statute was amended to include a definition of
"disseminate" that clarified the statute was targeted at "communications made to a patient under
28  [the provider's] care in the form of treatment or advice" and not to "statements made to the
general public about COVID-19 through social media or at a public protest."  *Id.*

standards for unprofessional conduct, *see* Cal. Bus. & Prof. Code § 3600-2, and AB 2098 is codified as a statute that applies on its terms to *all* doctors and surgeons.  And osteopathic and non-osteopathic practitioners serve similar roles and stand in a similar relationship when they treat and care for their patients—meaning inaccurate information and substandard care can cause the same negative, potentially life-threatening consequences for their patients.  It would make little sense to treat them differently solely with respect to spreading medically-inaccurate information or providing substandard care regarding COVID-19 alone, particularly in light of the evidence before the Legislature that medical professionals were spreading misinformation generally and the consequences that could have.  *See supra* at p. 4.

Plaintiffs also contend the statute is not narrowly tailored because there are alternatives that restrict less speech that could have been used, such as public information campaigns. PI Mot. at 20.  The argument is unconvincing.  Federal and state entities were already engaging in extensive public information campaigns about COVID, but the Legislature found that misinformation from physicians was nonetheless resulting in serious health consequences to patients.  More importantly, such an argument would presumably render unconstitutional *any* application of the standard-of-care requirement—whether in professional discipline or medical malpractice law—to dangerous and substandard medical advice to a patient.  A similar argument could be made that the State should devise a way to somehow detect and step in to provide information directly to any patient who has been advised by a doctor to take a drug that would be dangerous to those in the patient's condition or from whom the doctor has withheld information about a pertinent side effect of treatment.  No court has ever held that such dubious arguments mean that the First Amendment prohibits States from holding medical providers to the standard of care.

## B.  Plaintiffs Are Unlikely to Succeed on their Vagueness Claim

Plaintiffs further argue that AB 2098 is unconstitutional under the Fourteenth Amendment because it is void for vagueness.  A statute is impermissibly vague when it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement."  *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  But "[d]ue process does not require 'impossible standards of clarity'."  *Id.*

19

1   (quoting *Kolender v. Lawson*, 461 U.S. 352, 361 (1983)).  All that is required is for the statute "to

2   give a person of ordinary intelligence a reasonable opportunity to know what is prohibited."

3   *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013) (citation omitted).  And where

4   a statute "regulates licensed . . . health providers, who constitute 'a select group of persons having

5   specialized knowledge,' the standard for clarity is lower."  *Pickup*, 740 F.4th at 1234 (citation

6   omitted).

7        AB 2098 meets this standard.  It defines as unprofessional conduct a physician

8   "disseminat[ing] misinformation or disinformation related to COVID-19."  AB 2098, § 2(a).  The

9   statutory definitions of the relevant terms provide adequate context and guidance for a

10   practitioner of ordinary intelligence to know what is prohibited.  Under AB 2098, "dissemination"

11   is defined as "the conveyance of information from the licensee to a patient under the licensee's

12   care in the form of treatment or advice."  AB 2098, § 2(b)(3).  This clarifies that the type of

13   behavior implicated by AB 2098 involves: 1) conveying information, 2) in the form of treatment

14   or advice, 3) to a patient under the practitioner's care.  A practitioner of ordinary intelligence can

15   distinguish between the situations covered by this provision (e.g., providing advice to one's

16   patient about whether to receive the COVID-19 vaccines) from those that are not (e.g., publishing

17   a journal in a scientific article about the effectiveness of the COVID-19 vaccines).

18        AB 2098 in turn defines "misinformation" as "false information that is contradicted by

19   contemporary scientific consensus contrary to the standard of care."  AB 2098, § 2(b)(4).  This

20   language imposes three requirements for conduct to fall within the scope of AB 2098: that it is 1)

21   false, 2) contradicted by the contemporary scientific consensus, *and* 3) contrary to the standard of

22   care.[9]  This last requirement, in particular, is far from unduly vague.  The term "standard of care"

23   is not only familiar to medical practitioners but is used pervasively in the legal and medical

24   regulatory systems.  *E.g.*, CACI 501 (jury instruction stating that a medical practitioner who fails

---

[9] To the extent the Court believes there is a lack of clarity on this point, defendants contend the Court should adopt the narrower construction of the statute's reading.  *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014) (court may adopt narrowing construction of statute in vagueness challenge).  Such a reading of the statutory text is consistent with the legislative history, which indicates that the definition of "misinformation" was amended expressly to connect it to the standard of care.  RJN, Ex. D, p. 10.  Requiring that any false information be contrary to the standard of care as a distinct element carries out that purpose.

20

to use the standard of care is negligent); *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 469-70 (2008) (describing standard of care in medical malpractice suit); *Trowbridge v. United States*, 703 F. Supp. 2d 1129, 1137-40 (D. Idaho 2010) (discussing factual findings as to standard of care in medical malpractice suit); Lim Decl. ¶ 3.  Indeed, California's medical licensing system holds licensees to the standard of care with respect to *all* care they provide.  *See supra* at p. 3.  No reasonable medical practitioner would be unsure what it means to provide advice or treatment that is "contrary to the standard of care."

Nor is the phrase "contradicted by contemporary scientific consensus" unduly vague. There may be issues open to debate within the scientific and medical communities, but that does not mean there are not objectively provable facts on which the scientific community has a consensus: that apples contain sugar, that measles is caused by a virus, that Down syndrome is caused by a chromosomal abnormality, etc.  To the extent there are instances where the scientific consensus is less clear—just as it can be difficult at times to prove what the relevant standard of care is—that does not make the statute unduly vague.  And when a scientific consensus does not exist, that makes the statute *inapplicable by its own terms*, not vague.  Furthermore, in a disciplinary hearing, the burden of proof would be on the Board to establish all elements of a charge of disseminating misinformation, and where that does not happen, no discipline can occur. *Ettinger v. Bd. of Med. Quality Assurance*, 135 Cal. App. 3d 853, 856 (1982).

In any event, there is no danger of this term leading to confusion about whether doctors should provide certain information.  Under the statute, misinformation can lead to discipline under the statute only if it is false, making truth a defense.  And such misinformation falls within the scope of AB 2098 only if it is contradicted by the scientific consensus *and also* contrary to the standard of care.  Thus, plaintiffs and all medical practitioners know that if their treatment and advice falls within the standard of care or if it they are accurate in the information they relay (such as accurately describing a study to a patient), they are not in violation of AB 2098.

Ultimately, "while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Hill v.*

21

1   *Colorado*, 530 U.S. 703, 733 (2000) (citation omitted) (alterations in original).  The "Supreme

2   Court has held that 'speculation about possible vagueness in hypothetical situations not before the

3   Court will not support a facial attack on a statute when it is surely valid in the vast majority of its

4   intended applications.'"  *Pickup*, 740 F.3d at 1234 (quoting *Hill*, 530 U.S. at 733).  All that the

5   Fourteenth Amendment requires is that it be "clear what the [statute] as a whole prohibits."  *Hill*,

6   530 U.S. at 733 (citation omitted).  AB 2098 meets that standard.

7   ## II.   THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF

8         First, plaintiffs have failed to demonstrate any irreparable harm.  In their brief, they contend

9   that they suffer irreparable harm because of a loss of constitutional rights.  PI Opp. at 23.  If

10   plaintiffs had demonstrated that AB 2098 was a likely violation of their constitutional rights, that

11   might well constitute irreparable harm.  *E.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

12   2012) ("deprivation of constitutional rights 'unquestionably constitutes irreparable injury'"

13   (citation omitted)).  However, as explained above, AB 2098 is a constitutional statute.  *See supra*

14   at pp. 7-22.

15         Second, the balance of equities and public interest do not favor injunctive relief.  Where, as

16   here, the government is the opposing party, the last two factors of the preliminary injunction

17   analysis—the balance of equities and public interest—merge.  *Drakes Bay Oyster Co. v. Jewell*,

18   747 F.3d 1073, 1092 (9th Cir. 2014).  To analyze these factors, the Court "balance[s] the

19   competing claims of injury" and "consider[s] the effect of granting or withholding the requested

20   relief," paying "particular regard for the public consequences in employing the extraordinary

21   remedy of injunction."  *Winter*, 555 U.S. at 24 (citation omitted).

22         Here, the State has a strong interest in enforcing AB 2098's obligations to protect the public

23   and would suffer irreparable harm if enjoined from doing so.  *Maryland v. King*, 567 U.S. 1301,

24   1303 (2013) ("[A]nytime a State is enjoined by a court from effectuating statutes enacted by

25   representatives of its people, it suffers a form of irreparable injury.") (internal quotation marks

26   omitted).  In addition, an injunction here would undermine the State's long tradition of regulating

27   physician conduct and care.  *See Tingley*, 47 F.4th at 1079-81.  California has an indisputable and

28   substantial public interest in the effective regulation and operation of the medical practice to

22

1    ensure the health and safety of patients and the public.  That is especially true here, where AB

2    2098 serves to ensure that patients receive accurate and medically appropriate information and

3    that doctors do not provide patients with substandard care.  And since such care can involve the

4    vaccinations against COVID-19 that have played a critical role in reducing the severity and

5    spread of the disease, an injunction could also undermine the public health.

6         Although plaintiffs allege deprivations of their constitutional rights, any actual burden on

7    those rights that might exist (and defendants contend there is none) is incidental and exceedingly

8    minimal.  State law already defines incompetence, a single instance of gross negligence, or

9    repeated negligent acts as unprofessional conduct —regulations not challenged by plaintiffs in

10   this case.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  All AB 2098 does is clarify that a single

11   instance of negligence with respect to the treatment and care provided to a patient can constitute

12   unprofessional conduct, if that care involves misinformation or disinformation about COVID-19.

13   This de minimis intrusion into plaintiffs' medical practices must be considered against the lives

14   AB 2098 will save.  Any incremental impact on speech—particularly speech that comes in the

15   form of advice or treatment below the standard of care—is far outweighed by the State's

16   compelling interest in ensuring that doctors provide adequate care for the protection and safety of

17   their patients and the public.

18                                   **CONCLUSION**

19        This Court should deny Plaintiffs' motion for a preliminary injunction.

20

21   Dated:  December 27, 2022                    Respectfully submitted,

22                                               ROB BONTA
                                                 Attorney General of California
23                                               ANYA M. BINSACCA
                                                 EDWARD KIM
24                                               Supervising Deputy Attorneys General
                                                 CHRISTINA SEIN GOOT
25                                               Deputy Attorney General

26                                                */s/ Kristin Liska*
                                                 _____
27                                               KRISTIN A. LISKA
                                                 Deputy Attorney General
28                                               *Attorneys for Defendants*

                                         23

1

**CERTIFICATE OF SERVICE**

2

Case Name:     ***Letrinh Hoang, D.O., Physicians for Informed Consent, et al. v. Rob***
3                         ***Bonta, et al.***

Case No.       **2:22-cv-02147-WBS-AC**
4

I hereby certify that on <u>December 27, 2022</u>, I electronically filed the following documents
5
with the Clerk of the Court by using the CM/ECF system:
6

7            1.  **OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY**
                 **INJUNCTION**
8
             2.  **DECLARATION OF ERIKA CALDERON, EXECUTIVE DIRECTOR OF THE**
9                **OSTEOPATHIC MEDICAL BOARD OF CALIFORNIA, IN SUPPORT OF**
                 **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
10               **PRELIMINARY INJUNCTION**

11           3.  **DECLARATION OF ANGELA LIM, D.O. IN SUPPORT OF DEFENDANTS'**
                 **OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**
12               **INJUNCTION (with EXHIBIT 1)**

13           4.  **REQUEST FOR JUDICIAL NOTICE (with EXHIBITS A-F)**

14       I certify that **all** participants in the case are registered CM/ECF users and that service will

15  be electronically accomplished by the CM/ECF system.

16       I declare under penalty of perjury under the laws of the State of California and the United

17  States of America the foregoing is true and correct.

18       Executed on <u>December 27, 2022</u>, at San Francisco, California.

19

20  _____              *Vanessa Jordan*_____
             Vanessa Jordan                          Signature
             Declarant
21

22

23

24

25

26

27

28