RICHARD JAFFE, ESQ.
State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
Email: rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
(Admitted *pro hac vice*)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LETRINH HOANG, D.O., PHYSICIANS FOR INFORMED CONSENT, a not-for-profit organization, and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER, a California Nonprofit Corporation <br><br> Plaintiffs, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California and ERIKA CALDERON, in her official capacity as Executive Officer of the Osteopathic Medical Board of California ("OMBC") <br><br> Defendants. | Case No: **2:22-cv-02147-WBS-AC** <br><br><br> **REPLY MEMORANDUM OF LAW** <br><br> **Date:** January 23, 2023 <br> **Time:** 1:30 PM <br> **Courtroom:** 5, 14th floor <br> **Judge:** Hon: William B. Shubb <br><br> Action Commenced: December 1, 2022 |

Reply In Support of Preliminary Injunction

## **<u>TABLE OF CONTENTS</u>**

**<u>Page #</u>**

TABLE OF AUTHORITIES ...................................................................................ii

REPLY MEMORANDUM OF LAW ...................................................................... 1

I.     INTRODUCTION AND SUMMARY ........................................................ 1

II.    AB 2098 AND THE LEGISLATIVE REPORTS........................................ 3

     A.     The "'Actual Problem' in Need of Solving" .................................. 3

     B.     What is and is not in the Legislative Reports ........................... 7

III.  THE FIRST AMENDMENT ISSUE ......................................................... 8

     A.     Judge Slaughter's Decision ......................................................... 8

           1.     Judge Slaughter's Use of the Rational Relationship test was Clearly Erroneous ............................................ 8

           2.     There is No long-standing Recognized or Unrecognized Tradition in California (or any place else) holding that the information which a physician provides to patients is Unprotected Speech. ........................ 10

     B.     Strict Scrutiny applies to Section 2270 ................................. 13

     C.     Applying Strict Scrutiny........................................................... 14

IV.  The Vagueness Issue ......................................................................... 17

V.    Other Preliminary Injunction Factors and the Real-World Implications of the Law ............................................................................ 20

CONCLUSION ....................................................................................................... 22

AMENDED LOCAL RULE 231 (D)(3) STATEMENT .......................................... 23

CERTIFICATE OF E SERVICE ........................................................................... 24

# TABLE OF AUTHORITIES

**Federal Cases**

*Ass'n of Irritated Residents v. Fred Schakel Dairy*,
No. 1:05-CV-00707-OWW-SMS, 2008 WL 850136 (E.D. Cal. March 28, 2008) ............... 4

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) ............................................................ 2, 3, 13, 14, 15

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ............................................................................ 15

*Conant v. McCaffrey*,
2000 WL 1281174 (N.D. Cal. Sept. 7, 2000) ...................................... 12

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002) ................................................. 10, 12, 19

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir. 2022) ........................................................ 9

*Florida Star v. B.J.F.*
491 U.S. 524 (1989) .......................................................................... 15

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ....................................................................... 2, 14

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
138 S.Ct. 2361 (2018) ...................................................... 1, 3, 9, 12, 21

*Nat'l Inst. Of Family & Life Advocates v. Harris*,
839 F.3d 823 (9th Cir. 2016) ........................................................... 9

*Otto v. City of Boca Raton*,
981 F.3dd .................................................................................. 2, 13

*Pickup v. Brown*,
740 F.3d 1208 (9th Cir. 2014) .................................................... 1, 3, 9

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ...................................................................... 2, 14

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................... 2, 13, 14

*Rosenberger v. Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ................................................................... 2, 13, 14

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ........................................................ 1, 3, 9

*United States v. Alverez*,
    567 U.S. 709 (2012) ......................................................... 2, 8, 9, 12, 13

*United States v. O'Brien*,
    391 U.S. 367 (1968) ...................................................................... 14

*Welch v. Brown*,
    907 F. Supp. 2d 1102 (E.D. Cal. 2022) ...................................... 3, 14, 21

**California Cases**

*Arnet v. Dal Cielo*,
    14 Cal.4th 4 (1996) ........................................................................ 12

*Flowers v. Torrance Mem. Hosp. Med. Center*,
    8 Cal.4th 992 (1994) ...................................................................... 12

*Fuller v. Bd. of Med. Exam'rs*,
    14 Cal. App. 2d 734 (1936) ............................................................ 11

*Gore v. Board of Med. Quality Assurance*,
    110 Cal. App. 3d 184 (1980) .......................................................... 12

*Kearl v. Bd. of Med. Quality Assurance*,
    189 Cal. App. 3d 1040 (1986) ........................................................ 12

*Shea v. Board of Medical Examiners*,
    81 Cal. App. 3d. 564 (1978) .......................................................... 13

**Docketed Cases**

Order Denying Motion for Preliminary Injunction dated December 28, 2022
    (Dkt. 78), in *McDonald v. Lawson*, Case No. 8:22-cv-01805-FWS-ADS ........................... 1

**United States Constitution**

First Amendment ................................................................................ 1, *passim*
Fifth Amendment ................................................................................. 7, 20
Fourteenth Amendment ....................................................................... 20

**California Statutes**

Business & Professions Code
§ 2234 ............................................................................................ 16
§ 2270 ....................................................................................... 4, *passim*

**Federal Rules of Evidence**

Rule 201(b) ........................................................................................ 4

**Legislative Sources**

Assembly Bill 2098 ........................................................................ 1, *passim*

**Online Sources**

*Determinations to Support an EUA Declaration*, Emergency Use Authorization
   of Medical Products and Related Authorities, Guidance for Industry and
   Other Stakeholders, FDA.GOV (Jan. 2017), https://www.fda.gov/regulatory-
   information/search-fda-guidance-documents/emergency-use-authorization-
   medical-products-and-related-authorities#A1 ....................................................... 4

*Understanding the Regulatory Terminology of Potential Preventions and
   Treatments for COVID-19* (Oct. 22, 2020),
   https://www.fda.gov/consumers/consumer-updates/understanding-regulatory-
   terminology-potential-preventions-and-treatments-covid-19 ............................... 5, 6

1

**REPLY MEMORANDUM OF LAW**

2

**I.    INTRODUCTION AND SUMMARY**

3      The elephant in the Courtroom is that on December 28, 2022, in *McDonald v. Lawson*,

4 Central District Judge Fred Slaughter denied Plaintiffs' Motion for a Preliminary Injunction to

5 stop enforcement of AB 2098, which as of January 1, 2023 is now law. Although not binding

6 (and currently being appealed), it is for Plaintiffs to show why this Court should reach a

7 different result. And it should, for several reasons.

8      First, Judge Slaughter's use of the rational relationship test in finding there was not a

9 likelihood of success is plain error because it is inconsistent with Supreme Court authority, and

10 even with the Ninth Circuit authority cited in his decision. Specifically, under the abrogated

11 *Pickup*[1] First Amendment continuum framework, intermediate scrutiny applies to a physician's

12 providing information, and that would include the physician's opinions for or against a

13 particular treatment. The *Pickup* court only applied the rational relationship test because the

14 speech was the treatment, and the treatment was the speech.

15     Second, Judge Slaughter boldly decided to recognize a "'long … tradition' of restrictions

16 [which] are subject to lesser scrutiny of that type of regulation." (Slaughter Decision[2] at page

17 25.) This is clear error because the tradition he recognizes is only the state's general statutory

18 authority over a physician for negligent, grossly negligent or incompetent medical conduct.

19 These are conclusory terms, and their application to a physician providing information to a

20 patient defies Supreme Court precedent that providing information to patients is *not* conduct

21 which is regulatable by the Board. The state case law cited by the Attorney General's office in

22

23

---

24

25  [1] *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) (hereinafter "*Pickup*"). *Pickup* was abrogated

26 by *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (hereinafter "NIFLA"), but partially revived by *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022).

27  [2] Order Denying Motion for Preliminary Injunction dated December 28, 2022 (Dkt. 78), in

28 *McDonald v. Lawson*, Case No. 8:22-cv-01805-FWS-ADS, *quoting Tingley v. Ferguson*, 47 F.4th at 1079, *quoting NIFLA*, 138 S. Ct. at 2372.

1  *McDonald* (and in our case), and Judge Slaughter's decision, do not support the claimed

2  longstanding history to regulate information conveyed to patients.

3        Third, the mainstream science has contradicted itself over three years of the pandemic.

4  The record before this Court is uniquely scientific -- Dr. Verma's declaration provides a

5  thorough mainstream chronology of public health authorities' flip-flops throughout the

6  pandemic. See especially ¶¶ 28-37, 41-42, 44-54, and 61-64.

7        AB 2098 is unprecedented, and Judge Slaughter's opinion stands alone. The Supreme

8  Court has *never* recognized the state's ability to restrict, limit or censor the information which a

9  physician can give to a patient, and neither has this Circuit. Such restrictions amount to

10  censorship and are subject to heightened scrutiny.

11        The statute's effort to circumvent the law by limiting the information to "in the form or

12  treatment or advice" via the addition of a definition of "disseminate" (Subsection (b) (3)), does

13  not alter the First Amendment free speech constitutional jurisprudential principle that content

14  and viewpoint-based restrictions are presumptively unconstitutional, subject to the strictest of

15  strict scrutiny, and practically speaking, never permissible. *See Reed v. Town of Gilbert*, 576

16  U.S. 155 (2015); *United States v. Alverez,* 567 U.S. 709, 717 (2012) (except in 7 recognized

17  categories); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011); *Holder v. Humanitarian*

18  *Law Project,* 561 U.S. 1 (2010); *Rosenberger v. Visitors of Univ. of Virginia,* 515 U.S. 819,

19  829, (1995); *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992).[3]

20

21  _____

22  [3] Plaintiffs do not concede that medical advice is unprotected speech subject to the rational

23  relationship test. *Pickup* states that medical advice is entitled to mid-level heightened scrutiny.
   Nor is it conceded that speech which is therapy is unprotected, *Pickup's* holding. Despite the

24  Defendants' view, which was adopted by Judge Slaughter, that *Pickup* was abrogated on other
   grounds, those other grounds were that the Supreme Court rejected *Pickup*'s view that

25  professional speech was a separate category of speech. We think the correct view of the law on
   this issue is set out in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), as set forth in

26  Plaintiffs' Opening Memo at pages 16-17. However, the specific issue addressed in *Otto*, *Pickup*

27  and *Tingley*, whether medical treatment performed by speech is entitled to First Amendment
   protection (i.e., some form of heightened scrutiny) is not the issue in this case. Rather, the issue

28  is whether intermediate scrutiny applies, as stated by the abrogated *Pickup* decision, or strict

On the Due Process vagueness issue, Defendants again fails to provide any response to the many dozens of data points and scientific statements presented in the declarations showing the impossibility of fair enforcement. Their only nonresponsive response is that physicians are required to know the standard of care and keep up when it changes. Defendants are effectively admitting that physicians can be punished for speaking truth, so long as the government declines to recognize truth as truth, a recurring phenomenon of the pandemic as catalogued with mainstream examples by Dr. Verma. Tellingly, in addition, the law is "wildly underinclusive" because the Legislature and the medical board acknowledged the vagueness in the law.

## II.    AB 2098 AND THE LEGISLATIVE REPORTS

### A.    The "'Actual Problem' in Need of Solving"[4]

AB 2098 was introduced into the Assembly on February 14, 2022. The problem the bill sought to address was to stop and sanction California licensed physicians who were questioning the safety and efficacy of Covid vaccines *in the media and social media*, which was creating public mistrust in the vaccine. The authorities felt that these physicians were increasing the public's "vaccine hesitancy" and thereby hindering their efforts to achieve widespread Covid vaccination, which the public health authorities thought was necessary to achieve "herd immunity." (*See* the Legislative Report, attached as Exhibit "B" (hereinafter "Exhibit "B") to the Defendants' Judicial Notice Motion at pages 7-12.)[5]

---

scrutiny applies, which seems to be the case because of the content and viewpoint restrictions in the statute, as held by virtually all Supreme Court authority (and *Conant* in this Circuit).

[4] Taken from *Brown v. Entm't Merchants Ass'n*, 564 U.S. at 799, as employed by this Court in its opinion in *Welch v. Brown*, 907 F. Supp. 2d 1102 (E.D. Cal. 2022), *rev. Pickup v. Brown*, 740 F.3d 1208. *Pickup* was abrogated by *NIFLA*, 138 S. Ct. 2361, but partially revived by *Tingley v. Ferguson*, 47 F.4th 1055.

[5] On the Requests for Judicial Notice, Plaintiffs accept the authenticity of the documents and concur with judicial notice that the statements were made. However, Plaintiffs object to taking judicial notice of the truth of the scientific matters and the alleged asserted facts that physicians were spreading false information by criticizing the public health authorities' statements about the safety and efficacy of the vaccines and boosters, and the efficacy of off-label treatment for Covid. Per Dr. Verma's declaration, those legislative statements are subject to reasonable

To remedy that problem, AB 2098 characterized such questioning of the safety and efficacy of the vaccines (as well as advocating for the off-label and repurposed use of FDA approved drugs like Ivermectin for the treatment of Covid) as "Covid misinformation," which was eventually defined as "false information that is contradicted by the contemporary scientific consensus contrary to the standard of care." Bus. & Prof. Code, Section 2270 (hereinafter "Section 2270"), definition of "Misinformation" at subsection (b) (4).

The initial Legislative Report stated that the illustrative example of the doctor (*and her conduct*) the bill intended to target was California medical licensed physician Simone Gold, MD, who "has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as 'experimental' despite numerous safety and efficacy trials successfully confirming their safety and efficacy."[6] (citation omitted). Exhibit "B" at page 9, second paragraph.

---

dispute (and therefore are not judicially noticeable under Federal Rules of Evidence, rule 201(b) ("not subject to reasonable dispute"). *See, e.g.*, *Ass'n of Irritated Residents v. Fred Schakel Dairy*, No. 1:05-cv-00707-OWW-SMS, 2008 WL 850136, at *4 n.4 (E.D. Cal. March 28, 2008) (rejecting request for judicial notice of draft government report and scientific articles because such matters were subject to dispute).

[6] Calling an Emergency Use Authorized drug (as all the Covid vaccines were initially, and still are for some age groups, and as are all Covid boosters) "experimental" is accurate.  Emergency Use Authorized drugs are drugs which "may be effective" to prevent, diagnose, or treat serious or life-threatening diseases or conditions . . ." "The 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals.[21]"  (ftn. 21: "Regulations regarding treatment INDs and IDEs also use the terminology "may be effective."" *Determinations to Support an EUA Declaration*, Emergency Use Authorization of Medical Products and Related Authorities, Guidance for Industry and Other Stakeholders, FDA.GOV (Jan. 2017), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities#A1.

EUA drugs are still in the FDA clinical investigation stage (i.e., before full FDA approval and awaiting the results of further clinical trial pursuant to an IND (Investigational New Drug Application) testing. Hence, they are considered for most FDA purposes as "Investigational new

The Legislative Report goes on:

> Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her (citation omitted). Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California.

*Id*. at third paragraph.[7]

---

drugs" which is defined as "a new drug or biological drug that is used in a clinical investigation."

"An investigational drug can also be called an experimental." *Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19*, FDA.GOV (Oct. 22, 2020), https://www.fda.gov/consumers/consumer-updates/understanding-regulatory-terminology-potential-preventions-and-treatments-covid-19.

Based on the foregoing, and ironically, in a sense, the Legislative Report's criticizing Dr. Gold's description of Covid vaccines as experimental might itself be Covid misinformation under the statute because it is false or misleading, and both the scientific consensus and the standard of care recognize the significant difference between the level of evidence supporting full FDA approval and EUA status, which is unrecognized in the Report's criticism of Dr. Gold.

Is it permissible for a California physician to tell a patient that the vaccine for that patient's age group and all boosters are only Emergency Use Authorized and hence technically investigational/experimental? Or would that be Covid misinformation because it might make some patients less likely to take the shots?  There is no way to tell under AB 2098 because based on the Legislative Report and the purpose of the bill, the use of the word "false" in "false information" likely only means information which might make it less likely that a person will take the Covid shots. On the other hand, if "false" really means false, that would mean that physicians could say things which could increase vaccine hesitancy. However, that would be inconsistent with the stated purpose of the bill. Unfortunately, Defendants' papers offer no answer to this or to any of the dozens of Covid information data points presented in the moving papers.  But the bill has problems either way.

[7] The discussion of Dr. Gold was carried over to the next Legislative Report after the bill was amended to limit its application to interactions with patients. *See* Exhibit "C" page 5, and similarly quoted the Federations Press Release targeting the public dissemination of

There are other references demonstrating that the target of the bill was the public speech of physicians and their outsized impact on the public discourse which was limiting the effectiveness of the public message being sent out by the public health institutions:

> [H]ealth practitioners whose views on Covid-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse. Anti-government cynics and vaccine skeptics cohere to the opinions of those few physicians…. The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

Exhibit "C" attached to Defendants' Request for Judicial Notice at page 3, third paragraph.

In explaining the role of the state medical boards, the initial Legislative Report points out that "In July of 2021, The Federation of State Medical Boards (FSMB) issued a statement positioned as being 'in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media.'" Exhibit "B" page 7, last paragraph. AB 2098 (a) (1) (f) specifically references the FSMB press release.

Clearly, the problem AB 2098 was intended to address and solve was primarily, if not exclusively, the public statements being delivered by California licensed physicians which were thought to undermine the public's confidence in Covid shots, i.e., increase vaccine hesitancy.[8]

---

information. *Id.* at page 3. The same discussion of Dr. Gold and the Federation's Press Release was provided in the August 22, 2022 version of the bill. Exhibit "F" page 4 and 2 respectively. The Legislature does not appear to comprehend that the activity which the bill is targeting is not actually prohibited by the bill. This might be constitutionally problematic both in terms of the fit of the bill to the state interest on a First Amendment level of scrutiny analysis as well as under a heightened specificity analysis under the Due Process vagueness analysis. The short of it is that based on the Legislative Reports, the law misses the identified target and the purpose of the bill.

[8] In fairness, there are a few sporadic references to information conveyed to patients in terms of the goal, but these Legislative Reports make clear that the main focus and problem was that the

However, because of concerns that the state could not constitutionally sanction physicians' public speech prior to the first legislative hearing on April 17, 2022, the bill's authors agreed to gut the bill and abandon the bill's basic purpose by limiting the sanctionable "covid misinformation"/disinformation to speech directed at a patient "for the purposes of treatment or advice." Exhibit "B" at page, 12 third paragraph. This was accomplished by adding "disseminate" as a defined term, and limiting the "Covid misinformation" (and disinformation) to the communication of information from physicians to patients for the purpose of treatment or advice. *Id.* at "Amendments" (1) (5)", incorporated into the bill as subsection (b) (3).[9]

However, the fact that the censored/sanctionable information has to be in the form of treatment or advice does not change the fact that the purpose of the law was to target speech/information conveyed by a physician.

The other result of this Legislative History is that the final version of the bill did not address the conduct the bill targeted, and sought to redress, making the law constitutionally underinclusive under both a First and Fifth Amendment analysis set forth *infra*.

**B.      What is and is not in the Legislative Reports**

Finally, it is important to point out what is and is not in the Legislative History. There is very little science related information in these reports. Just some sporadic and random references

---

use of social media by a handful of contrarians was drowning out the public recommendations of the public health authorities to take every shot and every booster.

[9] The Court might be hard pressed to think of physician speech to patients for some purpose other than for treatment or advice. If treatment or advice is the entire universe of physician encounters with patients, then the law imposes content and viewpoint based absolute censorship on physician/patient communications which is more akin to how totalitarian governments restrict physicians, as noted by the Supreme Court and the Eleventh Circuit, and as discussed and quoted on pages 18-19 of the Complaint. But attempting to turn information provided to patients into regulatable conduct or "medical care" as argued by the Defendants does not strip away its protected speech status. That is what the Supreme Court said in *NIFLA* the last time the California Legislature tried to transform protected speech into unprotected medical conduct. *See* Plaintiffs' Opening Memo at pages 13-16 discussing *NIFLA* and why strict scrutiny applies to Section 2270, based on the entire body of First Amendment speech jurisprudence at pages 12-13 *infra*.

to a study here and there. The Legislative Reports do contain a list of mainstream medical organizations that support the original bill. We remind the Court of how the Eleventh Circuit dealt with the record in its SOCE regulation case wherein it stated that it would have been more impressed by actual evidence than argument by authority (i.e., the list of medical organizations opposed to SOCE), and that the position of the medical establishment about sexual orientation has radically changed over time, which failed to instill confidence in the value of a medical consensus. (*See* Plaintiffs' Opening Memo at page 19 ln 7 to page 20, ln 2). Based on the declaration of Dr. Verma, which is actual evidence and is extensively referenced, the Eleventh Circuit's caution applies many-fold more here and now.

## III.   THE FIRST AMENDMENT ISSUE

### A.   Judge Slaughter's Decision

Let us discuss the two central parts of Judge Slaughter's decision: (1) The use of the rational relationship test, (2) His acceptance of the State's argument that there is a longstanding tradition of unprotected professional speech/conduct of the type in Section 2270.[10]

### 1.   Judge Slaughter's Use of the Rational Relationship test was Clearly Erroneous

The Supreme Court has recognized seven categories of content and/or viewpoint-based speech which are unprotected by the First Amendment and can be prohibited, or for which the speaker can be sanctioned or penalized. *See United States v. Alverez,* 567 U.S. at 717.  The

---

[10] The third part of Judge Slaughter's opinion is his discussion of the other three *Winter* preliminary injunction factors. (Decision at pages 27-29.) However, since he held that there was not a viable First Amendment claim, his findings on the other three factors were preordained (especially irreparable injury, as he so indicated). But conversely, a finding of a likely First Amendment violation all but preordains or entails a finding that the other three elements are satisfied. *See* Plaintiffs' Opening Memo at pages 8-9. Accordingly, there seems little need for a detailed response to that part of Judge Slaughter's opinion, especially since the record in our case provides specific facts supporting the other *Winter* elements, like the declarations of the patients, which show the erosion of trust in the doctor/patient relationship that the statute is causing and that supports the public's interest in granting the preliminary injunction.

state's regulation of the information which medical professionals can provide to patients is not one of these categories. *Id*.

In *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, the Supreme Court specifically rejected the notion that professional speech is a recognized special category of speech which had different and less protective First Amendment rules than other forms of speech (save two exceptions) and of that professional speech is unprotected or subject to rational relationship review. (*See* Opening Memo at pages 13-16.) The *NIFLA* court criticized by name, *Pickup v. Brown* and its professional speech categorial/continuum First Amendment approach, and thus, Plaintiffs argue that *Pickup* has been abrogated by the Supreme Court, and is not good law, save possibly for its holding, per *Tingley v. Ferguson*, 47 F.4th 1055 (discussed in the Opening Memo at pages 17-18).

Judge Slaughter's decision to use the rational relationship test is even inconsistent with the abrogated *Pickup v. Brown*, 740 F.3d 1208, which he incorrectly cites as authority for his application of the test. As set forth in Plaintiffs' Opening Memo, *Pickup* used the rational relationship test because the speech was purportedly the treatment, and the *Pickup* court made a hard distinction between the SOCE treatment "while leaving mental health practitioners free to discuss and recommend, or recommend against, SOCE," which was somewhat less protected than physicians' soapbox speech. (*See* Opening Memo at pages 12-13.)

Furthermore, even the Ninth Circuit's decision in *NIFLA* used intermediate scrutiny review in its First Amendment challenge to compelled speech which was incidental to the treatment or advice given by the clinic's doctors. *Nat'l Inst. Of Family & Life Advocates v. Harris*, 839 F.3d 823, 841-844 (9th Cir. 2016) *rev*. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361. Accordingly, there is no case law support for Judge Slaughter's use of the rational relationship test to evaluate the censorship imposed under Section 2270.

Judge Slaughter cites *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214 (11th Cir. 2022). However, that case does not involve the issue in this case, which is whether a medical board can stop its licensees from providing information and their opinions to the patients. *Del Castillo* is a First Amendment free speech challenge by unlicensed practitioners

(nutritionists) who want to charge for their services of providing nutritional advice in a state which requires a dietician's license to do so.

Unlike the activity sought to be regulated by Section 2270, there actually is a long history of the government being able to control and limit the people who practice a profession (going back to the English trade guilds which obtained a royal seal from the king to determine who could practice a trade). The fact that the government can restrict unlicensed persons from engaging in an activity requiring a license offers little support for the notion that the state can stop its licensees from providing information to patients/clients.[11]

Judge Slaughter's use of the *Del Castillo* case to support a rational relationship test to review Section 2270 conflicts with even the abrogated *Pickup*, and the Ninth Circuit's *NIFLA* decision under which the information and opinions conveyed by physicians to their patients is reviewed under intermediate scrutiny. It also conflicts with *Conant v. Walters,* 309 F.3d 629 (9th Cir. 2002) under which the same type of information and opinions are reviewed under strict scrutiny. (*See* the *Conant* discussion in Plaintiffs' Opening Memo at pages 10-11.)

In short, there is no legal support for the use of the rational relationship test on Section 2270 and as a result, the Court should not follow Judge Slaughter on this point.

> **2.     There is No long-standing Recognized or Unrecognized Tradition in California (or any place else) holding that the information which a physician provides to patients is Unprotected Speech.**

As discussed, even the abrogated *Pickup* considered the information and opinions conveyed by a physician, including the recommendation of the SOCE treatment to be protected speech, subject to heightened (intermediate) scrutiny, even if the physician could not legally

---

[11] Defendants in this case make a similar argument discussing a number of other cases on page 14 of their Response. But the answer is the same. The fact that there is a long-standing history of a professional board being able to regulate who can practice the profession, and exclude others from engaging in that professional activity, is not a tradition of allowing a board to restrict what its licensees can tell patients just because the state does not agree with the message. Here again, the Defendants' argument begs the question at issue, and the Defendants' cases cited are no support at all.

provide (i.e., provide without the threat of discipline) the SOCE treatment. (And in that factual regard, *Pickup* is consistent with *Conant* where the physician could convey information about, and recommend medical marijuana, but could not prescribe it, because to do so would be a federal crime.)

Thus, contrary to Judge Slaughter's position (see pages 18-20 of the decision), *Pickup* actually refutes the notion of regulating a physician's conveying information to a patient, *including conveying opinions and recommendations for a treatment that violated the standard of care, which SOCE did per the statute challenged in Pickup.*

This is critical and worth repeating. The SOCE statute barred giving SOCE therapy because it was dangerous and against the consensus of medical science. *Pickup* thus rejected that the SOCE speech/therapy was entitled to First Amendment protection (i.e., heightened scrutiny). Nonetheless, *Pickup* stated that providing information about this dangerous therapy which was against the statutory standard of care, and a physicians' giving her opinion and recommendation of the dangerous therapy, was entitled to heightened protection.  It is hard to have a long tradition of unfettered regulation when the principal case relied upon rejects that very idea. Thus, a proper analysis of *Pickup* itself strongly suggests that there is no long tradition of the regulation of information or the opinions and recommendations conveyed by physicians to patients.

Further as demonstrated above, the claimed "longstanding" tradition of regulating the speech in AB 2098, which the Defendants argued and Judge Slaughter accepted, was based on the misdirection of transposing conveying information and giving opinions with providing medical treatment and then considering prior cases which discuss medical treatment as legal support for a long tradition of the Boards' regulation of information. However, there are no cases in California which hold that a health care board can censor a physician's conveying information to a patient or sanction a physician for doing so. This is admittedly a strong statement, but a review of the cases cited by the Defendants and Judge Slaughter bears this out.

The Defendants cite *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936) as "upholding sanctions on physician who made false claims about his ability to treat hernias"

(Opposition Brief at page 2). However, that was a false advertising case, not a case involving communications with a patient. Advertising (commercial speech) by anyone is entitled to limited First Amendment protection, but false advertising is considered to be a one of the seven categories of unprotected content-based speech, regardless of who the false advertiser is. *See United States v. Alverez*, 567 U.S. at 717; *see also NIFLA*, 138 S.Ct. at 2372. There is no professional speech except to false advertising (called fraud in the *Alverez* seven categories list). Accordingly, *Fuller* does not support the long history of regulating physician speech which is the subject/target of AB 2098.

The other cases cited by the Defendants, *Arnet v. Dal Cielo*, 14 Cal.4th 4 (1996), *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 194 (1980), *Flowers v. Torrance Mem. Hosp. Med. Center,* 8 Cal.4th 992, 997-98 (1994), and *Kearl v. Bd. of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) are just general cases affirming the state's ability to regulate medical conduct the state considers negligent or incompetent. Like *Fuller*, these cases are silent as to the issue in this case, i.e., whether a physician's conveyance of information to a patient is unprotected. By reliance on inapposite cases, Judge Slaughter assumed it was based on a long history of such regulation. But on closer inspection (as the appellate court will likely do), these cases do not support Defendants.

Judge Slaughter discusses at length a part of the *Pickup* opinion which references *Conant v. McCaffrey*, 2000 WL 1281174 at *13 (N.D. Cal. Sept. 7, 2000), *aff'd sub nom. Conant, v. Walters*, 309 F.3d 629 (2012), relating that the state can bar quack medical advice, which Judge Slaughter said would "foreclose" the notion that advice or professional speech is protected. (Slaughter opinion at page 20.) However, he is reading too much into that case.

Context is everything. First, District Judge Alsup in his *Conant* decision upheld the prior preliminary injunction barring the DEA from investigating or revoking the DEA registration of physicians based on their recommending medical marijuana, holding that strict scrutiny applied and that the First Amendment barred the DEA from interfering with the physicians' First Amendment right to give information, advice and recommend the drug to patients. *Id*.

1    Judge Alsup cites as authority for his "quack medicine" comment *Shea v. Board of*
2  *Medical Examiners*, 81 Cal. App. 3d. 564 (1978). That case is a far, far outlier. Dr. Shea was a
3  sexual deviant who satisfied his sexual perversion with his patients (two actual patients and
4  several undercover government agents posing as patients). He tried (but failed) to hypnotize
5  them, and then tried to sexually stimulate them by performing graphic sexual monologues. He
6  then gave the women patients full body massages.

7    Yes, Dr. Shea's medical defense attorney argued that the doctor had a First Amendment
8  right to engage in these graphic sexual monologues with patients, even though none of them
9  complained of any sexual problems. (And perhaps his lawyer argued that the full body massages
10 were "incidental" to the doctor's free speech.) But the court held that Dr. Shea's perverted, self-
11 sexual gratification speeches to patients were unprotected.

12    *Shea* is not a real First Amendment professional free speech case involving a physician's
13 delivery of information and opinions about a subject of great importance which is or might be
14 contrary to the opinion of most physicians. It certainly does not support Judge Slaughter's
15 position that there is a longstanding history of regulating physicians' information provided to
16 patients. Accordingly, this Court should reject Judge Slaughter's view that there is a
17 longstanding history of the government restricting physicians' information and opinions
18 conveyed to patients.

19    **B.    Strict Scrutiny applies to Section 2270**

20    After this Court rejects Judge Slaughter's clearly erroneous position that Section 2270 is
21 judged under the rational relationship test, and that California has a long tradition of censoring
22 the information physicians provide to patients, it should engage in a traditional First
23 Amendment analysis to determine the level of scrutiny. Because the law clearly is both content
24 (Covid) and viewpoint based (any information which questions the safety and efficacy of the
25 Covid vaccines and boosters), strict scrutiny unquestionably applies. *Reed v. Town of Gilbert*,
26 576 U.S. 155 (content); *Otto v. City of Boca Raton,* 981 F.3d at 864 (content), *citing*
27 *Rosenberger v. Visitors of Univ. of Virginia,* 515 U.S. at 829 (viewpoint). *See also United*
28 *States v. Alverez,* 567 U.S. at 717 (except in 7 recognized categories); *Brown v. Entm't*

*Merchants Ass'n*, 564 U.S. 786; *Holder v. Humanitarian Law Project,* 561 U.S. 1; *R.A.V. v. City of St. Paul,* 505 U.S. at 382.

Furthermore, even if this Court were to somehow find that conveying information and opinions to patients plays double duty as conduct (i.e., speech transformed into treatment or advice), under *United States v. O'Brien*, 391 U.S. 367 (1968) and subsequent cases (including *Holder v. Humanitarian Law Project,* 561 U.S. 1), a law regulating conduct which incidentally affects speech is subject to strict scrutiny if the restriction is content or viewpoint based, and Section 2270 is clearly both. Thus, strict scrutiny would apply to Section 2270. (*See* this Court's analysis in *Welch v. Brown*, 907 F. Supp. 2d at 1112-1114 cited in footnote 4 page 3, discussing *O'Brien*, and *Humanitarian Law Project,* both of which cases are still good law.) *See also Rosenberger v. Visitors of Univ. of Virginia,* 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale of the restriction.") and *Reed v. Town of Gilbert*, 576 U.S. 155.

On a straight-up content and viewpoint based constitutional analysis, this Court should apply strict scrutiny to Section 2270.

## C.    Applying Strict Scrutiny

To supplement Plaintiffs' strict scrutiny analysis (Plaintiffs' Opening Memo at pages 18-20), let us look at this case through the lens of *Brown v. Entm't Merchants Ass'n*, 564 U.S. at 799, wherein the Supreme Court stated that to satisfy strict scrutiny "[the] State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." The *Brown* court said that under strict scrutiny the state "bears the risk of uncertainty" and "ambiguous proof will not suffice", as well as a "direct causal link" between the targeted information and the harm. *Id*.

As indicated, the "actual problem" Section 2270 sought to address was physicians who were speaking out in public in a way that was increasing the public's vaccine hesitancy, thus limiting the percentage of the population agreeing to take the Covid shots and boosters. However, there does not appear to be any actual evidence in the legislative record that restricting

public free speech of California physicians (or even the free speech of physician communications with their patients) would be necessary or causally linked to stopping the alleged harm, i.e., a less than ideal vaccine and booster uptake rate. What you have is some newspaper articles and a couple paragraphs of press release for the Federation of State Medical Boards. That is not sufficient evidence to infringe upon the free speech rights of physicians, even their speech to patients under a *Brown* analysis.

In addition to a failure of proof of causation, *Brown* suggests another reason why Section 2270 fails strict scrutiny, and that is the fatal under inclusiveness of the statute "when judged against its asserted justification. Under inclusiveness raises serious doubts about whether the government is in fact pursuing the interests it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. at 802, *citing City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) and *Florida Star v. B.J.F.* 491 U.S. 524, 540 (1989).

Section 2270 is, in the parlance of *Brown*, "wildly underinclusive" in several critical respects. First, as stated, it does not even address the problem that the bill was supposed to address, namely the public dissemination of information (i.e., on social media) by California physicians, so the law's limited application to communications with patients is underinclusive.

Second, the law only applies to physicians. It does not include other licensed (and unlicensed) health care practitioners like chiropractors, or licensed or unlicensed naturopathic doctors. "Given that many additional licensed health care providers also have a 'high degree of public trust…' it is unclear why only one category of professional would be specified…. The author may wish to continue discussing whether other health care licensees should be included in the provisions of this bill." Exhibit "D" Section 6, "Should this bill only apply to physicians and surgeons" pages 10-11. (This concern was carried over the subsequent Legislative Report, Exhibit E page 4, last paragraph to page 5.) This Legislative information is strong evidence that the law is unconstitutionally underinclusive and is not a reasonable fit under either form of heightened scrutiny.

On the other side of the evidentiary ledger is the Declaration of Sanjay Verma, M.D. which demonstrates that on almost every major Covid issue, and especially on the safety and

efficacy of the vaccines and boosters, the government authorities have oversold vaccine safety and efficacy, overpromised vaccine benefits, and underemphasized side effects, all of which have resulted in very frequent and highly visible revisions to the public health edicts. *See* the Verma declaration on The Safety of COVID-19 Vaccine, Section III page 7 to page 11, The Efficacy of Vaccines, Section IV page 11 to page, 13, The incorrect Legislative Finding that the unvaccinated are dying at 11 times the rate of the vaccinated, Section VI page 13 to page 15, and very important information showing that the number of deaths and hospitalizations from COVID-19 have been overestimated at Section IX page 16 to page 18. This unrebutted evidence from Dr. Verma addresses and directly challenges the specific legislative findings on these issues, which mostly consist of newspaper articles decrying those who do not follow the mainstream Covid narrative at any given time.

Dr. Verma's declaration suggests that the actual cause of vaccine questioning is the loss of public trust because of public health's wrong edicts about vaccine safety and efficacy and the continuous need for boosters, without any end in sight. This Court might also consider that another cause of vaccine or booster immunity is that now that there is an FDA approved Covid treatment, many people might be making the personal risk/benefit calculation to forgo the vaccine or third or fourth booster and take the Covid treatment, if they become seriously ill, especially those who have already had Covid, one or more times previously.

But these alternative analyses are ultimately unnecessary. Under *Brown*, the absence of a proven causal connection between the problem identified by the law and the restrictions on physicians' free speech, in conjunction with the wild under inclusiveness of the law, requires the Court to find that the Defendants have not sustained their burden of proof under strict scrutiny.

For the reasons set forth above and in the Opening Memo, this Court should hold that there is a likelihood of success on the merits of the First Amendment claim because Section 2270 fails strict scrutiny.[12]

---

[12] The Legislative Reports state that the two boards believe they likely already have the power to regulate physician speech, both in public and to patients under Section 2234. (*See, e.g.,* Exhibit C page 4, third paragraph.) The Defendants make the same argument with respect to physicians'

**IV.    The Vagueness Issue**

Let us start with a question. Does Section 2270 apply to physicians' newsletters to patients, which contain medical information and advice about Covid vaccines and boosters and the off-label drugs for Covid treatment?  The statute does not appear to answer this question, in large part because the statute does not specifically limit the dissemination of information to a one-on-one physician encounter. That is a fairly large point of vagueness in the statute, especially because newsletters are a primary First Amendment tool that many physicians use to keep patients updated on the latest emerging science *before* it is consensus, and regardless of whether it *ever* becomes consensus.

We would also point out that the Legislature and the Medical Board themselves had concerns that AB 2098 was unconstitutionally vague. See Exhibit "B" at page 11, calling for "clearer definitions."  However, the change in the definition from one general term (gross negligence) to another general term ("standard of care") in the "covid misinformation" definition[13]  does not solve the vagueness problem; it just lowered the evidentiary requirement for the violation. Therefore, by their own admission, the statute is vague.

In addition, the statute seems to be unclear if not contradictory about whether misleading Covid information is or can be "Covid misinformation" (compare the definition of Covid misinformation at subsection (b) (4) which is defined as false information (and does not include misleading information) with Section 2270 (a) under which it is unprofessional conduct for a physician to disseminate "misinformation or disinformation, relating to COVID-19, including

─────────────────

speech to patients. (Defendants' Response at*, inter alia* page 23, lns. 80-14.) Plaintiffs disagree. There is no California case which holds or states that either board has the power to sanction a physician for providing information to a patient or that holds that the boards have the constitutional right to do so. That makes the boards' position more wishful thinking than legal analysis. *Conant* and all of the Supreme Court authority cited and discussed in this section would be precedent for rejecting Defendants' position. Meaning all of the data points set out in the Verma, Hoang and Miller declarations would be subject to a strict scrutiny analysis (or intermediate scrutiny under the abrogated *Pickup* and the reversed *NIFLA* Ninth Circuit decision).

[13] Exhibit D page 11, redlined, strikeout definition of "misinformation." Same Exhibit E page 4.

false or misleading information relating to…."  Meaning the operative part of the statute, subsection (a) appears to incorporate and expand "misinformation" beyond that which is in the definition of the term.

Let us consider the Complaint, the declarations of Plaintiff Dr. Hoang, PIC President Dr. Miller and especially the 40-page declaration of Dr. Verma, which provides dozens of examples of specific information/speech/data points that would or might make a patient less willing to take the Covid shots, and thus per the Legislative Reports, could be, or likely is, targeted and sanctionable speech under the statute.[14]

What is the Defendants' response? There is no substantive response, not to the information Plaintiff Hoang intends to convey to patients, and not to the seven categories of Covid information that Dr. Verma details in his declaration, which Dr. Hoang and Dr. Shira Miller on behalf of PIC's physician members think patients may need to know.

The non-substantive/nonresponsive response contained in Defendants' papers consists of the following three points: (1) Physicians are obligated to know the standard of care and keep up with changes in the standard of care (Lim Declaration page 2 para. 3), (2) doctors can say anything they want in public and to their friends, but must follow the standard of care in giving patients advice (Opposition papers at page 20), and (3) that there are some objectively provable facts within the scientific consensus like "apples contain sugar, that measles is caused by a virus, that Downs Syndrome is cause by a chromosomal abnormality, etc." (*Id.* page 21, lns. 11-13), and that when there is no consensus, the statute doesn't apply. *Id.* at lns. 12-17).

In response to Plaintiffs' assertion that the term "contradicted by contemporary consensus" the Defendants make a series of underwhelming and unsatisfying arguments, like apples contain sugar and measles is caused by a virus. This misses the point of the First Amendment. It is not

---

[14] Judge Slaughter makes no reference to any expert declarations or any specific information which would appear to be the target of the law. Also, Judge Slaughter's analysis omits an analysis of the original version of the law and the clearly articulated purpose in the Legislative Reports. Therefore, given the difference in the records of the two cases, Judge Slaughter's vagueness analysis would seem not as important to address as his legal analysis of the First Amendment issue.

the government's job to make a list of true statements. Plaintiffs presented many dozens of data points about Covid which they want to convey to patients (and which directly contradict the legislative findings in AB 2098), and the Defendants could not (or chose not) to respond to any of them in terms of whether they are consistent with the contemporary scientific consensus.

Perhaps the most unsatisfying argument in the opposition papers is that the Board has the burden of proof in a disciplinary proceeding. Defendants claim that if the Board does not meet their burden, the physician is not disciplined, and that truth is a defense. In other words, Defendants do not recognize the stigma of a disciplinary proceeding, the cost of defense, and trauma upon the physician's life.

The DEA in *Conant v. Walters*, 309 F.3d 629 made a similar argument to what the Defendants are claiming here, namely that physicians who legally recommend medical marijuana had nothing to fear from DEA investigations. But as Judge Kozinski in his concurring opinion stated, "... doctors are particularly vulnerable to intimidation; with little to gain and much to lose, only the most foolish or committed of doctors will defy the federal government's policy [of prohibiting the use of marijuana for medical purposes] and continue to give candid advice about the medical use of marijuana."[2] *Id.* at 640-41. Judge Kozinski's footnote 2 which quotes an expert puts it more ominously:

> [P]hysicians are particularly easily deterred by the threat of governmental investigation and/or sanction from engaging in conduct that is entirely lawful and medically appropriated. [A] physician' practice is particularly dependent upon the physician's maintaining a reputation of unimpeachable integrity. A physician's career can be effectively destroyed merely by the fact that governmental board has investigated his or her practice.

*Id.*

There is an old saying in criminal defense law. "You can beat the rap, but you can't beat the ride."  The Defendants are offering cold to zero comfort to California licensed physicians.

In sum, Plaintiffs maintain that Defendants' Response in conjunction with the above admissions that the statute is vague, plus the argument set out in Plaintiffs' Opening Memo (pages 22-23), demonstrate that Section 2270 fails the heightened specificity requirement of the

1   Fifth and Fourteenth Amendments.

2   **V.    Other Preliminary Injunction Factors and the Real-World Implications of the Law**

3           The purpose of AB 2098 as originally introduced was to threaten physicians with

4   professional discipline if they spoke out in public in a manner which increased vaccine hesitancy

5   and thus decreased the percentage of people who get the vaccine and boosters. That the passed

6   version is limited to physician-patient interactions makes the bill even more unconstitutional,

7   because it impairs the trust between physicians and patients. As confirmed in the patient

8   declarations in support of preliminary injunction, patients will rightfully question whether

9   physicians are giving an honest opinion or just parroting what the medical authorities are forcing

10  them to say. Beyond the abstract First Amendment concepts and arguments, it is important for

11  the Court to appreciate the real-world effect of the law on physicians who do not completely

12  subscribe to the mainstream Covid narrative.

13          As to the patients' perspective, we refer the Court to the declarations of Debbie Hobel

14  and Jamie Coker-Robertson. The physicians' perspective is set out in Plaintiff Hoang's

15  declaration and Shira Miller M.D.'s declaration speaking for PIC's physicians.

16          To further clarify both perspectives, we relate herein how the law would likely be

17  implemented in a patient interaction by physicians who are neither "the most foolish or

18  committed doctors" in response to any question where the physician's answer might decrease

19  the likelihood that the patient will take every recommended shot and booster.

20          In answer to your specific questions about Covid-19 vaccines and boosters, and
21      Covid-19 treatments, the public health and medical authorities and the California
        standard of care require me to advise you to take all Covid vaccines and every
22      booster, whether fully approved by the FDA or only Emergency Use Authorized
        (where the vaccine may be effective), and to only take or consider taking Covid-19
23      treatments which are specifically approved for the Covid-19 virus because that is
        what the consensus of medical science and the standard of care consider to be
24      truthful (and not misleading) information concerning these subjects.
25
        California law prohibits me from providing you with any information, including
26      information about peer-reviewed published scientific studies, which might make
        you less willing to take all Covid-19 shots and boosters, or which might make you
27      less amenable to take the on-label FDA approved drugs if you contract Covid-19.
28

If you would like to receive information or advice different from what I as your physician am permitted to tell you under California law, you must go to a physician in a state which allows physicians to disclose information, including peer-reviewed medical literature, which might make you, given your particular circumstances, less willing to take the Covid-19 shot or the third (fourth, fifth, or semi-annual) booster you are currently considering. If you cannot travel to another state, you might consider a licensed healthcare practitioner other than a physician, or an unlicensed healthcare practitioner because only California licensed physicians are limited in the information they can convey to patients. Fortunately, the California Legislature is an outlier. Most states do not restrict physicians from providing patients with evidence-based information and opinions about these issues. If fact, many state legislatures are attempting to prohibit their medical boards from sanctioning physicians for providing what the California Legislature has termed 'Covid misinformation.' [15] [16]

If this is the only answer California physicians can give to patients' questions about Covid, then what is the point of patients going to physicians for information and advice about anything to do with Covid, other than to have all California licensed physicians indoctrinate, cajole or wheedle their patients into complying with the government's message to keep on taking the shots and every EUA booster?

Regardless of the purported often unproven and frequently changing public health edicts (as demonstrated by Dr. Verma's declaration), this is not legitimate constitutional regulation of the practice of medicine. In the most literal sense, it is medical authoritarianism masquerading as public health.  Calling it out as such is no different than what the Supreme Court said the last time the California Legislature attempted to dictate the information medical facilities were required to provide to their patients. *See NIFLA*, 138 S. Ct. 2361, quoted language from the

---

[15] "Legislation in at least fourteen states have been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with FSMB's guidance." [URL reference omitted.] Legislative Report attached to Defendant's Request for Judicial Notice as Exhibit B, page 8. The FSMB's (Federation of State Medical Boards) "guidance" referred in this Legislative Report is in reality just the FSMB's July 21, 2021 "Press Release" and is quoted in full in the Complaint at page 13, para. 58.

[16] This part of the disclosure might be reminiscent of the preliminary injunction hearing in *Welch v. Brown*, but it applies with equal force in this motion.

opinion is set out in full in the Complaint on pages 18-19.

But here is the deeper problem with Section 2270 or any law which literally allows the government to restrict the information and advice physicians give to their patients. Patients will learn that they cannot trust their physicians to give them their candid and honest opinions about Covid (or the next public health crisis), which is the takeaway from the two-patient declarations submitted in this case.  In short, the public's trust in physicians is greatly undermined by the government limiting the information physicians can provide to their patients. The law's corrosion of the public trust is a strong factor favoring the grant of the preliminary injunction.

## CONCLUSION

For the forgoing reasons, Plaintiffs request that the Court grant the Preliminary Injunction and bar the enforcement of Section 2270 pending the final disposition of this lawsuit.

Dated: January 9, 2023

Respectfully submitted,

RICHARD JAFFE, ESQ.
SBN 289362
428 J Street, 4th floor
Sacramento, California, 95814
Telephone: 916-492-6038
Facsimile:  713-626-9420
Email:  rickjaffeesquire@gmail.com

ROBERT F. KENNEDY JR., ESQ.
(Admitted Pro Hac Vice)
Children's Health Defense
752 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417
Telephone: (202) 854-1310
Attorneys for Plaintiffs

22    Reply In Support of Preliminary Injunction

**AMENDED LOCAL RULE 231 (D)(3) STATEMENT**

1. Plaintiffs rescind their request for an evidentiary hearing, and will not call any witnesses at the hearing.

2. Plaintiffs anticipate that the hearing will take between a half hour and forty-five minutes for both sides depending on the Court's questioning.

_____

Richard Jaffe, Esq.

1

**CERTIFICATE OF E SERVICE**

2   I, Richard Jaffe affirm as follows:

3       1.   I am an attorney at law admitted to practice in this court. I am not a party to this action

4            and am over the age of 18. I am counsel of record for the Plaintiffs in this case. I submit

5            this Certificate of Service under penalties of perjury.

6       2.   This Reply was E served on Defendants' counsel Kristin Liska when it was filed.

7

8

9

10   _____

11   Richard Jaffe, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28