Hannah Kieschnick (SBN 319011)
  hkieschnick@aclunc.org
Chessie Thacher (SBN 296767)
  cthacher@aclunc.org
Shilpi Agarwal (SBN 270749)
  sagarwal@aclunc.org
Angélica Salceda (SBN 296152)
  asalceda@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478

Peter Eliasberg (SBN 189110)
  peliasberg@aclusocal.org
Melissa Goodman (SBN 289464)
  mgoodman@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

*Attorneys for Amici Curiae*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LETRINH HOANG, D.O.; PHYSICIANS FOR INFORMED CONSENT, *a non-for-profit organization*; and CHILDREN'S HEALTH DEFENSE, CALIFORNIA CHAPTER, *a California Nonprofit Corporation*,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, *in his official capacity as Attorney General of California*; and ERIKA CALDERON, *in her official capacity as Executive Officer of the Osteopathic Medical Board of California*,<br><br>Defendants. | Case No. 2:22-cv-02147-WBS-AC<br><br>**[PROPOSED] BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA AND AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:     Hon. William B. Shubb<br>Date:      January 23, 2023<br>Time:      1:30 P.M.<br>Courtroom: 5 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ 3

INTRODUCTION ............................................................................................................................... 5

ARGUMENT ....................................................................................................................................... 7

    I.   Under the Ninth Circuit's Well-Established Framework for Evaluating Healthcare Regulations, AB 2098 Regulates Protected Speech, and the First Amendment Applies ............... 7

    II.  This Court Should Resist the Parties' Efforts to Collapse the Distinction Between Speech and Conduct ................................................................................................................. 9

        A.   Not All Information Sharing Is Protected Speech ...................................................... 9

        B.   Not All Doctor-Patient Interaction Is Regulable Conduct ........................................ 11

    III. Even if AB 2098 Regulates Some Conduct, the Court Should Apply First Amendment Scrutiny Because AB 2098 Is Overbroad and Chills Protected Speech. .................. 13

    IV. AB 2098 Is Unconstitutional Because the State Can Achieve its Goal of Protecting Patients Using Less Restrictive Alternatives, like Laws that Already Regulate Physician Conduct. ................................................................................ 14

CONCLUSION .................................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**   Page(s)

*Cobbs v. Grant*,
  8 Cal. 3d 229 (1972) ............................................................................................. 15

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ............................................................................. Passim

*Davis v. Physician Assistant Bd.*,
  66 Cal. App. 5th 227 (2021) ................................................................................. 15

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ...................................................................................... 8, 10

*Forsyth Cnty., Ga. v. Nationalist Movement*,
  505 U.S. 123 (1992) ............................................................................................. 13

*Fuller v. Bd. of Med. Exam'rs*,
  14 Cal. App. 2d 734 (1936) .................................................................................. 16

*Hill v. Colorado*,
  530 U.S. 704 ......................................................................................................... 10

*Hughes v. Bd. of Architectural Exam'rs*,
  17 Cal. 4th 763 (1998) .......................................................................................... 16

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
  538 U.S. 600 (2003) ........................................................................................ 13, 16

*Klein v. San Diego Cnty.*,
  463 F.3d 1029 (9th Cir. 2006) .............................................................................. 13

*NAACP v. Button*,
  371 U.S. 415 (1963) ............................................................................................. 13

*Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*,
  228 F.3d 1043 (9th Cir. 2000) .............................................................................. 10

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ..................................................................................... Passim

*Nelson v. Gaunt*,
  125 Cal. App. 3d 623 (1981) ................................................................................ 16

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) .............................................................................. 10

*Pickup v. Brown*,
  740 F.3d 1208 (9th Cir. 2014) .......................................................................... Passim

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ............................................................................................... 8

[PROPOSED] BRIEF OF AMICI CURIAE
ACLU NORCAL & SOCAL ISO PLAINTIFFS' MPI    3    Case No. 2:22-cv-02147-WBS-AC

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................................................. 7

*Thomas v. Collins*,
  323 U.S. 516 (1945) ........................................................................................................... 12

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) ........................................................................................................... 17

*Thornhill v. Alabama*,
  310 U.S. 88 (1940) ............................................................................................................. 13

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) ......................................................................................*Passim*

*United States v. Alvarez*,
  567 U.S. 709 (2012) ........................................................................................................... 16

*United States v. Hansen*,
  25 F.4th 1103 (9th Cir. 2022) ............................................................................................ 13

*United States v. Playboy Ent. Group, Inc.*,
  529 U.S. 803 (2000) ........................................................................................................... 15

*Victory Processing, LLC v. Fox*,
  937 F.3d 1218 (9th Cir. 2019) ........................................................................................... 15

*Wollschlaeger v. Gov., Fla.*,
  848 F.3d 1293 (11th Cir. 2017) ........................................................................................... 8

*Yellen v. Board of Medical Quality Assurance*,
  174 Cal. App. 3d 1040 (1985) ........................................................................................... 16

**Statutes**

2022 Cal. Stat., ch. 938 (AB 2098) (to be codified at Cal. Bus. & Prof. Code § 2270) ...................*Passim*

Cal. Bus. & Prof. Code § 2234 ................................................................................ 14, 15, 16, 17

Cal. Bus. & Prof. Code § 2234.1 ................................................................................................. 15

**Other Authorities**

Johnny Diaz, *A San Diego doctor receives a prison sentence for selling a '100 percent'
  cure for COVID-19*, N.Y. Times (May 30, 2022) ............................................................. 16

Andres Picon, *Napa doctor convicted of selling fake COVID vaccination cards, remedies*,
  S.F. Chronicle (Apr. 6, 2022) ............................................................................................ 16

[PROPOSED] BRIEF OF AMICI CURIAE
ACLU NORCAL & SOCAL ISO PLAINTIFFS' MPI        4        Case No. 2:22-cv-02147-WBS-AC

## INTRODUCTION

"An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002). Before prescribing medicine, performing a medical procedure, or administering some other form of treatment, a physician discusses their patient's symptoms, risk factors, values, and goals; explains treatment options; and shares their opinion on the advantages and disadvantages to different courses of action. Healthcare decisions are, as the Supreme Court has described, "deeply personal." *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2374 (2018) (citation omitted). Accordingly, candor between doctor and patient is "crucial." *Id.* (citation omitted).

Assembly Bill ("AB") 2098[1] threatens that candor. While California is rightly focused on the role of licensed medical professionals during the COVID-19 pandemic, AB 2098 goes too far. According to the State, the law is needed because an "extreme minority" of physicians have used their positions of trust—and popularity on social and legacy media—to propagate what the State deems "false or misleading information" about COVID-19.[2] But rather than employ the existing tools at its disposal, the State has taken a blunt instrument to the entire profession. AB 2098 declares it "unprofessional conduct" for a physician to "disseminate misinformation or disinformation related to COVID-19," with "disseminate" defined broadly as the "conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." AB 2098, § 2(a), § 2(b)(3).[3]

---

[1] 2022 Cal. Stat., ch. 938 (AB 2098) (to be codified at Cal. Bus. & Prof. Code § 2270). Plaintiff Hoang is a licensed osteopathic physician who seeks to prohibit enforcement of AB 2098 against osteopathic physicians and surgeons. *See* Compl., ECF 1, § 11. As the State explains, the statutory scheme governing the Osteopathic Medical Board of California's oversight is the same as that which governs the Medical Board of California's oversight over non-osteopathic physicians and surgeons. *See* Defs.' Opp. to Mot. for Prelim. Inj. ("Opp."), ECF 16, at 2. Accordingly, AB 2098 applies to both osteopathic and non-osteopathic practitioners. *See id.* at 2 n.3. For ease of reference, this brief uses the term "physician" to refer to both osteopathic and non-osteopathic practitioners.

[2] Defs.' Req. for Judicial Notice ("RJN"), Ex. B, ECF 16-3, Assembly Comm. on Bus. & Prof. Report at 6–7 (Apr. 19, 2022) (hereinafter "Apr. 19, 2022 Assembly Rep.").

[3] Amici focus on the First Amendment analysis, but share Plaintiffs' concerns that AB 2098's definitions of "misinformation" and "disinformation" are impermissibly vague. *See* Plaintiffs' Mot. for Prelim. Inj. ("MPI"), ECF 4, at 22. Amici likewise agree that giving the State the power to separate "truth" from "fiction," and then to censor speech on that basis, risks irreparable First Amendment harm including, among other things, stifling important public debate, prioritizing state-approved messages,

The State claims that AB 2098 is a mere professional regulation—out of reach of the First Amendment and subject to rational basis review—because it targets only medical "care" that is well within the government's purview to regulate. Not so. Under the Ninth Circuit's well-established framework for evaluating regulations of healthcare professionals, AB 2098 sweeps in exactly the kind of protected speech physicians rely on in their doctor-patient relationships. And while both Plaintiffs and the State resist aspects of the Ninth Circuit's framework, this Court need not. Under a straightforward application of this framework and the speech-conduct continuum most recently articulated in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), AB 2098 is a content-based regulation encompassing speech protected by the First Amendment. Strict scrutiny therefore applies.

Fortunately, as even the State acknowledges, it does not need AB 2098 to keep patients safe. *See* Opp. at 5. A less restrictive alternative exists: the California Business and Professions Code already regulates unprofessional conduct by physicians to the full extent allowed by the First Amendment. Under section 2234 of that code, physicians can be—and historically have been—disciplined for committing medical fraud, prescribing medically inappropriate treatment, and failing to provide patients with material information to make informed choices, like the availability of conventional treatment options. Inexplicably, the California Medical Board has failed to take advantage of its authority under section 2234 to investigate and punish unprofessional conduct related to COVID-19. Requiring California to prove such conduct before imposing a sanction neither ties officials' hands nor harms patients. Indeed, the State does not explain why existing law has fallen so short as to justify a sweeping censorship law, or why the burden to prove unprofessional conduct under AB 2098 would be any less onerous than under the current section 2234.

This brief proceeds as follows. After explaining the Ninth Circuit's framework for distinguishing between speech and conduct in the healthcare context, Amici address the parties' analyses, which muddle that framework. Amici conclude by offering the Court an additional reason as to why AB 2098 fails strict scrutiny: existing law is able to address California's stated concerns. Because AB 2098 violates the First Amendment, Amici respectfully urge the Court to grant Plaintiffs' motion for a

---

and silencing already marginalized voices. *See id.* at 2, 3–4.

preliminary injunction and enjoin AB 2098 in full. If the Court is not inclined to enjoin the law in full, Amici urge this Court to narrowly construe AB 2098 so that it reaches no more conduct than that already deemed "unprofessional" under existing law by, for example, holding that the phrase "or advice" violates the First Amendment and enjoining the State from enforcing that portion of AB 2098.

## ARGUMENT

**I.   Under the Ninth Circuit's Well-Established Framework for Evaluating Healthcare Regulations, AB 2098 Regulates Protected Speech, and the First Amendment Applies.**

While the government must play a role in licensing and regulating physicians, the First Amendment strictly limits restrictions on doctor-patient communications. *See NIFLA*, 138 S. Ct. at 2373–75. The Ninth Circuit uses a "continuum approach" to evaluate whether the government is interfering with the speech of healthcare providers or instead merely regulating the conduct of the profession. *See Tingley*, 47 F.4th at 1072. If the former, the First Amendment and strict scrutiny apply. *Id.* at 1072–73; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."). If the latter, the First Amendment does not apply, and the regulation need only be reasonable. *See Tingley*, 47 F.4th at 1077–78. This approach safeguards the free speech rights of physicians to exchange information and opinions, and the government's ability to regulate medical treatment for patient safety.

The constitutionality of AB 2098 turns on where along the continuum the law falls. On one end, a physician's "public dialogue"—including advocacy for a "position that the medical establishment considers outside the mainstream"— "receives the greatest First Amendment protection." *Id.* at 1072–73 (citing *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014), *overruled on other grounds by NIFLA*, 138 S. Ct. 2361 (2018)). At the other end of the continuum, consistent with the government's general police powers, a physician's "professional conduct"—such as performing a particular type of procedure—does not receive First Amendment protection. *Id.* at 1073 (citing *Pickup*, 740 F.3d at 1229). The Ninth Circuit includes in this category any treatment provided through words, like the talk therapy at issue in *Tingley* designed to alter a patient's sexual orientation or gender identity: "States do not lose the power to regulate the safety of medical treatments performed under the authority of a state license

merely because those treatments are implemented through speech rather than through scalpel." *Id.* at 1064. The Ninth Circuit also includes in the professional-conduct category regulations on the practice of medicine that only "incidentally involve[] speech," such as prohibitions on malpractice and laws that require informed consent. *Id.* at 1074 (quoting *NIFLA*, 138 S. Ct. at 2373); *see also, e.g.*, *NIFLA*, 138 S. Ct. at 2373 (explaining that informed-consent law, which required doctors to provide information to patients before treatment, regulated "speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State[]'") (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)). And in the middle of the speech-conduct continuum, certain speech receives less First Amendment protection, including "commercial speech or compelled disclosures" about the terms of services. *Tingley*, 47 F.4th at 1074 (citing *NIFLA*, 138 S. Ct. at 2372–73).

Some courts, including the Ninth Circuit, previously recognized a distinct category of "professional speech"—that is, speech "within the confines of a professional relationship"—that also fell in the middle of the continuum and so received "diminished" constitutional protection. *See Pickup*, 740 F.3d at 1228. The Supreme Court, however, expressly rejected such a rule in *NIFLA*. *See* 138 S. Ct. at 2371–72, 2374–75. Thus, consistent with *NIFLA*, the First Amendment protects physicians' medical advice and recommendations—including about treatments the government is otherwise permitted to regulate—because physicians and patients "must be able to speak frankly and openly." *See Conant*, 309 F.3d at 636–37 (federal regulation allowing government to revoke DEA prescription authority based solely on physician's recommendation that medical marijuana could help patient violated First Amendment). In a case quoted approvingly in *NIFLA*, *see* 138 S. Ct. at 2374, the Eleventh Circuit likewise recognized that "doctor-patient communications *about* medical treatment" are distinct from the treatment itself, and thus "receive substantial First Amendment protection[.]" *Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc) (quoting *Pickup*, 740 F.3d at 1227).

As written, AB 2098 undoubtedly reaches speech protected by the First Amendment. It expressly limits the ability of physicians to speak about certain topics to their patients and thereby restricts their ability to communicate. The law defines the prohibited dissemination as a licensed professional's "conveyance of information from the licensee to a patient under the licensee's care in the form of

[PROPOSED] BRIEF OF AMICI CURIAE
ACLU NORCAL & SOCAL ISO PLAINTIFFS' MPI     8     Case No. 2:22-cv-02147-WBS-AC

treatment *or advice*." AB 2098, § 2(b)(3) (emphasis added). *Conant* plainly forecloses the State from censoring physicians' discussion, medical advice, and recommendations related to COVID-19 unless the content-based regulation can meet strict scrutiny.[4]

## II. This Court Should Resist the Parties' Efforts to Collapse the Distinction Between Speech and Conduct.

As the foregoing shows, AB 2098 presents a straightforward application of the Ninth Circuit's speech-conduct continuum. The law restricts, at the very least, physicians' advice, and such advice is protected speech. Notwithstanding this evident infirmity, both Plaintiffs and the State resist aspects of the well-established framework for evaluating regulations on healthcare professionals' speech. The Ninth Circuit's carefully calibrated framework is both doctrinally sound and safeguards against state interference with doctor-patient discourse, *see NIFLA*, 138 S. Ct. at 2374, while allowing the state to prevent unprofessional conduct, like practicing without a license or providing harmful treatments. There is no need for the Court to stray from that framework to decide this case. *See id.* at 2373 ("While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it, and the line is long familiar to the bar.") (internal citations, quotation marks omitted).

### A. Not All Information Sharing Is Protected Speech.

*First*, Plaintiffs. Plaintiffs falter by misinterpreting the sweep of *NIFLA* and then, based on this misinterpretation, urging the Court to ignore the Ninth Circuit's recent decision in *Tingley* and instead follow a contrary decision from the Eleventh Circuit. The Court should not heed this call.

To argue that AB 2098 regulates speech and not professional conduct, Plaintiffs claim that *NIFLA* rejected not just *Pickup*'s less-protective treatment of professional speech but *any* "continuum-based First Amendment doctrine." *See* MPI at 11, 15–16. Plaintiffs offer an unduly narrow interpretation of professional conduct, contending that the *NIFLA* Court "more or less" added a new requirement for a

---

[4] Early versions of AB 2098 focused on an "extreme minority" of healthcare practitioners' contribution to "the public discourse" on COVID-19, rather than on general doctor-patient communications. *See* Apr. 19, 2022 Assembly Rep. at 7, 9 (describing as an "illustrative example" of the need for legislation a well-known physician speaking at a public rally and otherwise engaging "in multiple campaigns to stoke public distrust in COVID-19 vaccines"). Disciplining physicians for sharing their opinions in the public square obviously violates the First Amendment, and the Legislature was right to narrow the reach of AB 2098. But as Amici explain herein, and as Plaintiffs also argue, the Legislature did not narrow the law enough, and AB 2098 continues to penalize protected speech.

regulation of professional conduct to have but an incidental burden on speech: the speech must be a "required part of some separate medical procedure." *Id.* at 17. Far from it. Rather, in discussing cases upholding "regulations of professional conduct that incidentally burden speech," the *NIFLA* Court gave as *one example* informed-consent requirements that mandate giving certain information about medical procedures. *See* 138 S. Ct. at 2373. In that context, the speech must be tethered to a specific condition, procedure, or treatment. *Id.* But the Supreme Court did not impose a similar nexus limit on other regulations of professional conduct that only incidentally burden speech, such as medical licensing and malpractice laws. *See id.*[5]

Properly interpreted, *NIFLA* is perfectly consistent with the "continuum-based" approach the Ninth Circuit uses to evaluate regulations of healthcare professionals. The *NIFLA* Court rejected the Ninth Circuit and other courts' placement of "professional speech" in the middle of the speech-conduct continuum, but otherwise reaffirmed that most speech receives full First Amendment protection, some (commercial speech and mandated disclosures) receives less, and some (speech incidental to conduct) receives none. And while Plaintiffs urge the Court to follow instead the Eleventh Circuit's decision in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), which treated as a speech regulation Florida's conversion-therapy ban, *see* MPI at 16–17, this Court must apply *Tingley* as binding precedent.

Under *Tingley* and earlier cases, the Ninth Circuit categorizes regulations on "the safety of medical treatments" that are "implemented through speech" as permissible regulations on professional conduct. *See Tingley*, 47 F.4th at 1064; *see also, e.g.*, *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000) (rejecting argument that psychoanalysis, as "talking cure," was pure speech because "key component of psychoanalysis" is "treatment of emotional suffering and depression") (internal citation, quotation marks omitted). Plaintiffs therefore miss the mark

---

[5] Plaintiffs also go astray when they suggest that by overruling *Casey*, the Supreme Court will no longer interpret informed-consent requirements as having an incidental impact on speech. *See* MPI at 10 & 10 n.6 (citing *Dobbs*, 142 S. Ct. 2228 (2022)). As Amici explain, *NIFLA* reaffirmed that informed-consent requirements are treated as regulations of conduct, *see supra* at p. 8; *Dobbs* overturned *Casey* on its holding on the right to abortion, not its First Amendment holding; and the dicta from *Dobbs* that Plaintiffs cite refers not to informed consent but to distinct time, place, and manner restrictions on specific communications near abortion clinics, *see Dobbs*, 142 S. Ct. at 2276 & 2276 n.65 (citing *Hill v. Colorado*, 530 U.S. 704, 741–42 (Scalia, J., dissenting); *id.* at 765 (Kennedy, J., dissenting)).

by suggesting that *any time* there is a conveyance of information from a professional to a patient or client, protected speech is at issue.

### B. Not All Doctor-Patient Interaction Is Regulable Conduct.

*Second*, the government. The State points to the phrase "under the [practitioner's] *care*," to insist that, like the conversion-therapy bans in *Tingley* and *Pickup*, AB 2098 is a regulation on professional conduct that incidentally impacts speech. *See* Opp. at 8–9. Under the State's rubric, *all* "patient care" must be construed as the "practice of medicine" and is thus professional conduct immune from First Amendment protection. *See id.* at 8–9, 10, 13. But the State does not cabin "care" to the treatment physicians provide. Rather, consistent with the explicit scope of the statute itself, in the State's telling, "patient care" encompasses "the *advice* and treatment physicians provide—and the information conveyed in such advice and treatment." *Id.* at 15 (emphasis added); *see also id.* ("Because medical care frequently involves the provision of professional advice, effective protection for patients must encompass the ability to regulate such speech."). This sweeping position eviscerates the carefully wrought distinction drawn in cases like *Conant* and *NIFLA* between speech and conduct, thereby threatening to swallow whole the free speech rights of physicians.

The Ninth Circuit has declined to construe all clinical interactions between a physician and their patient as falling into a catch-all category of "care" subject to regulation. Instead, to strike the balance between protecting physicians' free speech rights and patient safety, the court has expressly distinguished treatment from the discussions, advice, recommendations, and other information sharing a physician may engage in leading *up to* the treatment itself. So in *Conant*, the First Amendment applied to a physician's "discussion of the medical use of marijuana," including the "pros and cons" of such use, and the "recommendation" that, even if the physician could not prescribe it, "medical marijuana would likely help a specific patient." 309 F.3d at 634, 637. In *Pickup*, too, the First Amendment protected providers' "discussions about treatment, recommendations to obtain treatment, and expressions of opinions" about treatment even if the First Amendment did not protect the treatment itself. 740 F.3d at 1229. The same in *Tingley*. *See* 47 F.4th at 1073, 1077–78. In other words, the Ninth Circuit did not step back and analyze the totality of interactions between physicians and patients as overarching "care"; rather, it looked more specifically at the function of the communication itself.

Moreover, the practical effect of the State's proposed rule—that *Conant*, *Pickup*, and *Tingley* imply that provider speech is protected *only* when consistent with the standard of care, *see* Opp. at 11–12, 13—turns the rubric upside down. The State's rule fails because it would resurrect something like the "professional speech" doctrine, which subjected speech "within the confines of a professional relationship" to lesser First Amendment protection. *See Pickup*, 740 F.3d at 1228. As explained, the Supreme Court in *NIFLA* expressly declined to conclude that professionals such as doctors have diminished First Amendment rights simply by virtue of their state-issued licenses. *See* 138 S. Ct. at 2371–72, 2374–75; *see also Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or *privately* to speak urging persons to follow or reject any school of medical thought.") (emphasis added). In addition, the State's rule conflicts with the very case law on which it is based. While the State argues that the speech at issue in *Conant* was protected only because it was consistent with the standard of care, look again to the conversion-therapy bans at issue in *Pickup* and *Tingley*. The Ninth Circuit found it critical to the First Amendment analyses there that physicians could still talk about, express support for, and even recommend a treatment that both the "medical community" and the States of California and Washington had deemed contrary to the "applicable standard of care and governing consensus at the time." *See Tingley*, 47 F.4th at 1081.[6]

To be sure, the *NIFLA* Court recognized that the First Amendment does not stand in the way of "[l]ongstanding torts for professional malpractice" that harm patients. *See* 138 S. Ct. at 2373 (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The Supreme Court was quick to caution, however, that the government "may not, under the guise of prohibiting professional misconduct, ignore constitutional

---

[6] If the State takes an unduly broad view of professional conduct, the court in *McDonald v. Lawson*, No. 8:22-cv-01805-FWS-ADS (C.D. Cal.) took an unduly narrow view of professional advice in denying the plaintiffs' motion for preliminary injunction. For the reasons provided both in this brief and a substantially similar one submitted in *McDonald*, Amici disagree with the conclusion that AB 2098 regulates professional conduct with an incidental burden on speech. In reaching that conclusion, the *McDonald* court interpreted AB 2098 to allow—as it must under *Conant*—physicians to "express[] a particular medical opinion." *See* Notice of Supplemental Authority, *McDonald v. Lawson* Order at 19, ECF 18. Inexplicably, however, the court interpreted AB 2098 to prohibit physicians from sharing the information supporting those protected opinions. *See id.* In other words, a physician could share her opinion but not tell her patient why she holds that opinion. As with the State's proposed rule, this cramped interpretation cannot be reconciled with *Conant* and the broad First Amendment rights that physicians retain.

rights." *Id.* (quoting *NAACP*, 371 U.S. at 439). Healthcare providers who endanger or harm their patients can be held accountable, but "[b]road prophylactic rules in the area of free expression are suspect." *See NAACP*, 371 U.S. at 438 (listing cases).

**III.   Even if AB 2098 Regulates Some Conduct, the Court Should Apply First Amendment Scrutiny Because AB 2098 Is Overbroad and Chills Protected Speech.**

Prophylactic, content-based rules like AB 2098 are suspect in part because their "very existence" threatens to chill speech. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992). And because the threat of chilled speech is untenable, courts have struck down overbroad laws that may have some constitutional applications, but which also reach a substantial amount of protected speech. *Id.* at 130, 133–34; *see also Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.* ("*Madigan*"), 538 U.S. 600, 619–20 (2003) (distinguishing between constitutional regulations "aimed at fraud" and unconstitutional regulations "aimed at something else in the hope that it would sweep fraud in during the process") (citation omitted). So even if the Court determines that AB 2098 touches on some professional conduct that is properly regulated by the State, AB 2098 should still be subject to First Amendment scrutiny because the law threatens to chill a significant amount of protected speech. AB 2098 presents no mere incidental impact on speech.

"A law is overbroad if it 'does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech[.]" *Klein v. San Diego Cnty.*, 463 F.3d 1029, 1038 (9th Cir. 2006) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)). Courts apply the overbreadth doctrine when there is a "realistic danger" that the law will "significantly compromise" the free speech rights of others or where it is "susceptible of regular application to protected expression." *See United States v. Hansen*, 25 F.4th 1103, 1109–10 (9th Cir. 2022) (internal citations, quotation marks omitted).

These risks are present here. Given the ambiguities in the reach of AB 2098 highlighted by Plaintiffs, *see* MPI at 22–23, physicians will be loath to speak their minds and share their opinions with patients about a rapidly evolving disease with many unknowns. At any point, the State could determine that a physician has violated AB 2098 for sharing an unconventional opinion and take away their medical license. The State's brief does not assuage such concerns and leaves the scope of the law

ambiguous. As just one example, the State does not clarify whether AB 2098 would prohibit a physician from explaining to their patient the reason for a particular recommendation, such as advising against being vaccinated because the physician believes there is not enough data yet to support the current medical consensus that COVID-19 vaccines are safe and effective.

**IV.   AB 2098 Is Unconstitutional Because the State Can Achieve its Goal of Protecting Patients Using Less Restrictive Alternatives, like Laws that Already Regulate Physician Conduct.**

Properly construed as a restriction on protected speech, AB 2098 fails strict scrutiny because it is not narrowly tailored to the State's asserted interests. The legislative record reflects the State's driving concerns in passing AB 2098. First and foremost, the Legislature focused on addressing physicians' public dialogue regarding COVID-19, which ironically is beyond AB 2098's final scope because the State cannot regulate such speech. *See supra* 9 n.4. And second, the Legislature focused on curtailing physicians who "promot[e] [] treatments and therapies that have no proven effectiveness against the virus" and prescribe what the State asserts are "ineffective and potentially unsafe" treatments, like ivermectin, hydroxychloroquine, and injected disinfectants. *See, e.g.*, Apr. 19, 2022 Assembly Rep. at 6, 8–9; RJN, Ex. D, ECF 16-3, Sen. Comm. on Bus., Prof. & Econ. Dev. Report at 4–5, 8 (June 27, 2022).

AB 2098 is not necessary to address these concerns, however. The State has at its disposal existing narrowly tailored laws that govern unprofessional conduct to the full extent tolerated by the First Amendment. Under California Business and Professions Code section 2234, the Medical Board of California and the Osteopathic Medical Board of California (together, "Medical Board") "shall take action against any licensee who is charged with unprofessional conduct," which includes, among other things, "gross negligence," "repeated negligent acts," "incompetence," and acts involving "dishonesty." Cal. Bus. & Prof. Code §§ 2234, (b)–(e). And California courts have long interpreted the types of conduct the Legislature was concerned about—such as failing to provide patients with sufficient information to make informed health choices, committing medical fraud, and providing patients with medically inappropriate treatment—as falling under section 2234. Indeed, when considering AB 2098, the Legislature acknowledged that the Medical Board was "*already fully capable* of bringing an accusation against a physician for this type of misconduct." Apr. 19, 2022 Assembly Rep. at 8 (emphasis added); *see also* Opp. at 5 (citing same). While the State acknowledges this "larger system of medical

regulation," *see* Opp. at 18, it fails to explain or offer evidence demonstrating why that system has proven "ineffective to achieve its goals." *See Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019) (quoting *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 816 (2000)); *see also Playboy Ent. Group*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

Starting with informed consent. A physician who fails to obtain informed consent or to provide their patient with "adequate information to enable an intelligent choice" about their health can be disciplined under section 2234. *See Cobbs v. Grant*, 8 Cal. 3d 229, 245 (1972); *see also Davis v. Physician Assistant Bd.*, 66 Cal. App. 5th 227, 276–79 (2021) (affirming finding of unprofessional conduct under section 2234(c) when physician assistant failed to disclose information material to patients' healthcare decisions). When recommending or administering treatment, physicians must provide "whatever information is material to the [patient's] decision" to undergo such treatment, which can include the "available choices" for treatment options and "the dangers inherently and potentially involved in each." *Cobbs*, 8 Cal. 3d at 243, 245.

In addition to general informed-consent requirements, physicians are specifically required to obtain informed consent and to describe "conventional treatment" before recommending or providing unconventional or "alternative or complementary medicine." *See* Cal. Bus. & Prof. Code § 2234.1(a)(1). This provision alone can accomplish most, if not all, of what the Legislature set out to do with AB 2098. And importantly, disciplining physicians for the failure to provide adequate material information does not violate the First Amendment because requirements for informed consent are treated as regulations on professional conduct that only incidentally impact speech. *See NIFLA*, 138 S. Ct. at 2373; *supra* at p. 8. Thus, even if the First Amendment protects physicians' advice about unconventional at-home COVID-19 treatments, for example, the State can still discipline those physicians who fail to provide patients with all material information necessary to make an informed decision about choosing to undergo such treatments.

Moving to medical fraud. A physician who peddles to their patients harmful treatments below the standard of care commits fraud and thus engages in unprofessional conduct based on a dishonest act.

*See* Cal. Bus. & Prof. Code § 2234(e); *Nelson v. Gaunt*, 125 Cal. App. 3d 623, 635–36 (1981) (patient stated cause of action for fraud against physician who falsely told patient she would experience "absolutely no side effects" from unsafe treatment that physician had previously been arrested for providing, ultimately leading to patient needing double mastectomy); *see also, e.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 739–40, 743 (1936), *abrogated on other grounds by Hughes v. Bd. of Architectural Exam'rs*, 17 Cal. 4th 763 (1998) (affirming revocation of medical license of physician who falsely advertised to patients that he could cure their hernias without surgery).

Disciplining physicians for medical fraud does not violate the First Amendment because "the First Amendment does not shield fraud." *Madigan*, 538 U.S. at 612; *see also United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality op.) ("Where false claims are made to effect a fraud or secure moneys or other valuable considerations . . . , it is well established that the Government may restrict speech without affronting the First Amendment."). Instead of prophylactically censoring vast swaths of protected speech, California could—and should—have relied on the existing prohibitions against medical fraud to respond to any harm that flows from physicians who mislead patients about COVID-19. Indeed, the federal government has done so, successfully prosecuting licensed healthcare providers in California who defrauded patients by marketing and selling, for example, so-called "COVID-19 treatment packs," or "homeoprophylaxis immunization pellets" that were promised to provide "lifelong immunity" to COVID-19 as well as fake COVID-19 vaccination record cards.[7]

Continuing with gross negligence and incompetence. Even if they do not intentionally lead their patients astray, a physician who engages in a course of treatment that is medically inappropriate or otherwise not indicated can be found to be grossly negligent and incompetent, and thus liable for unprofessional conduct. *See* Cal. Bus. & Prof. Code §§ 2234(b), (d). For example, in *Yellen v. Board of Medical Quality Assurance*, 174 Cal. App. 3d 1040 (1985), the California Court of Appeal affirmed the revocation of the medical license of a physician who had a "practice of injecting and prescribing medications which were medically inappropriate and dangerous," even though the physician saw

---

[7] *See* Johnny Diaz, *A San Diego doctor receives a prison sentence for selling a '100 percent' cure for COVID-19*, N.Y. Times (May 30, 2022), https://tinyurl.com/52pkj5hn; Andres Picon, *Napa doctor convicted of selling fake COVID vaccination cards, remedies*, S.F. Chronicle (Apr. 6, 2022), https://tinyurl.com/ck8rvj46.

"nothing wrong with the injections and type of prescription given" to a minor patient who ultimately died. *Id.* at 1048, 1059. The physician also failed to instruct his minor patient's guardian about appropriate care while ordering these "contraindicated" or "useless" medications. *Id.* at 1058. Thus, California already can discipline physicians for prescribing medically inappropriate or dangerous medications to treat COVID-19.

"If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try." *Conant*, 309 F.3d at 637 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)). As in *Conant*, the legislative record in this case reflects that the regulatory body charged with enforcing section 2234 has not taken advantage of what should have been the State's first resort. For instance, the Legislature criticized the Medical Board's "underwhelming enforcement activities" and failure "to take aggressive action against physicians who commit unprofessional conduct." *See* Apr. 19, 2022 Assembly Rep. at 8. And the Executive Director of the Osteopathic Medical Board admits that, "[t]o date, no osteopathic physician or surgeon has been disciplined by the Board related to the dissemination of COVID-19 misinformation or dissemination[.]" Decl. of E. Calderon ISO Opp. to Mot. Prelim. Inj., ECF 16-1, ¶ 11. The State now suggests but one type of physician conduct that can be regulated consistent with the First Amendment that is arguably not covered by section 2234: "a single instance of negligence." Opp. at 23; *see also id.* at 18. But the legislative record points to no actual incidents where section 2234 fell short or otherwise justify enacting a new, overbroad law that sweeps in protected speech only to get at single acts of negligence. Nor does the legislative record explain why AB 2098 will lead to more enforcement given the boards' apparent unwillingness or lack of capacity to enforce existing law.

## CONCLUSION

For the foregoing reasons, Amici respectfully urge the Court to grant Plaintiffs' motion and preliminarily enjoin the State from enforcing AB 2098. In the alternative, Amici urge this Court to narrowly construe AB 2098 to reach no more conduct than that already regulated as "unprofessional"

//

//

under existing law by, for example, holding that the phrase "or advice" violates the First Amendment and enjoining the State from enforcing that portion of AB 2098.

Dated: January 10, 2023                    Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

/s/ Hannah Kieschnick
Hannah Kieschnick (SBN 319011)
Chessie Thacher (SBN 296767)
Shilpi Agarwal (SBN 296152)
Angélica Salceda (SBN 296152)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA

Peter Eliasberg (SBN 189110)
Melissa Goodman (SBN 289464)

*Attorneys for Amici Curiae*