1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                            ----oo0oo----

11

12  TRACY HØEG, M.D., Ph.D.; RAM           No. 2:22-cv-01980 WBS AC
    DURISETI, M.D., Ph.D.; AARON
13  KHERIATY, M.D.; PETE
    MAZOLEWSKI, M.D.; and AZADEH
14  KHATIBI, M.D., M.S., M.P.H.,

15            Plaintiffs,                   MEMORANDUM AND ORDER RE:
                                            PLAINTIFFS' MOTIONS FOR
16       v.                                 PRELIMINARY INJUNCTION

17  GAVIN NEWSOM, Governor of the
    State of California, in his
18  official capacity; KRISTINA
    LAWSON, President of the
19  Medical Board of California, in
    her official capacity; RANDY
20  HAWKINS, M.D., Vice President
    of the Medical Board of
21  California, in his official
    capacity; LAURIE ROSE LUBIANO,
22  Secretary of the Medical Board
    of California, in her official
23  capacity; MICHELLE ANNE BHOLAT,
    M.D., M.P.H., DAVID E. RYU,
24  RYAN BROOKS, JAMES M. HEALZER,
    M.D., ASIF MAHMOOD, M.D.,
25  NICOLE A. JEONG, RICHARD E.
    THORP, M.D., VELING TSAI, M.D.,
26  and ESERICK WATKINS, members of
    the Medical Board of
27  California, in their official
    capacities; and ROB BONTA,
28  Attorney General of California,

                                1

1  in his official capacity;

2          Defendants.

3

4  LETRINH HOANG, D.O.; PHYSICIANS          No. 2:22-cv-02147 WBS AC
   FOR INFORMED CONSENT, a not-for
5  profit organization; and
   CHILDREN'S HEALTH DEFENSE,
6  CALIFORNIA CHAPTER, a
   California Nonprofit
7  Corporation;

8          Plaintiffs,

9      v.

10 ROB BONTA, in his official
   capacity as Attorney General of
11 California; and ERIKA CALDERON,
   in her official capacity as
12 Executive Officer of the
   Osteopathic Medical Board of
13 California;

14         Defendants.

15

16                      ----oo0oo----

17         Plaintiffs Tracy Høeg, Ram Duriseti, Aaron Kheriaty,

18 Pete Mazolewski, and Azadeh Khatibi (collectively, "Høeg

19 plaintiffs") brought a § 1983 action against Gavin Newsom, in his

20 official capacity as Governor of California; Rob Bonta, in his

21 official capacity as Attorney General of California; Kristina

22 Lawson, in her official capacity as President of the Medical

23 Board of California (the "Medical Board"); Randy Hawkins, in his

24 official capacity as Vice President of the Medical Board; Laurie

25 Rose Lubiano, in her official capacity as Secretary of the

26 Medical Board; and Michelle Anne Bholat, David E. Ryu, Ryan

27 Brooks, James M. Healzer, Asif Mahmood, Nicole A. Jeong, Richard

28 E. Thorp, Veling Tsai, and Eserick Watkins, in their official

                              2

capacities as members of the Medical Board.  (Høeg Compl. (Docket No. 1).)  The Høeg plaintiffs are physicians licensed by the Medical Board.

Plaintiffs Letrinh Hoang, Physicians for Informed Consent, and Children's Health Defense, California Chapter[1] (collectively, "Hoang plaintiffs") brought a § 1983 action against defendants Rob Bonta, in his official capacity as Attorney General of California, and Erika Calderon, in her official capacity as Executive Officer of the Osteopathic Medical Board of California (the "Osteopathic Board").  (Hoang Compl. (Docket No. 1).)  Plaintiff Hoang is a physician licensed by the Osteopathic Board.  The remaining two plaintiffs are organizations representing the interests of doctors and patients.

Plaintiffs in these related cases (see Høeg Docket No. 21; Hoang Docket No. 9.) allege that Assembly Bill ("AB") 2098[2] is unconstitutional under the First and Fourteenth Amendments of the U.S. Constitution.  Plaintiffs filed separate motions seeking a preliminary injunction to enjoin the State of California from enforcing AB 2098.  (Høeg Notice of Mot. and Mem. In Support of Mot. for Prelim. Inj. ("Høeg Mot.") (Docket No. 5); Hoang Mot. for Prelim. Inj. and Mem. of Law ("Hoang Mot.") (Docket No. 4).)

I.   The Challenged Statute

A.   Statutory Provisions

---

[1]   Hereinafter, the court will refer to Children's Health Defense, California Chapter as "Children's Health Defense."

[2]   AB 2098 has been codified at Cal. Bus. & Prof. Code § 2270.  Because the parties refer to the law as "AB 2098" throughout their briefs, the court will refer to the statute as AB 2098 for convenience.

1          AB 2098, codified at Cal. Bus. & Prof. Code § 2270,

2     took effect on January 1, 2023.  The statute provides that "[i]t

3     shall constitute unprofessional conduct for a physician and

4     surgeon to disseminate <u>misinformation</u> or <u>disinformation</u> related

5     to COVID-19, including false or misleading information regarding

6     the nature and risks of the virus, its prevention and treatment;

7     and the development, safety, and effectiveness of COVID-19

8     vaccines."  Cal. Bus. & Prof. Code § 2270(a) (emphasis added).

9          The statute defines "<u>misinformation</u>" as "false

10    information that is contradicted by contemporary scientific

11    consensus contrary to the standard of care."  <u>Id.</u> § 2270(b)(4)

12    (emphasis added).  The statute defines "<u>disinformation</u>" as

13    "misinformation that the licensee deliberately disseminated with

14    malicious intent or an intent to mislead."  <u>Id.</u> § 2270(b)(2)

15    (emphasis added).

16         The misinformation or disinformation must be conveyed

17    "[by] the licensee to a patient under the licensee's care in the

18    form of treatment or advice."  <u>Id.</u> § 2270(b)(3).  Physicians and

19    surgeons licensed by the Medical Board or the Osteopathic Board

20    (the "Boards") are covered by the statute.  <u>Id.</u> § 2270(b)(5).

21         The Boards are tasked with enforcing AB 2098.  The

22    statute augments the definition of "unprofessional conduct," <u>id.</u>

23    § 2270(a), which is a pre-existing basis for disciplinary action

24    by the Boards, <u>see</u> <u>id.</u> § 2234.  Unprofessional conduct also

25    includes, but is not limited to, "gross negligence," "repeated

26    negligent acts," and "incompetence."  <u>Id.</u>

27         B.   <u>Legislative Findings</u>

28              At the time AB 2098 was enacted, the California

4

Legislature made several findings.  The Legislature found that "[t]he global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians."  AB 2098, 2021-22 Reg. Sess. (Cal. 2022) § 1(a).  The Legislature also found that "[d]ata from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated."  Id. § 1(b).  It further stated that "[t]he safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC."  Id. § 1(c).

        The Legislature then addressed the policy problems the bill was designed to remedy.  The bill first states that "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk," with "major news outlets [reporting that] some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals."  Id. §§ 1(d), 1(e).  The bill states that in response to these concerns, the Legislature previously "declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians."  Id. § 1(g).  The Legislature also noted that "[t]he Federation of State Medical Boards has released a statement warning that physicians who

1   engage in the dissemination of COVID-19 vaccine misinformation or

2   disinformation risk losing their medical license, and that

3   physicians have a duty to provide their patients with accurate,

4   science-based information."  Id. § 1(f).

5   II.  Preliminary Injunction Standard

6          To succeed on a motion for a preliminary injunction,

7   plaintiffs must establish that (1) they are likely to succeed on

8   the merits; (2) they are likely to suffer irreparable harm in the

9   absence of preliminary relief; (3) the balance of equities tips

10  in their favor; and (4) an injunction is in the public interest.

11  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008);

12  Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir.

13  2011).  "[I]njunctive relief [i]s an extraordinary remedy that

14  may only be awarded upon a clear showing that the plaintiff is

15  entitled to such relief."  Winter, 555 U.S. at 22.

16  III. Article III Standing[3]

17         To determine whether plaintiffs are entitled to a

18  preliminary injunction, the court must first determine whether

19  they have standing to challenge AB 2098.  "In order to invoke the

20  jurisdiction of the federal courts, a plaintiff must establish

21  'the irreducible constitutional minimum of standing.'"  Lopez v.

22  Candaele, 630 F.3d 775, 785 (9th Cir. 2010) (quoting Lujan v.

23  Def. of Wildlife, 504 U.S. 555, 560 (1992)).  Article III

24

25         [3]  Defendants initially disputed that the Høeg plaintiffs
    have standing (see Høeg Opp'n (Docket No. 23) at 6), though they
26  all but conceded the issue at oral argument.  Defendants did not
    argue that the Hoang plaintiffs lack standing. (See Hoang Opp'n
27  (Docket No. 16).)  Regardless, the court has a duty to evaluate
    all parties' standing.  See Bernhardt v. County of Los Angeles,
28  279 F.3d 862, 868 (9th Cir. 2002).

standing has three elements: "(1) injury-in-fact--plaintiff must allege concrete and particularized and actual or imminent harm to a legally protected interest; (2) causal connection--the injury must be fairly traceable to the conduct complained of; and (3) redressability--a favorable decision must be likely to redress the injury-in-fact." Barnum Timber Co. v. U.S. EPA, 633 F.3d 894, 897 (9th Cir. 2011) (citing Lujan, 504 U.S. at 560-61) (internal quotation marks omitted).

Challenges that involve First Amendment rights "present unique standing considerations" because of the "chilling effect of sweeping restrictions" on speech. Ariz. Right to Life Pol. Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003). "In order to avoid this chilling effect, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1171 (9th Cir. 2018) (internal quotation marks omitted). Accordingly, when the challenged law "implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." LSO, Ltd. v. Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000).

A.   Individual Physician Plaintiffs

In the context of a pre-enforcement challenge to the constitutionality of a law, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony

List v. Driehaus, 573 U.S. 149, 159 (2014) (quoting Babbitt v.
United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)); see
also Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1015 (9th Cir.
2013) (applying this standard to a facial vagueness challenge).

The Ninth Circuit applies a "three-factor inquiry to
help determine whether a threat of enforcement is genuine enough
to confer an Article III injury": "(1) whether the plaintiff has
a 'concrete plan' to violate the law, (2) whether the enforcement
authorities have 'communicated a specific warning or threat to
initiate proceedings,' and (3) whether there is a 'history of
past prosecution or enforcement.'" Tingley v. Ferguson, 47 F.4th
1055, 1067 (9th Cir. 2022) (quoting Thomas v. Anchorage Equal
Rts. Comm'n, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).  In
the context of a pre-enforcement challenge on First Amendment
grounds, a plaintiff "need only demonstrate that a threat of
potential enforcement will cause him to self-censor."  Id. at
1068.

Plaintiffs Høeg, Duriseti, Kheriaty, Mazolewski, and
Hoang have sufficiently alleged a concrete plan to violate the
challenged law.  Plaintiffs state that they have provided
specific advice to patients about potential health risks of
COVID-19 vaccines and boosters and have informed patients of
flaws in the research supporting vaccines and boosters.  (Suppl.
Decl. of Dr. Tracy Høeg ("Høeg Suppl. Decl.") (Høeg Docket No.
26-1) ¶¶ 4-5; Suppl. Decl. of Dr. Aaron Kheriaty ("Kheriaty
Suppl. Decl.") (Høeg Docket No. 26-2) ¶ 12; Suppl. Decl. of Dr.
Pete Mazolewski ("Mazolewski Suppl. Decl.") (Høeg Docket No. 26-
3) ¶ 5; Decl. of Dr. Letrinh Hoang ("Hoang Decl.") (Hoang Docket

No. 4-1) ¶ 5.)   Plaintiffs also state that they have informed patients about flaws in the research supporting universal masking, and at times have advised patients against wearing masks based on the patients' individual needs.   (Høeg Suppl. Decl ¶ 6; Kheriaty Suppl. Decl. ¶¶ 3-6; Mazolewski Suppl. Decl. ¶ 3.) Plaintiff Duriseti states that he treated COVID-19 patients with non-invasive ventilatory support rather than intubation early in the pandemic.   (Decl. of Ram Duriseti ("Duriseti Decl.") (Høeg Docket No. 1-3) ¶ 8.)   Plaintiff Hoang additionally states that she has discussed the possible use of off-label treatments for COVID-19 with her patients.   (Hoang Decl. ¶ 2.)

Physician plaintiffs state that, in these instances, their conduct contradicted the "scientific consensus" at the time, as determined by public health agencies like the CDC or by common practice in the medical field.   (See, e.g., Decl. of Pete Mazolewski ("Mazolewski Decl.") (Høeg Docket No. 1-5) ¶ 13; Høeg Suppl. Decl. ¶¶ 6-7; Duriseti Decl. ¶ 8; Kheriaty Suppl. Decl. ¶ 7; Hoang Decl. ¶¶ 3-4.)   The Hoang plaintiffs provide an expert declaration by Dr. Sanjay Verma, which similarly concludes that much of the advice and treatment provided in these situations has previously contradicted or currently contradicts the "consensus." Dr. Verma cites to numerous examples of contrary guidance provided by the CDC on the issues of masking and vaccination. (See Decl. of Dr. Sanjay Verma ("Verma Decl.") (Hoang Docket No. 4-1) at 20-32.)

Some of the physician plaintiffs intend to continue providing such advice and treatment to patients in the future. (Kheriaty Suppl. Decl. ¶ 6; Mazolewski Suppl. Decl. ¶ 5; Hoang

1  Decl. ¶ 15.)  Others indicate that their conduct will be chilled

2  by AB 2098.[4]  (Høeg Suppl. Decl. ¶ 3; Duriseti Decl. ¶ 16.)  The

3  physician plaintiffs have therefore established a concrete plan

4  to violate the challenged law.  See Tingley, 47 F.4th at 1068

5  (the Ninth Circuit "do[es] not require plaintiffs to specify

6  'when, to whom, where, or under what circumstances' they plan to

7  violate the law when they have already" engaged in conduct

8  "arguably" proscribed by the law) (quoting Thomas, 220 F.3d at

9  1139); id. (in the context of a pre-enforcement challenge on

10  First Amendment grounds, a plaintiff "need only demonstrate that

11  a threat of potential enforcement will cause him to self-

12  censor").

13          Physician plaintiffs have also established a credible

14  threat of enforcement.  They aver that they intend to convey

15  truthful information and provide treatment consistent with the

16  standard of care.  However, plaintiffs' beliefs about their

17  conduct do not preclude the enforcing agencies from determining

18  that their conduct violates the challenged statute.  See Susan B.

19  Anthony List, 573 U.S. at 162-63 (in determining whether

20  plaintiffs have established a threat of enforcement, plaintiffs'

21  conduct need only "arguably" be proscribed by the challenged

22

23          [4]    Plaintiffs contend that the law was intended to
   intimidate them into not expressing their views.  They point to
24  the text of the statute, as well as its legislative history.
   See, e.g., Defs.' Ex. E, Assembly Report on Third Reading of AB
25  2098 (Høeg Docket No. 23-3 at 43-49) at 7 (noting that while the
   Boards may already have the ability to discipline licensees for
26  the conduct proscribed by AB 2098, the statute will "make[]
   clear" that the Boards have such authority and thereby discourage
27  licensees from sharing information that "undermine[s] public
   health efforts").
28

1   statute and plaintiffs' beliefs about their conduct are not

2   dispositive).  Based on plaintiffs' explanations of the advice

3   and treatment they provide contrary to public health

4   recommendations, it is plausible that the Boards will determine

5   that their conduct violates AB 2098.  This fear is especially

6   reasonable given the ambiguity of the term "scientific consensus"

7   and of the definition of "misinformation" as a whole, as

8   discussed in further detail in Section IV.  The government's

9   "failure to disavow enforcement of the law" further weighs in

10  favor of standing.  See Tingley, 47 F.4th at 1068.

11        "The third factor, concerning the history of

12  enforcement, carries 'little weight' when the challenged law is

13  'relatively new' and the record contains little information as to

14  enforcement."  Id. at 1068 (quoting Cal. Trucking Ass'n v. Bonta,

15  996 F.3d 644, 653 (9th Cir. 2021)).  AB 2098 has been in effect

16  for less than a month, and this action was initiated prior to AB

17  2098 coming into effect.  Unsurprisingly, the parties have

18  presented no history of enforcement.  The lack of enforcement

19  history "weighs against standing but is not dispositive."  Id. at

20  1069 (internal quotation marks omitted).

21        As the first and second factors weigh in favor of

22  standing, the court concludes that plaintiffs have established an

23  injury-in-fact.  See id.  Because the injury alleged--a credible

24  threat of prosecution under AB 2098--is "clearly traceable" to AB

25  2098, and "can be redressed through an injunction enjoining

26  enforcement of that provision," physician plaintiffs have

27  standing to challenge it.  See Valle del Sol, 732 F.3d at 1016.

28        B.   Individual Patient Plaintiff

1      Although plaintiff Khatibi is a physician licensed by

2 the Medical Board, she asserts standing as a patient, on the

3 basis that AB 2098 interferes with her right to receive

4 information from her doctors.

5      The Supreme Court has stated that "the Constitution

6 protects the right to receive information and ideas," which "is

7 an inherent corollary of the rights of free speech and press that

8 are explicitly guaranteed by the Constitution." Bd. of Educ.,

9 Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853,

10 867 (1982).  Accordingly, "where the effect of a vague statute

11 would infringe upon a party's First Amendment rights, standing

12 requirements to challenge the statute under the Fourteenth

13 Amendment Due Process Clause are broader than they otherwise

14 might be."  Arce v. Douglas, 793 F.3d 968, 987 (9th Cir. 2015)

15 (citing Hynes v. Mayor & Council of Borough of Oradell, 425 U.S.

16 610 (1976); Maldonado v. Morales, 556 F.3d 1037 (9th Cir. 2009)).

17 Thus, where a statute interferes with a plaintiff's First

18 Amendment right to receive information, she has standing to

19 challenge the law, even if it does not apply to her.  Id. at 987-

20 88.

21      Because AB 2098 implicates plaintiff Khatibi's First

22 Amendment right to receive information, she has standing.  See

23 id.; see also Conant v. Walters, 309 F.3d 629, 632 (9th Cir.

24 2002) (deciding the merits of First Amendment challenge to

25 statute prohibiting doctors from "recommending" medical

26 marijuana, which was brought by patients who wanted access to

27 treatment, physicians who feared enforcement of statute, and

28 organizations representing such physicians and patients); Forbes

v. Napolitano, 236 F.3d 1009, 1010 (9th Cir. 2000), amended, 247
F.3d 903 (9th Cir. 2000), amended, 260 F.3d 1159 (9th Cir. 2001)
(deciding the merits of vagueness challenge to statute
criminalizing certain medical procedures, which was brought by
patients who wanted access to treatment and physicians who feared
prosecution under statute).

C.   Organizational Plaintiffs

In addition to the individual plaintiffs in both
matters, there are two organizational plaintiffs in the Hoang
matter: Physicians for Informed Consent and Children's Health
Defense.

"When suing on behalf of its members, an organization
must show that its members would have individual standing, the
issues are germane to the organization's purpose, and neither the
claim nor the requested relief requires individual
participation."  Inland Empire Waterkeeper v. Corona Clay Co., 17
F.4th 825, 831 (9th Cir. 2021) (citing Hunt v. Wash. State Apple
Advert. Comm'n, 432 U.S. 333, 342-43 (1977)).

Plaintiff Physicians for Informed Consent is a non-
profit organization whose educational mission is to "deliver data
on infectious diseases and vaccines, and unite doctors,
scientists, healthcare professionals, attorneys, and families who
support voluntary vaccination."  (Decl. of Dr. Shira Miller
(Hoang Docket No. 4-6) ¶ 3.)  The claims here are clearly
relevant to the organization's mission.

Physicians for Informed Consent's membership includes
physicians who intend to violate AB 2098 or who have been chilled
by AB 2098, and patients who contend that AB 2098 interferes with

13

their right to receive information.  (See id. ¶¶ 4-6.)  Like the

individual physician and patient plaintiffs discussed above, the

organization's members would have individual standing.  The

participation of individual members is not necessary for this

action to proceed.

Plaintiff Children's Health Defense is a non-profit

organization whose mission is to "end childhood health epidemics

by working aggressively to eliminate harmful exposures, hold

those responsible accountable, and to establish safeguards to

prevent future harm," which "includes advocating for medical

freedom, bodily autonomy, and an individual's right to receive

the best information available based on a physician's best

judgment."  (Hoang Compl. ¶ 31.)  The claims here are clearly

relevant to the organization's mission.

Children's Health Defense's membership includes parents

in California who contend that AB 2098 interferes with their

right to receive information pertinent to their children's

health.  (Id. ¶ 33.)  Like plaintiff Khatibi, the organization's

members would have individual standing.  The participation of

individual members is not necessary for this action to proceed.

Because both organizations' members would have

individual standing, the issues raised here are germane to the

organizations' purposes, and neither the claims nor the requested

relief require individual participation, the court concludes that

Physicians for Informed Consent and Children's Health Defense

have standing.  See Inland Empire Waterkeeper, 17 F.4th at 831.

1    IV.   Vagueness Challenge[5]

2          Having determined that plaintiffs have standing, the

3    court next considers whether they have demonstrated a likelihood

4    of success on the merits.  Plaintiffs contend that the law's

5    definition of "misinformation" is unconstitutionally vague under

6    the Due Process Clause of the Fourteenth Amendment.  AB 2098

7    defines misinformation as "false information that is contradicted

8    by contemporary scientific consensus contrary to the standard of

9    care."  Cal. Bus. & Prof. Code § 2270.

10         A statute is unconstitutionally vague when it either

11   "fails to provide a person of ordinary intelligence fair notice

12   of what is prohibited, or is so standardless that it authorizes

13   or encourages seriously discriminatory enforcement."  United

14   States v. Williams, 553 U.S. 285, 304 (2008); see also Hill v.

15   Colorado, 530 U.S. 703, 732 (2000); Tingley, 47 F.4th at 1089.

16         "The operative question under the fair notice theory is

17   whether a reasonable person would know what is prohibited by the

18   law."  Tingley, 47 F.4th at 1089.  "The terms of a law cannot

19   require 'wholly subjective judgments without statutory

20   definitions, narrowing context, or settled legal meanings.'"  Id.

21   (quoting Holder, 561 U.S. at 20).  The standardless enforcement

22

23         [5]   Judge Fred W. Slaughter of the Central District of
     California recently issued an order denying a similar motion for
24   preliminary injunction in McDonald v. Lawson, No. 8:22-cv-01805.
     Judge Slaughter concluded that the physician plaintiffs had
25   failed to establish a likelihood of success on the merits of
     their First and Fourteenth Amendment claims.  2022 WL 18145254,
26   at *6, 16 (C.D. Cal. Dec. 28, 2022).  The court notes that it is
     not bound by the McDonald court's decision, and for the reasons
27   discussed herein, does not find that decision's reasoning on the
     vagueness issue persuasive.
28
                                  15

1   theory asks whether the law provides "objective standards" that

2   "establish minimal guidelines to govern . . . enforcement." <u>See</u>

3   <u>Gonzales v. Carhart</u>, 550 U.S. 124, 150 (2007).

4           Vague statutes are particularly objectionable when they

5   "involve sensitive areas of First Amendment freedoms" because

6   "they operate to inhibit the exercise of those freedoms." <u>Cal.</u>

7   <u>Tchrs. Ass'n v. State Bd. of Educ.</u>, 271 F.3d 1141, 1150 (9th Cir.

8   2001) (citing <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09

9   (1972)).  The Supreme Court has said that "when a statute

10  'interferes with the right of free speech or of association, a

11  more stringent vagueness test should apply.'" <u>Holder v.</u>

12  <u>Humanitarian L. Project</u>, 561 U.S. 1, 19 (2010) (quoting <u>Hoffman</u>

13  <u>Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 495

14  (1982)); <u>see also</u> <u>McCormack v. Herzog</u>, 788 F.3d 1017, 1031 (9th

15  Cir. 2015), <u>abrogated on other grounds by</u> <u>Dobbs v. Jackson</u>

16  <u>Women's Health Org.</u>, 142 S. Ct. 2228 (2022) (applying heightened

17  clarity requirement in vagueness challenge to statute that

18  implicated a then-existing constitutional right).[6]

19          When the challenged law implicates First Amendment

20  rights, a facial challenge based on vagueness is appropriate.

21  <u>Cal. Tchrs. Ass'n</u>, 271 F.3d at 1149; <u>see also</u> <u>City of Chicago v.</u>

22  <u>Morales</u>, 527 U.S. 41, 55 (1999).  In considering a facial

23  _____

24          [6]   Though the court does not reach plaintiffs' First
    Amendment challenges, AB 2098 clearly implicates First Amendment
25  concerns.  <u>See</u> <u>Nat'l Inst. of Fam. & Life Advocs. v. Becerra</u>, 138
    S. Ct. 2361, 2375 (2018) (stating that professional speech,
26  including speech by medical providers, "is [not] exempt from
    ordinary First Amendment principles"); <u>Conant</u>, 309 F.3d at 637
27  (recognizing "the core First Amendment values of the doctor-
    patient relationship").  Accordingly, the court will apply a more
28  exacting vagueness analysis.

1    vagueness challenge, the court "consider[s] whether a statute is

2    vague as applied to the particular facts at issue, for '[a]

3    plaintiff who engages in some conduct that is clearly proscribed

4    cannot complain of the vagueness of the law as applied to the

5    conduct of others.'"  Holder, 561 U.S. at 18–19 (quoting Hoffman

6    Estates, 455 U.S. at 495).

7         A.   "Contemporary Scientific Consensus"

8              "Usually, [courts] look to a term's common meaning, but

9    if the law regulates the 'conduct of a select group of persons

10   having specialized knowledge,' then the 'standard is lowered' for

11   terms with a 'technical' or 'special meaning.'"  Tingley, 47

12   F.4th at 1090 (quoting United States v. Weitzenhoff, 35 F.3d

13   1275, 1289 (9th Cir. 1993)).  In Tingley, the Ninth Circuit

14   applied a lower vagueness standard to psychologists, who

15   challenged the terms "sexual orientation" and "gender identity"

16   as unconstitutionally vague.  Based on an expert declaration and

17   the plaintiff's own usage of the term "gender identity" in

18   describing his expertise, the Ninth Circuit concluded that the

19   terms at issue were within the specialized knowledge of the

20   regulated group.  Id.

21             In contrast, it is inappropriate to apply a lower

22   vagueness standard here because, based on the record before the

23   court, it appears that the primary term at issue--"contemporary

24   scientific consensus"--does not have an established technical

25   meaning in the medical community.  Physician plaintiffs provide

26   declarations explaining that "scientific consensus" is a poorly

27   defined concept.  (See Duriseti Decl. ¶¶ 7-13; Decl. of Dr. Tracy

28   Høeg ("Høeg Decl.") (Docket No. 1-2) ¶¶ 11-24; Decl. of Dr. Aaron

1  Kheriaty ("Kheriaty Decl.") (Docket No. 1-4) ¶¶ 7-10; Decl. of

2  Dr. Pete Mazolewski ("Mazolewski Decl.") (Docket No. 1-5) ¶¶ 7-

3  13; Decl. of Dr. Azadeh Khatibi ("Khatibi Decl.") (Docket No. 1-

4  6) ¶¶ 8-11.)  For example, Dr. Khatibi explains that there are

5  different notions of scientific "consensus."  These include

6  "informal consensus," which refers to the general opinion of

7  doctors, and "formal consensus," which refers to a process by

8  which "a group of doctors with expertise in a particular topic

9  come together to . . . discuss[] and debate the evidence around a

10 topic," and "arrive at some conclusions for general patient care

11 guidelines," which are then published.  (Khatibi Decl. ¶ 8.)

12 Expert declarant Dr. Verma also explains that the term

13 "scientific consensus," as it has come to be used during the

14 pandemic, often refers to the pronouncements of public health

15 officials.  (See Verma Decl. ¶ 8.)

16      Defendants provide no evidence that "scientific

17 consensus" has any established technical meaning; the expert

18 declarations they offer are notably silent on the topic.  (See

19 Decl. of Dr. James Nuovo (Høeg Docket No. 23-1); Decl. of Dr.

20 Angela Lim (Hoang Docket No. 16-2).)  And contrary to defendants'

21 argument, the mere fact that the statute regulates medical

22 professionals does not trigger a lower vagueness standard.  See

23 Forbes, 236 F.3d at 1013 (applying a typical vagueness analysis

24 and holding that challenged terms in statute regulating medical

25 providers were unconstitutionally vague).  The court therefore

26 will not apply a lower vagueness standard here.

27      In Forbes, the Ninth Circuit considered a vagueness

28 challenge to a law prohibiting medical "experimentation" or

                                    18

"investigation" involving fetal tissue from abortions unless necessary to perform a "routine" pathological examination. 236 F.3d at 1010. The court relied on testimony from the plaintiffs (who were physicians) and expert witnesses to evaluate the challenged terms, which were not defined by the statute. The experts "highlight[ed] doctors' lack of consensus about what procedures are purely experimental" and pointed out difficulties arising from the changing nature of scientific understanding, by which some "experiments" will eventually become recognized as "treatment." Id. at 1011-13. The terms "investigation" and "routine" were problematic because multiple common definitions could apply in the medical community, which "[lacked] any official standards to help" define the terms. Id. at 1012. The Ninth Circuit reasoned that because the contested terms lacked sufficiently clear, commonly understood definitions in the medical community, and the statute failed to provide narrowing definitions, the statute was unconstitutionally vague. Id. at 1013. The lack of definitional clarity failed both to give doctors fair notice of what conduct was prohibited, and to give courts and law enforcement sufficient standards by which to narrow the terms' meanings. Forbes, 236 F.3d at 1013 (citing Kolender v. Lawson, 461 U.S. 352, 358 (1983); and Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972)).

Like the contested terms in Forbes, "contemporary scientific consensus" lacks an established meaning within the medical community, and defendants do not propose one.[7]  The

--------

[7]  At oral argument, defense counsel declined to explain what specific conduct the law may prohibit, arguing that

statute provides no clarity on the term's meaning, leaving open
multiple important questions.  For instance, who determines
whether a consensus exists to begin with?  If a consensus does
exist, among whom must the consensus exist (for example
practicing physicians, or professional organizations, or medical
researchers, or public health officials, or perhaps a
combination)?  In which geographic area must the consensus exist
(California, or the United States, or the world)?  What level of
agreement constitutes a consensus (perhaps a plurality, or a
majority, or a supermajority)?  How recently in time must the
consensus have been established to be considered "contemporary"?
And what source or sources should physicians consult to determine
what the consensus is at any given time (perhaps peer-reviewed
scientific articles, or clinical guidelines from professional
organizations, or public health recommendations)?  The statute
provides no means of understanding to what "scientific consensus"
refers.

          Judicial references to the concept of scientific
consensus--in the context of COVID-19 as well as other disputed
scientific topics--confirm that the term lacks an established
meaning.  Courts have based their understanding of scientific
consensus on a wide range of sources, including U.S. professional
organizations, international professional organizations, state
and federal courts, U.S. scientific studies, international
scientific studies, various federal agencies, and the state of

---

application of the law is highly fact-specific.

California.[8]

_____

        [8]    See, e.g., Coonce v. United States, 142 S. Ct. 25, 28
(2021) (Sotomayor, J., dissenting) (clinical determinations by
professional organizations including the American Psychological
Association were "powerful evidence of medical consensus" on
definition of intellectual disability); United States v.
Scheffer, 523 U.S. 303, 309-10 (1998) (citing "polarization"
within the scientific community and disagreement among state and
federal courts as evidence of "lack of scientific consensus" on
efficacy of polygraphs); S. Bay United Pentecostal Church v.
Newsom, 985 F.3d 1128, 1133-34 (9th Cir. 2021), cert. granted,
judgment vacated, 141 S. Ct. 2563 (2021) (citing public health
framework published by State of California concerning COVID-19
masking, social distancing, and activity restrictions as
representative of "scientific consensus"); Edmo v. Corizon, Inc.,
935 F.3d 757, 769 (9th Cir. 2019) (citing an international
professional organization's official standards of care as
representative of scientific consensus on healthcare for
transgender people); Ledezma-Cosino v. Sessions, 857 F.3d 1042,
1054 (9th Cir. 2017) (Thomas, J., dissenting) (citing
determinations by American Medical Association and U.S. Surgeon
General as reflecting "medical consensus"); Alaska Oil & Gas
Ass'n v. Pritzker, 840 F.3d 671, 679 (9th Cir. 2016) (federal
agency's consultation of "the best available research" was
evidence of "scientific consensus" on climate change-related
issue); Planned Parenthood Fed'n of Am., Inc. v. Gonzales, 435
F.3d 1163, 1172 (9th Cir. 2006), rev'd sub nom. Gonzales v.
Carhart, 550 U.S. 124 (2007) ("By medical consensus, we do not
mean unanimity or that no single doctor disagrees, but rather
that there is no significant disagreement within the medical
community."); Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311,
1314 (9th Cir. 1995) (citing FDA's approval of a medication and
"every published study here and abroad" as evidence of "consensus
within the scientific community"); Keene v. City & Cnty. of San
Francisco, No. 22-cv-01587 JSW, 2022 WL 4454362, at *3 (N.D. Cal.
Sept. 23, 2022) (citing California Department of Public Health's
determinations as evidence of "scientific consensus" on COVID-
19); United States v. Smith, 538 F. Supp. 3d 990, 995, 997 (E.D.
Cal. 2021) (Mueller, J.) (citing CDC public health guidelines as
representative of scientific consensus on COVID-19 vaccination);
United States v. Avalos-Villasenor, No. 16-cr-02189 GPC, 2021 WL
3534983, at *4 (S.D. Cal. Aug. 11, 2021) (citing "a recent study"
conducted by the CDC for the proposition that COVID-19 vaccines
are effective); Brach v. Newsom, No. 2:20-cv-06472 SVW AFM, 2020
WL 6036764, at *7 (C.D. Cal. Aug. 21, 2020) (characterizing
"scientific consensus" as a higher standard than "the most
reliable scientific evidence").

Because the term "scientific consensus" is so ill-defined, physician plaintiffs are unable to determine if their intended conduct contradicts the scientific consensus, and accordingly "what is prohibited by the law."  See Tingley, 47 F.4th at 1089.  As discussed in greater detail in Section III of this Order, plaintiffs represent that they have provided and would like to continue providing certain COVID-19-related advice and treatment that contradict the positions of public health agencies like the CDC.  If the "consensus" is determined by United States public health recommendations, physician plaintiffs' intended conduct would contradict that consensus; if the same term is defined by other metrics, their conduct may be permissible.  The language of the statute provides no way to determine which of multiple interpretations is appropriate.

Rather than merely providing the statute with "flexibility and reasonable breadth," the term "scientific consensus" makes it impossible to understand "what the ordinance as a whole prohibits."  See Grayned, 408 U.S. at 110.  See also McCormack, 788 F.3d at 1030-31 (quoting Tucson Woman's Clinic v. Eden, 379 F.3d 531, 55 (9th Cir. 2004)) (statute requiring abortion providers to be "properly" staffed and have "satisfactory" admitting arrangements with hospitals was unconstitutionally vague because its terms "lack[ed] precise definition, and 'subject[ed] physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others.'"); Tucson Woman's Clinic, 379 F.3d at 554-55, abrogated on other grounds by Dobbs, 142 S. Ct. 2228 (statute requiring health care providers to "ensure that a patient is . . . treated

22

1    with consideration, respect, and full recognition of the

2    patient's dignity and individuality" was unconstitutionally vague

3    because meanings of terms were "widely variable" and terms were

4    "not medical terms of art").  Cf. Planned Parenthood of Cent. &

5    N. Ariz. v. State of Ariz., 718 F.2d 938, 949 (9th Cir. 1983)

6    ("counseling for abortion procedures" was not a vague term

7    because it had a commonly understood meaning that a reasonable

8    person would understand, and previous case law on abortion

9    statutes sufficiently defined the term).

10          Defendants argue that while the scientific consensus

11   may sometimes be difficult to define, there is a clear scientific

12   consensus on certain issues--for example, that apples contain

13   sugar, that measles is caused by a virus, or that Down's syndrome

14   is caused by a chromosomal abnormality.  (Høeg Opp'n at 21; Hoang

15   Opp'n at 21.)  However, AB 2098 does not apply the term

16   "scientific consensus" to such basic facts, but rather to COVID-

17   19--a disease that scientists have only been studying for a few

18   years, and about which scientific conclusions have been hotly

19   contested.  COVID-19 is a quickly evolving area of science that

20   in many aspects eludes consensus.

21          Physician plaintiffs explain how, throughout the course

22   of the COVID-19 pandemic, scientific understanding of the virus

23   has rapidly and repeatedly changed.  (Høeg Decl. ¶¶ 15-29;

24   Duriseti Decl. ¶¶ 7-15; Kheriaty Decl. ¶¶ 7-10; Mazolewski Decl.

25   ¶¶ 12-13.)  Physician plaintiffs further explain that because of

26   the novel nature of the virus and ongoing disagreement among the

27   scientific community, no true "consensus" has or can exist at

28   this stage.  (See id.)  Expert declarant Dr. Verma similarly

explains that a "scientific consensus" concerning COVID-19 is an
illusory concept, given how rapidly the scientific understanding
and accepted conclusions about the virus have changed.  Dr. Verma
explains in detail how the so-called "consensus" has developed
and shifted, often within mere months, throughout the COVID-19
pandemic.  (Verma Decl. ¶¶ 13-42.)  He also explains how certain
conclusions once considered to be within the scientific consensus
were later proved to be false.  (Id. ¶¶ 8-10.)  Because of this
unique context, the concept of "scientific consensus" as applied
to COVID-19 is inherently flawed.  (See id.)  See also Forbes,
236 F.3d at 1012 (indicating that the changing nature of a
medical term's meaning is evidence of vagueness).

The use of a poorly-defined, subjective term is
particularly objectionable here because it serves to define the
prohibited conduct, rather than merely explain the context in
which the prohibition applies.  See Gammoh v. City of La Habra,
395 F.3d 1114, 1120 (9th Cir. 2005), amended on denial of reh'g,
402 F.3d 875 (9th Cir. 2005).  The term "scientific consensus"
therefore lacks a sufficient "statutory definition[], narrowing
context, or settled legal meaning[]," Tingley, 47 F.4th at 1089,
and fails to provide sufficiently objective standards to "focus
the statute's reach," Forbes, 236 F.3d at 1013, rendering the
definition of "misinformation" unconstitutionally vague.

B.   "Contrary to the Standard of Care"

The Ninth Circuit has held that "otherwise imprecise
terms may avoid vagueness problems when used in combination with
terms that provide sufficient clarity."  Gammoh, 395 F.3d at 1120
(emphasis added).

1    Defendants argue that the inclusion of the phrase

2    "contrary to the standard of care" provides the definition of

3    misinformation with adequate clarity.  The court agrees that

4    "standard of care" in itself is a well-defined concept in the

5    realm of professional negligence.  The standard of care "requires

6    that medical service providers exercise that degree of skill,

7    knowledge and care ordinarily possessed and exercised by members

8    of their profession under similar circumstances."  Barris v.

9    County of Los Angeles, 20 Cal. 4th 101, 108 (1999).

10   However, far from clarifying the statutory prohibition,

11   the inclusion of the term "standard of care" only serves to

12   further confuse the reader.  Under the language of AB 2089, to

13   qualify as "misinformation," the information must be

14   "contradicted by contemporary scientific consensus contrary to

15   the standard of care."  Cal. Bus. & Prof. Code § 2270.  Put

16   simply, this provision is grammatically incoherent.  While

17   "statutes need not be written with 'mathematical' precision, they

18   must be intelligible."  Valle del Sol, 732 F.3d at 1020 (quoting

19   Forbes, 236 F.3d at 1011) (alterations adopted).  It is

20   impossible to parse the sentence and understand the relationship

21   between the two clauses--"contradicted by contemporary scientific

22   consensus" and "contrary to the standard of care."

23   One possible reading, as defendants argue, is that the

24   two elements are entirely separate requirements that each modify

25   the word "information."  See also McDonald, 2022 WL 18145254, at

26   *7 (adopting this construction).  However, this interpretation is

27   hard to justify.  If the Legislature meant to create two separate

28   requirements, surely it would have indicated as such--for

1    example, by separating the two clauses with the word "and," or at

2    least with a comma.  Further, the concept of "standard of care"

3    pertains to the nature and quality of <u>treatment</u> that doctors

4    provide or fail to provide.  It is thus difficult to accept

5    defendants' contention that the term "standard of care" modifies

6    the word "information."  By its very nature, the standard of care

7    applies to <u>care</u>, not information.  See <u>Alef v. Alta Bates Hosp.</u>,

8    5 Cal. App. 4th 208, 215 (1992) (the standard of care determines

9    "the minimum level of <u>care</u> to which the patient is entitled")

10   (emphasis added).[9]

11        Another equally plausible (or perhaps equally

12   implausible) interpretation is that any time a doctor's conduct

13   contradicts the scientific consensus, it is therefore contrary to

14   the standard of care.  Such a reading would distort the existing

15   meaning of the term "standard of care" by creating an additional

16   statutory definition in the context of COVID-19.

17        Even if the court adopted defendants' interpretation,

18   the mere inclusion of an entirely separate element does not

19   resolve the definition's vagueness.  The term "standard of care"

20   fails to provide additional context in which to understand the

21   meaning of the term "scientific consensus."  See <u>Gammoh</u>, 395 F.3d

22   ─────────────────

23        [9]    The provision of AB 2098 stating that misinformation or
     disinformation must be conveyed "in the form of treatment or
24   advice" is confusing for the same reason.  See Cal. Bus. & Prof.
     Code § 2270(b)(3).  A doctor's advice might suggest a particular
25   course of action or treatment (e.g., "you should not get the
     vaccine").  This advice is distinct from any information that
26   might be conveyed to a patient in conjunction with the advice
     (e.g., "scientific studies show that the vaccine carries a risk
27   of health complications for patients in your situation").  The
     statute improperly conflates "information" with "advice" or
28   "treatment."

at 1120.  More importantly, defendants' interpretation does nothing to address the chilling effect caused by the statute's unclear phrasing and structure.  See Holder, 561 U.S. at 19 ("a more stringent vagueness test" applies when the challenged statute chills First Amendment speech).  As it stands, doctors reading the statute have no assurance that the statute will be interpreted by courts or applied by the Boards consistently with defendants' proposed interpretation.

C.  "False Information"

Defendants also argue that the inclusion of the term "false information" as a separate element further clarifies the definition, or at least provides truthfulness as a defense.  (See Høeg Opp'n at 21-22; Hoang Opp'n at 21-22.)  See also McDonald, 2022 WL 18145254, at *7.  While this reasoning may appear sound at first, drawing a line between what is true and what is settled by scientific consensus is difficult, if not impossible.  The term "scientific consensus" implies that the object of consensus is provable or true in some manner.  This is evident in the examples of "consensus" given by defendants--that apples contain sugar, that measles is caused by a virus, and that Down's syndrome is caused by a chromosomal abnormality.  (See Høeg Opp'n at 21; Hoang Opp'n at 21.)  These propositions are so universally agreed upon that they are considered factual.  It is hard to imagine a scenario in which the Boards consider a proposition to be settled by the scientific consensus, yet not also "true."

Moreover, as discussed above, because COVID-19 is such a new and evolving area of scientific study, it may be hard to determine which scientific conclusions are "false" at a given

1  point in time.  The term "false information" thus fails to cure

2  the provision's vagueness.[10]

3         D.   <u>Defendants' Proposed Construction</u>

4         Defendants argue that even if the statutory text is

5  unclear, the court should adopt the "narrower construction" they

6  propose--namely that the definition of "misinformation" contains

7  three separate requirements: (1) false information, (2) that is

8  contradicted by contemporary scientific consensus, <u>and</u> (3) that

9  is contrary to the standard of care.  (<u>See</u> Høeg Opp'n at 20;

10  Hoang Opp'n at 20.)  <u>See also</u> <u>McDonald</u>, 2022 WL 18145254, at *7

11  (adopting this construction of the statute).  While the court

12  must "consider any limiting construction that a state court or

13  enforcement agency has proffered," <u>CPR for Skid Row v. City of</u>

14  <u>Los Angeles</u>, 779 F.3d 1098, 1103 (9th Cir. 2015) (quoting <u>Hoffman</u>

15  <u>Estates</u>, 455 U.S. at 494 n.5), what defendants propose is not a

16  narrowing or limiting construction at all.  Rather, the proposed

17  construction would require the court to essentially "[r]ewrite[e]

18  the statute."  <u>See</u> <u>Valle del Sol</u>, 732 F.3d at 1021.  This "is a

19  job for the [California] legislature, if it is so inclined, and

20  not for this court."  <u>See</u> <u>id.</u>

21         Because the definition of misinformation "fails to

22  provide a person of ordinary intelligence fair notice of what is

23  prohibited, [and] is so standardless that it authorizes or

24  encourages seriously discriminatory enforcement," <u>Williams</u>, 553

25         [10]   The <u>McDonald</u> court noted that "scienter requirements
26  alleviate vagueness concerns."  <u>See</u> <u>Gonzales</u>, 550 U.S. at 149.
   While the definition of "disinformation" includes a scienter
27  requirement, there is no such requirement in the definition of
   "misinformation," which is at issue here.  <u>See</u> Cal. Bus. & Prof.
28  Code §§ 2270(b)(2), (b)(4).

1   U.S. at 304, the provision is unconstitutionally vague.

2   Accordingly, the court concludes that plaintiffs have

3   demonstrated a likelihood of success on the merits of their

4   vagueness challenges.[11]

5   V.   Non-Merits Factors

6          In addition to establishing a likelihood of success on

7   the merits, plaintiffs must establish that they are likely to

8   suffer irreparable harm in the absence of preliminary relief;

9   that the balance of equities tips in their favor; and that an

10  injunction is in the public interest.  Winter, 555 U.S. at 20.

11         "[B]y establishing a likelihood that [the challenged

12  law] violates the U.S. Constitution, [p]laintiffs have also

13  established that both the public interest and the balance of the

14  equities favor a preliminary injunction."  Ariz. Dream Act Coal.

15  v. Brewer, 757 F.3d 1053, 1069 (9th Cir. 2014).  The plaintiffs

16  have thus established the elements necessary to obtain a

17  preliminary injunction.

18         IT IS THEREFORE ORDERED that plaintiffs' motions for

19  preliminary injunction (Høeg Docket No. 5; Hoang Docket No. 4)

20  be, and the same hereby are, GRANTED.  Pending final resolution

21  of this action, defendants, their agents and employees, all

22  persons or entities in privity with them, and anyone acting in

23  concert with them are hereby ENJOINED from enforcing Cal. Bus. &

24  Prof. Code § 2270 as against plaintiffs, plaintiffs' members, and

25  all persons represented by plaintiffs.

26  _____

27         [11]   Because plaintiffs have established a likelihood of
    success on the grounds of their Fourteenth Amendment vagueness
    challenges, the court need not address the merits of their First
28  Amendment arguments.

Dated:   January 25, 2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE