1　　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　EASTERN DISTRICT OF CALIFORNIA
2

TRACY HOEG, M.D., Ph.D., et al.)
3　　　　　　　　　Plaintiffs,　　) Case No. 2:22-cv-01980-WBS-AC
　　　　　　　　　　　　　　　　)
4　　　v.　　　　　　　　　　　) Sacramento, California
　　　　　　　　　　　　　　　　) Monday, January 23, 2023
5　　GAVIN NEWSOM, Governor of the ) 1:39 p.m.
　　　State of California, in his  ) Re: Plaintiffs' Motion for
6　　Official Capacity; et al.　　) Preliminary Injunction
　　　　　　　　　Defendants.　　)
7　　_____)
　　　LETRINH HOANG, D.O., et al.,　)
8　　　　　　　　　Plaintiffs,　　) Case No. 2:22-cv-02147-WBS-AC
　　　　　　　　　　　　　　　　)
9　　　v.　　　　　　　　　　　) Re: Plaintiffs' Motion for
　　　　　　　　　　　　　　　　) Preliminary Injunction
10　　ROB BONTA, in his official　　)
　　　capacity as Attorney General of)
11　　California, et al.,　　　　　)
　　　　　　　　　Defendants.　　)
12
　　　　　　　　　TRANSCRIPT OF PROCEEDINGS
13　　　　　BEFORE THE HONORABLE WILLIAM B. SHUBB
　　　　　　UNITED STATES SENIOR DISTRICT JUDGE
14
　　　FOR THE PLAINTIFFS　　　　　LAURA B. POWELL, ESQ.
15　　TRACY HOEG, M.D., et al.:　　2120 Contra Costa Boulevard
　　　　　　　　　　　　　　　　Pleasant Hill, California  94523
16
　　　　　　　　　　　　　　　　NEW CIVIL LIBERTIES ALLIANCE by
17　　　　　　　　　　　　　　　JENIN YOUNES, ESQ.
　　　　　　　　　　　　　　　　GREGORY DOLIN, ESQ.
18　　　　　　　　　　　　　　　1225 19th Street, NW, Suite 450
　　　　　　　　　　　　　　　　Washington, D.C.  20036
19
　　　FOR THE PLAINTIFFS　　　　　RICHARD AARON JAFFE, ESQ.
20　　LETRINH HOANG, D.O.,et al.　428 J Street, 4th Floor
　　　　　　　　　　　　　　　　Sacramento, California  95814
21
　　　　　　　MARYANN VALENOTI, RMR, CRR
22　　　　　　　　Official Court Reporter
　　　　　　　　501 I Street, Suite 4-200
23　　　　　　　　Sacramento, CA 95814
　　　　　　　　mvalenotiRMRCRR@gmail.com
24　　　　　　　　　(916)930-4275

25　　Proceedings reported via mechanical steno - transcript produced
　　　　　　　via computer-aided transcription

(APPEARANCES CONTINUED)

| | |
|---|---|
| FOR DEFENDANTS GAVIN NEWSOM, et al.and et al, and ROB BONTA, et al. | OFFICE OF THE ATTORNEY GENERAL by KRISTIN A. LISKA, DEPUTY ATTORNEY GENERAL MEGAN R. O'CARROLL, DEPUTY ATTORNEY GENERAL 455 Golden Gate Avenue, #11000 San Francisco, California  94102 |

SACRAMENTO, CALIFORNIA, MONDAY, JANUARY 23, 2023

--oOo--

(In open court.)

THE CLERK:  Calling Item 4, Civil 22-1980, Tracy Hoeg, et al. versus Gavin Newsom, et al. and Item 5, Civil 22-2147, Letrinh Hoang, et al. versus Rob Bonta, et al.

Counsel, your appearances on the Hoeg case first and then the Hoang case.

MS. YOUNES:  I'm Jenin Younes from the New Civil Liberties Alliance on behalf of the plaintiffs.

THE COURT:  All right.  Let me get my sheet with the lawyers' names on it here.

All right.  State your appearance again, please.

MS. YOUNES:  Yes.  Jenin Younes from the New Civil Liberties Alliance on behalf of the plaintiffs.

THE COURT:  Okay.  It's pronounced "Younes"?

MS. YOUNES:  Yes.

MS. LISKA:  Kristin Liska on behalf of the Attorney General's office on behalf of defendants.

THE COURT:  Anybody else behalf of either side in

1    that Hoang case?

2            MS. LISKA:  My colleague Megan O'Carroll is here,

3    Your Honor, but she will most likely not be saying anything.

4            THE COURT:  She will not be speaking.  All right.

5            MS. LISKA:  Yes.

6            MS. YOUNES:  My colleague, Greg Dolin.

7            MR. DOLIN:  Gregory Dolin from New Civil Liberties

8    Alliance.  I also most likely will not be speaking, Your Honor.

9            MS. POWELL:  I'm Laura Powell local counsel for

10   plaintiff.

11           THE COURT:  Are you going to be speaking?

12           MS. POWELL:  No, Your Honor.

13           THE COURT:  The plaintiff's name in that name is

14   pronounced "Hoeg"?

15           MS. YOUNES:  Yes, that's correct.

16           THE COURT:  All right.  Let's have the appearances on

17   the other case now.

18           MR. JAFFE:  Your Honor, this is Richard Jaffe for the

19   plaintiffs in the Hoang case, and the cases are not

20   consolidated, but related.  So am I still on deck back here?

21           THE COURT:  I'm going to talk about how to handle

22   this procedurally in a moment.  Let's get all the appearances

23   because they're not consolidated, but they're so related it

24   would make most sense to take everything together.

25           MR. JAFFE:  I'm going to stay here until you tell me

1  to actually go to the front.

2          MS. LISKA:  Kristin Liska again on behalf my

3  defendants, with my colleague Megan O'Carroll.

4          THE COURT:  All right.  Now, Mr. Jaffe, how would you

5  suggest we proceed?  I've got three lecturns up there.  I could

6  have one plaintiff's lawyer from each of the two cases at

7  each one of these lecturns as we do it, and could call upon you

8  as I see fit, would that make sense?

9          MR. JAFFE:  Tag team, I love it.

10         THE COURT:  But I do the tagging, you see.

11         MR. JAFFE:  Even better.  So as long as -- because,

12 essentially, these issues so overlap, I think that makes sense,

13 but, you know, they're not technically consolidated, so you

14 have to decide if you are going to do one decision, two

15 decisions, but it's ultimately -- from the papers they're

16 pretty similar, so I think that's the proper way to do it.

17         THE COURT:  Why don't you come up to the lecturn now.

18 Your client's name is pronounced "Hoang"?

19         MR. JAFFE:  "Hoang."  I picked that just because of

20 the confusion effect.  What are the chances?

21         THE COURT:  The plaintiffs are the masters of their

22 pleadings.

23         All right.  This is, of course, a motion for

24 preliminary injunctions, and the burden on the plaintiffs.

25         I would like to start off with your respective

1    discussions on the plaintiffs' side.

2         First, I have an overall question.  We received some

3    amicus briefs, and two of the amicus briefs raised the argument

4    of overbreadth, but I didn't see either of you make that

5    argument.  Do you think I ought to consider it, or do you think

6    it's not worthwhile?  So, I'll see what Ms. Younes has to say

7    about that.

8         MS. YOUNES:  I believe you should consider it.  I

9    think it's so related to the vagueness claim that it could sort

10   of be considered almost the same thing.

11        Also, I wanted to point out --

12        THE COURT:  Well, why didn't you make it?

13        MS. YOUNES:  Well, I think our arguments were

14   encapsulated in the viewpoint discrimination and the void for

15   vagueness, so it seemed to be redundant.  But I appreciate the

16   amici decided to raise it in a different sort of way of looking

17   at it.

18        I also want to ask you, we had asked that one of the

19   plaintiffs testify about standing, if Your Honor would permit

20   it.

21        THE COURT:  Well, I got your Declaration on that.

22   You had a couple of other declarations that were very similar.

23   First, why one wanting to testify and the other two not, and

24   then second, why -- what would it add to the Declaration?

25        MS. YOUNES:  If Your Honor doesn't think that it

1   would clarify anything, then that's fine with us.

2   Obviously because the defendants raised standing, we wanted to

3   make sure we covered all of our bases on that issue.

4         THE COURT:  Let's do this:  I will consider the

5   declarations.  When we get to a point in the argument if you

6   think it needs elaboration, then you could tell me you think

7   you want the witness to testify, and I'll decide at that time

8   whether it's going to add much to the discussion.

9         MS. YOUNES:  Sure.  That sounds good.  Thank you.

10        THE COURT:  Because I think you or somebody said they

11   wanted a half hour for argument.  It takes time away from

12   argument to hear testimony.  I think time is better served in

13   hearing your legal arguments.

14        MS. YOUNES:  That sounds fine, Your Honor.  Thank

15   you.

16        THE COURT:  So, Mr. Jaffe, what's your position with

17   regard to the overbreadth argument?

18        MR. JAFFE:  Well, I think overbreadth comes up on a

19   specific issue raised in the ACLU matter.

20        THE COURT:  Yes.

21        MR. JAFFE:  And I think our response to that is that

22   the statute is not only underinclusive, but overinclusive, but

23   it depends on the circumstances, some of the factual

24   circumstances that I don't think were developed by the parties

25   in the main briefs.

1          So I think my feeling is overbreadth is a concept

2     which you, of course, are quite familiar with based on what I

3     would call the other elephant in the room.

4          THE COURT:  Right.  Because it is a separate concept.

5     It's not the same as vagueness.  So you don't want to mix them

6     up.

7          MR. JAFFE:  Right.  But it comes up I think in

8     response to a separate, a very distinct factual allegation,

9     which really wasn't developed in my view in the opposition

10    papers, but was actually developed in the ACLU brief.  And we

11    don't have an opportunity to respond to a brief submitted after

12    we drew the reply.

13         So, I think what you ought to do is consider the

14    issue on the factual issue that it relates to, and I could

15    think of one of them right off the top of my head, which is

16    that if you consider some of the matters in the legislative

17    history, some of the statements, some of the wild statements,

18    like vaccines have computer chips in them, and I hate to

19    mention that.

20         My view -- the question which you might want to ask,

21    Judge, is, well, can't the Board -- can't the Board stop

22    doctors from telling their patients that they have computer

23    chips in the vaccine?

24         I think my answer to that would be even if that --

25    even if that -- the Board can do that.  The application of the

1    statute to limit that kind of crazy information or criminal

2    information, criminal conduct, like in *Shea*, that would be

3    taken care of by the concept of overbreadth, not

4    underinclusiveness.  So I think both would apply based on the

5    question that you might feel important to answer.

6         THE COURT:  All right.  Did you want to say anything

7    about this issue?  I doubt that you would.

8         MS. LISKA:  I mean, I'll just say, Your Honor, if the

9    issues -- since the issue has not been raised by plaintiffs, we

10   don't believe it's appropriate to consider.  It's possible some

11   discussions about things like overbreadth might factor into a

12   tailoring analysis should strict scrutiny be applied, which as

13   we say in our papers, we don't believe it's appropriate.  We

14   would ask that a separate issue not briefed, I think not be

15   considered at this time since we haven't had an adequate

16   opportunity to respond.

17        THE COURT:  All right.  I'm not inclined to consider

18   an argument that was not raised by the parties even though

19   there may be some logic to it.  So I don't think you need to

20   address the argument per se.

21        MR. JAFFE:  Could I just point out, because I think

22   Ms. Liska raised really an interesting issue.

23   I think what overbreadth is in the -- ultimately, the test is

24   the fit between what was done with what was tried to be done.

25   What we argued, and I believe the other plaintiffs argued as

1　　well, is that -- I mean, in both the main papers and reply we

2　　argued that there is not a right fit.  We argued that for a lot

3　　of reasons because of *Brown*, which you are quite familiar with.

4　　So we view, and we argued in the papers that even under

5　　intermediate scrutiny there is not even a narrow fit.  One of

6　　the reasons is because the difference between what the purpose

7　　of the bill was, was basically to stop doctors speaking out in

8　　public on COVID misinformation and what the bill actually did.

9　　　　　So all of these issues of under-inclusiveness,

10　　overbreadth, go to the heart of our case, which we have to

11　　prove.  We have the burden to prove that the fit was not -- did

12　　not meet whatever standard of heightened scrutiny, if standard

13　　heightened scrutiny applies, fits.  So you could argue it one

14　　way or another.

15　　　　　THE COURT:  I do see that.  The Court could consider

16　　if I get to the question of strict scrutiny, I could consider

17　　what you're talking about without couching it in any terms of

18　　overbreadth.

19　　　　　MR. JAFFE:  Right.  And that I think is really the

20　　point.  One way or the other, and I would argue that even under

21　　intermediate scrutiny, you're looking at the fit.  The fit

22　　is -- it's a binary opposite concept.  You can't look at the

23　　fit without looking at whether it's too broad or too narrow,

24　　which in this case and in *Welsh* is what the Court found.  It

25　　was both.  So any way, for what it's worth.

1          THE COURT:  I would like to start with the discussion

2     of standing.  So I'd like each of you to address standing.

3          MS. YOUNES:  Sure.  So the plaintiffs in our case

4     have alleged all the requirements to show standing.

5          First of all, they've established a concrete plan to

6     violate the law, and under the state of the law as it exists,

7     plaintiffs' alleged course of action only has to arguably fall

8     within the scope of the challenged law.

9          So the government kind of puts the plaintiffs in a

10    Catch 22 where they say, Well, the things that they're saying

11    won't lead them to be prosecuted under this law, but, you know,

12    we don't know that, that assurance has no legal bearing.

13         In *Tingley*, as Your Honor surely knows, it was enough

14    that the plaintiff alleged past practices and future work to

15    reduce clients unwanted same-sex attractions in the gay

16    conversion therapy context.

17         So here our clients have alleged that they've given

18    information in the past to statements such as that they don't

19    think they should get the vaccines or the boosters, that they

20    think masks don't work, they intend to give that information in

21    the future.  So they've established standing on those grounds.

22         THE COURT:  Well, they've established that element.

23    I'm assuming now you are going to get to the question.

24         MS. YOUNES:  Yes.

25         THE COURT:  Go ahead.

1    MS. YOUNES:  I also wanted to point out that the

2    *McDonald* case from the Central District, first of all, I don't

3    think was correctly decided on the issue of standing there.

4    But there the Court found that the plaintiffs lacked standing

5    because it pertained -- their allegations pertained only to

6    public statements and not to doctor-client communications and

7    so that was very different from this case.

8         So the second element is enforcement authorities

9    haven't communicated a specific warning or threat, and in

10   pre-enforcement cases the plaintiff only needs to demonstrate a

11   threat of potential enforcement will cause him to self-sensor,

12   sorry.

13        THE COURT:  I hope you're not glossing over this.

14   What is the threat that has been communicated to your client?

15        MS. YOUNES:  The threat is that they will be

16   prosecuted for spreading misinformation to clients under AB

17   2098.

18        THE COURT:  Other than passing, other than enacting

19   the bill, what have they done to constitute a threat that

20   they're going to enforce it or how they're going to enforce?

21        MS. YOUNES:  Well, first of all, in pre-enforcement

22   cases, the fact that the government has communicated no intent

23   not to enforce the law it has bearing.

24        Second of all, the chilling effect alone bears on

25   standing.  So our clients have alleged that they self-sensor.

1    They're now afraid -- Dr. Hoeg, for instance, has said that

2    she's even afraid a decoy will be sent, especially because of

3    the threats she's received on social media.  So she's afraid to

4    speak openly to patients.  She's trying to do her best, as a

5    doctor anyway, but she's afraid that there are circumstances in

6    which she might not give the information that she believes is

7    in her patients' best interest.

8          There's also been no expressed disavowal from the

9    government, and they've been defending this law as they are

10   today.  So that shows, again, an intent to enforce it.

11         THE COURT:  Is this a time to get into your

12   declarations here?  They give specific examples, each one of

13   them, of things that they have done in the past, intend to do

14   in the future, and in each one of their declarations they say

15   they are concerned that if they continue to do that, there will

16   be some enforcement action taken.  Do you want to get into that

17   now?

18         MS. YOUNES:  Sure.  So, I mean, of course they don't

19   want to expressly state that they're planning to break the law,

20   but they --

21         THE COURT:  Well, they do.  They say in their

22   declarations what they're planning to do.

23         MS. YOUNES:  Right, and the things that they have

24   said, such as that they, you know, think that perhaps some

25   people don't need the vaccine.  Some patients don't need the

1    vaccines; they don't believe masks work.  In fact, those were

2    some of the reasons that this bill was enacted.  Even the

3    analysis from the Senate committee and from the legislative

4    record shows that those were the very statements that this law

5    was designed to target.  So they have every reason to believe

6    that they will be disciplined under this law.

7            THE COURT:  What various statements are you referring

8    to that might correlate to the statements in their affidavits?

9            MS. YOUNES:  I'm sorry, statements --

10           THE COURT:  Well, you said about masks, vaccines, and

11   you said those are the very types of statements that were cited

12   as reasons for the bill.

13           MS. YOUNES:  Right.

14           THE COURT:  Cite me to what you are referring to.

15           MS. YOUNES:  The bill was enacted because of

16   physicians supposedly saying things to patients such as masks

17   don't work -- sorry, masks might not work, vaccines -- not

18   everybody needs a vaccine, you know, things that depart from

19   the CDC guidelines or that meet California state guidelines.

20           THE COURT:  This is important:  Do you have a place

21   that you can point to where in the legislative history they

22   cited something that would correlate to what these doctors say

23   in their declarations?

24           MS. YOUNES:  Yes.  Well, first of all, the law itself

25   says that it's because of doctors casting doubt on the

1  vaccines, the vaccines have cut the chance of death by one in

2  11 or something if you get the vaccine, that's one of the

3  reasons for passing the law.  So I don't have the exact cite in

4  the legislative record, but the Senate -- sorry, the bill

5  analysis from the Senate committee talks about the problem of

6  misinformation about safety and effectiveness of vaccines and

7  use of masks for prevention.  And our clients have specifically

8  said that those are the types of things with which they speak.

9         THE COURT:  I know.  But it would be helpful if you

10 were able to look to the legislative history and say and point

11 to something where they said this is a problem, a specific type

12 of representation, and it's the same representation that your

13 client wants to make to her patients.

14        MR. JAFFE:  Can I make a more general point?

15        THE COURT:  Let's stick with this particular question

16 now.

17        MR. JAFFE:  Well, let me cite to the record.

18        THE COURT:  Okay.

19        MR. JAFFE:  Because the record lays out I think the

20 general point.  Exhibit B, Page 8 to the defendant's motion to

21 for judicial notice, which would be one -- I think that would

22 be the first legislative bill analysis.  On Page 8 in the

23 middle, it says, "It is certainly meaningful that the bill

24 would establish as a matter of California law that physicians

25 are subject to discipline for spreading false information."

1   Now, that is a general statement, but I think if you read the
2   legislative history --

3           THE COURT:  That's what I'm trying to do.

4           MR. JAFFE:  Okay.

5           THE COURT:  I got the general statement now.  Do you
6   have anything specific?

7           MS. YOUNES:  I got it for you.

8           MR. JAFFE:  You know what, let me tell you exactly
9   the statement because there is a one-page footnote about it in
10  my reply brief.  All right.

11          I'll give you the specific statement.  It's the
12  prototypical example of false information that they refer to in
13  the legislative history, it's referring to Simone Gold, who is
14  the poster child of this bill because she goes on social media
15  and basically knocks back the safety and efficacy of the bill.
16  The specific term, words that they challenged her on was the
17  fact that the vaccine and the boosters were "experimental."
18  This has double duty in my case because it turns out that
19  calling an emergency-use authorized drug "experimental" is
20  true, that's what they are.  They are experimental.

21          So to foreshadow part of my other argument, we know
22  what "false information" means under the statute because
23  calling an emergency-use, authorized drug "experimental," which
24  happens to be true, is false information.

25          THE COURT:  Okay.  Now, that's a partial answer to my

1    question; it's the language that these vaccines were

2    "experimental."

3         Now, is there something in the declarations where the

4    plaintiff says, I want to tell my client, patients, that the

5    vaccines were experimental?

6         MS. YOUNES:  Your Honor, if I may, no, not

7    "experimental," but that they might not need them in specific

8    cases.

9         So, for instance, the AB 2098 sponsor, the California

10   Medical Association said that the law is needed because of

11   physicians who call into question public health efforts such as

12   masking and vaccinations.

13        I don't think that there could be any doubt that the

14   law is designed to target physicians who may tell some patients

15   that they don't necessarily need the vaccines or boosters.

16        THE COURT:  I don't know.  It would be nice if this

17   specifically said that.  It's kind of a general, kind of a

18   specific thing, false information about vaccines and masks, if

19   that's what it was about, but if you don't have anything more

20   specific, then we could move on.  I just wanted to see if there

21   was something that your clients wanted to say that we could go

22   back and look at the legislative history and they said, This is

23   what we are going to do.

24        MS. YOUNES:  I think -- I think what I just said

25   covers that, but also this goes to the vagueness issue also.

1    So we don't exactly know --

2            THE COURT:  We'll get to vagueness.

3            MS. YOUNES:  Yeah, I know, but I mean, part of my

4    point is it's not entirely clear what the law means, but we

5    have every reason to believe from the history that it was

6    designed for this sort of thing, that's one of the problems,

7    that it creates this chilling effect.

8            Our clients, they're some of the best physicians in

9    the state.  If they think -- if they understand the law to

10   apply to them, I don't think -- they're physicians of ordinary

11   intelligence at the very least, so I think that shows, again,

12   that they have standing.

13           MR. JAFFE:  I have one specific example, if it helps.

14   In the Complaint, that would be Page 5, Footnote 3, which

15   discusses the very issue of emergency-use authorization and how

16   the latest Pfizer vaccine was approved based on it being given

17   to eight mice, and that goes to the very heart of the fact that

18   its emergency use authorization specifically referred to beyond

19   that.  It was going into the data that supported the emergency

20   use authorization, and that would be characterized as

21   "experimental."

22           I think the argument probably would be made you can't

23   talk about experimental use authorization as being -- the other

24   footnote refers to "may be effective," and that's the

25   difference between "full approval," which is proven to the

1  FDA's satisfaction for an NDA approval, and the emergency use

2  authorization, which shows that a vaccine may be approved.

3      So basically the State's position manifest in the

4  legislative history is you can't tell a patient that a vaccine

5  is emergency use authorized for the very reason that statement

6  would tend to increase vaccine hesitancy, meaning it would be

7  more likely that someone would be less likely to take the shot.

8  Our view is that's really what's going on.  That is the purpose

9  of the bill.

10      What they say in the legislative history -- and I

11  could get you the cite later on, the point of the bill is to

12  lessen vaccine hesitancy by diminishing the effect of these

13  doctors going on media and social media, which would negatively

14  impact the number of people who are going to take it, and the

15  reason for that is also set out in the legislative history,

16  which is to that -- they think they needed -- back then anyway,

17  they thought they needed to get to 95 percent of vaccine rate

18  in order to create what's called "herd immunity."

19      THE COURT:  That's history.  But that's not the only

20  purpose of the bill, is it?

21      It doesn't just deal with vaccinations.  It deals

22  with masks.  It deals with treatment; anything to do with

23  COVID, right?

24      MS. YOUNES:  Correct.

25      MR. JAFFE:  Yes, but in terms of masks, Judge, I

1    don't think patients are going to spend money and time to go to

2    a doctor to talk about a mask, not most patients.

3         I mean, you know, you are talking about a doctor and

4    they cost money in this country, and that reminds me of one

5    other point.

6         In terms of this underinclusivness, which we'll get

7    to, you don't need to go to a doctor to talk about vaccines.

8    You could go to Walmart.  So we'll get back into that.

9         THE COURT:  I prefer to talk to my doctor about

10   medical, I think most people do, than get your medical advice

11   from Walmart.

12        MR. JAFFE:  That's an interesting point because that

13   goes to the nub of it.  If you want a vaccine, you don't need

14   to spend the money, you go to Walmart if you are convinced to

15   do it, and that relates -- that's really a precursor to the

16   whole issue of physician conduct versus speech, and we'll get

17   to that.

18        THE COURT:  I want to stay -- before we get on to

19   other things, I want to make sure on your side you've said

20   everything you wanted to about standing, and then I want to

21   hear from Ms. Liska about standing, okay?

22        MS. YOUNES:  Just two more quick things, Your Honor.

23   First of all, on the mask issue, several of our clients have

24   testified that perhaps in passing, clients have asked them what

25   they thought about the efficacy of masks, and they are now

1    afraid to say that they think they don't work, or they might

2    give a false sense of security.  You may not pay to go to the

3    doctor to get their advice about masks, but it might be

4    something you bring up in the course of the consultation.

5          The other thing is I want to reiterate is that the

6    law itself gives us its justification of the fact that the

7    unvaccinated are dying at significantly higher rates, that the

8    spread of misinformation about the vaccines has weakened public

9    confidence in them.  So there really is every reason --

10         THE COURT:  Where does it say the unvaccinated are

11   dying at a faster rate?

12         MS. YOUNES:  That's in Section 1 of AB 2098 itself.

13   That's the justification for the bill.  So I don't think you

14   even need to go to the legislative record, although that's

15   elucidating in and of itself for sure.

16         THE COURT:  Let me hear from you, Ms. Liska.  What is

17   your argument with regard to standing?

18         MS. LISKA:  Your Honor, I think it depends upon

19   whether we're looking at the original Declarations that were

20   filed with the Complaint or if we're taking into account the

21   Supplemental Declarations.

22         THE COURT:  Let's take into account the Supplemental

23   Declarations.  The Court will consider them.

24         MS. LISKA:  At that juncture, Your Honor, there's

25   definitely more specificity in the Supplemental Declarations

1    because they do start to point to specific statements that had

2    been made and infer indications that the doctors would continue

3    to make those statements.  Our concerns were more with the

4    original declarations since in the original declarations a lot

5    of what was pointed to was conduct not within the scope of

6    AB 2098, congressional testimony, public statements, published

7    articles.  This starts to look much more akin to the

8    Declarations that were found sufficient in *McDonald* and the

9    declarations submitted by Dr. Hoang.

10         So I hate to concede anything, but I do think the

11   Supplemental Declarations, if taken into account, make a much

12   stronger argument for standing.

13         THE COURT:  I appreciate that because I'm not going

14   to limit the Court's inquiry to the original declarations.

15   Did you want to, at this stage of the proceedings, comment upon

16   what the defendant's, or the Board at least's position would be

17   with regard to some of these examples that the declarants have

18   given as to statements they have made or intend to make?

19         MS. LISKA:  I'm afraid that I can't sort of say

20   whether a particular statement would violate AB 2098 or not.

21   We've talked about whether or not certain examples fall within

22   the scope of conduct that would potentially violate it since

23   AB 2098 only applies to information coming through

24   recommendations or advice to a patient under the doctor's care.

25   So we have first clarified where examples are things like

1    social media posts or congressional testimony that are outside

2    the scope.  Whether or not a specific statute or statement

3    would violate AB 2098 is a really factual-specific,

4    fact-dependent inquiry since it will depend on what was said,

5    who the patient is, their medical history, the larger context.

6    So I don't think we could opine on this or at least I am not in

7    a position to opine on this off the cuff.

8            THE COURT:  If you can't tell us, how do you expect

9    the plaintiffs to know whether their conduct would be

10   considered by the Board to be a violation of the statute?

11           MS. LISKA:  If Your Honor is asking this to sort of

12   speak to the question of vagueness, I think that it's

13   sufficiently clear for doctors to understand that they must

14   comply with the standard of care.

15           There are certainly situations where it's very clear

16   when something was or was not a violation of the standard of

17   care.  You know, an example might be a doctor who recommends a

18   patient take a vaccine when the patient has a deathly allergy

19   to a component, that might violate the standard of care.  There

20   may be situations where it's a harder call.  But that doesn't

21   make the statute overly vague.  That is a difficulty that

22   exists throughout the medical system and throughout the medical

23   regulatory system when it comes to requiring doctors to adhere

24   to the standard of care.

25           THE COURT:  Well, if you are softly conceding the

1   standing issue, I think you're right, we don't have to address

2   these hypotheticals in the context of standing.  We may get to

3   them, as you suggest, when we get to vagueness, though.

4         MS. LISKA:  Yes, Your Honor.  I do just sort of want

5   to clarify, we don't think that a plaintiff would need to come

6   into court and say, "I am going to violate the standard of care

7   to have standing."

8         It's probably sufficient that they allege that they

9   wish to engage in conduct that they think has a likelihood of

10  being called into question as to whether it complies with the

11  standard of care or not.

12        THE COURT:  Well, that's what they said.

13        MS. LISKA:  Yes.

14        THE COURT:  All right.  So I think we don't need to

15  belabor the standing issue any longer.

16        MR. JAFFE:  Correct.

17        THE COURT:  All right.  So would you like to go to

18  vagueness now?

19        MR. JAFFE:  Well, I would like to go to what

20  Ms. Liska said because I think that's the most important part

21  of the case, and let me just point to the record.

22  In our case I've got details, including how many mice this

23  booster was given to.  I've got 40 pages of a Declaration by

24  Dr. Verma which states dozens and dozens and dozens of data

25  points of what plaintiffs, what doctors would like to take.

1  Dozens and dozens and dozens of data points.

2         I think the most significant part just from the --

3  just from the record point of view, is in spite of that, they

4  have expert Declaration.  They have a Declaration from an

5  osteopath and a physician in the Hoeg case.  They have the

6  executive officer or director of each state doing it, and their

7  entire argument about what you can say in our case, all these

8  data points, their argument is simply the doctors have to know

9  the standard of care even when it changes, and that apples

10  contain sugar, and there's certain factual information which I

11  guess are true, like the apple thing, and that goes to the

12  heart of the problem in the case.

13         THE COURT:  Somebody could grow an apple that didn't

14  have sugar.  The farmers are pretty good at things like that.

15  They could breed an apple that had artificial sweetener in it.

16         MR. JAFFE:  That just shows you how sometimes science

17  can change and you can't sanction someone.

18         THE COURT:  That's true.

19         MR. JAFFE:  You can't sanction someone because you

20  don't know the next thing that's going to be developed.

21  But just from the record point of view, I think what the Court

22  could conclude is either that -- what Ms. Liska is saying, and

23  I think I agree with ultimately, is they don't know.  They

24  can't tell the Court -- I mean, we've made many, many specific

25  factual statements.  Is it proper to tell the patient how many

1    mice it was given to before it was proven?  It's kind of a yes

2    or no question.  You might not want to tell every patient that

3    because different patients require different levels of

4    granularity, I concede that, but the whole point of what we did

5    in this 40-page Declaration is list on the seven topics

6    information which either a doctor might want to convey or a

7    patient might ask about.  What we said is, Judge, at least put

8    them to the task of telling us whether we could say it.

9            THE COURT:  Well, you could correct me if I'm wrong,

10   you've referred to this how many mice were involved in the

11   testing before, but as I read the statute, the statement has to

12   be in the forum of treatment or advice.  Now, that's just a

13   fact that somebody might want to communicate to a patient, but

14   is that something that would be a violation of the statute?

15           MR. JAFFE:  Yes, and that goes to the nub of the

16   whole case.  And, Judge, you've got skin in the game in this,

17   right, because what is being done is -- remember, this is a

18   bill about information.  They're calling it "misinformation."

19   This is a bill about information that's communicated by a

20   doctor to a patient, that's what the bill says it is, and the

21   issue is information.

22           Now, what the bill does in the form of treatment or

23   advice, well, what I put in my papers is -- I'm a medical board

24   lawyer, I can't think of anything a doctor does other than give

25   treatment advice.  And the final step was in Ms. Liska's

1  papers, the transformation of information for treatment or

2  advice gets turned into medical care.  Medical care subsumes

3  the entire nature of the relationship or the communications

4  between the doctor and patient, and you know what that's

5  called, the Supreme Court calls that the Professional Speech

6  Doctrine.

7          So we've gone from information.  Information for

8  treatment or advice, which I think subsumes everything, to

9  medical care.  Now we're back to -- now we're back to

10  professional speech, which as I read the Supreme Court says has

11  not yet been recognized, and what the nub of it is is that the

12  Attorney General is attempting essentially to reestablish the

13  Professional Speech Doctrine on the same cases that the Supreme

14  Court has already rejected.  But yet they go a step beyond it.

15          Here I think is, just to summarize, to get to the

16  meat of the matter, not even *Pickup*, where the Ninth Circuit in

17  *NIFLA* did, not even they said rational relationship applies.

18  They said intermediate scrutiny does.

19          So to address the first elephant in the room, there's

20  just no way on God's green earth, not even the Ninth Circuit,

21  which seems in my opinion has a minority view, is not quite

22  consistent with *NIFLA*.  I don't see how they accept Judge

23  Slaughter's view that rational relationship is asserted because

24  *Conant*, *Pickup* and *NIFLA* Ninth Circuit says use intermediate

25  scrutiny.  So in my opinion, I just don't see you could follow

1    Judge Slaughter.

2          The only issue in this case is whether you adhere to

3    *Pickup* and Ninth Circuit *NIFLA* and hold intermediate scrutiny,

4    or you do what 20 years of First Amendment free speech

5    jurisprudence tells us to do is you ask two questions, right,

6    they're not complicated questions:  Is the speech content

7    based?  Is the speech viewpoint based?

8          You know, I think I missed something.  I missed

9    something in the original brief, which I picked up in the reply

10   brief.  The thing I missed is -- and I'll tell you this

11   candidly because it's just what happened -- I didn't read *Welsh*

12   until after you took the case.  I just didn't read it.  Once I

13   read *Welsh* and the Court's analysis in *O'Brien*, which is in our

14   reply papers, and the Court's analysis of *Brown*, I missed -- it

15   was the last piece of the puzzle intellectually.  In a way, you

16   foreshadowed *NIFLA* and what *NIFLA* didn't do -- the lawyers will

17   understand this -- what *NIFLA* didn't do when it discussed

18   *Casey*, it didn't say -- it talked about the controversial

19   aspect.  What *NIFLA* didn't do is quote *O'Brien* that if it's

20   both speech and content, it's strict scrutiny, and that's what

21   you did in *Welsh*.

22          THE COURT:  I know.  When I read the Ninth Circuit

23   opinion I wondered whether anybody made that argument to the

24   Ninth Circuit.

25          MR. JAFFE:  They didn't make it to the Supreme Court,

1  because I pulled the briefs, and by the way, as just a fun

2  factoid, the lead lawyer in *NIFLA* was John Eastman.

3          THE COURT:  Who?

4          MR. JAFFE:  John Eastman.  John Eastman, you ever

5  hear of him?  He's the person who's under criminal

6  investigation now, the Trump thing.

7          THE COURT:  Oh, yes, yes.

8          MR. JAFFE:  He was the lead lawyer in *NIFLA*, not

9  relevant to the case.

10          THE COURT:  Nothing to do with this.  This is a side

11  note, but I always wondered whether my position was effectively

12  argued to the Ninth Circuit.

13          MR. JAFFE:  It was not.  It was not.  I've read the

14  briefs, and what they did is -- here's the other thing they

15  missed:  They missed -- the other insight I got was *Casey* only

16  had three votes, Number 1.  It wasn't -- it wasn't even -- it

17  wasn't a First Amendment case.  It was a Fifth Amendment case

18  on privacy under substantial interference or whatever it was.

19          I'm here to tell you also the third thing is I

20  noticed this interesting thing:  All the cases I cited, and

21  what I did is almost a biography of the case law on viewpoint

22  and content, all the cases that I cited were -- the first one

23  was '92, the same year as *Casey*, everything else was after

24  that.

25          So personally I think what happened is the law of

1 content and viewpoint really came much after *Casey*.  So *NIFLA*

2 had to explain away why the information in *Casey*, which was --

3 they said it was nonconfrontational, and, therefore, what they

4 were really saying -- they missed one small point, they should

5 have cited *O'Brien* and saying because it's both, but I'm going

6 far afield.  I apologize.

7     THE COURT:  You are.  It's interesting, but we have

8 to live with the cases that have been decided.

9     So I want to make sure that I get everything that

10 both of you want to say because I do want to go back to Ms. --

11     MR. JAFFE:  I apologize, Judge.  That was my basic

12 spiel about the whole biography of the cases.

13     THE COURT:  Did you want to add anything on this

14 subject before I go to Ms. Liska?

15     MS. YOUNES:  The sort of general subject of viewpoint

16 discrimination or --

17     THE COURT:  No, no, no, not viewpoint discrimination.

18 Vagueness.

19     MS. YOUNES:  Vagueness.  Yes.  Well, actually, maybe

20 it was covered.  We could move on.

21     THE COURT:  All right.  Let me hear from defense,

22 then.  Tell me what your response is to the vagueness argument.

23     MS. LISKA:  Of course, Your Honor.  I think it would

24 be helpful if we sort of pulled back a bit from the weeds and

25 drill down into sort of what's really at issue here.

1          There is a lot of discussion about is this statement

2     appropriate about masks or this statement about vaccines, and

3     this case isn't about what specific statements fall within or

4     without the scope of AB 2098.  It's about whether the statute

5     itself is sufficiently clear, and if you break down what

6     AB 2098 does, first the doctor has to disseminate the

7     misinformation or disinformation; there's three elements to

8     that.  It needs to be information conveyed to a patient under

9     the doctor's care in the form of advice or treatment.  That

10    seems pretty clear.

11         THE COURT:  No, it's not clear.  It's not clear at

12    all.

13         I think that Mr. Jaffe hit on this.  It starts off

14    misinformation is false information, that's what it is.  The

15    statute proscribes the dissemination of misinformation or

16    disinformation about COVID-19.  So it's defining misinformation

17    as information.  And then it goes on to say that it's

18    contradicted by contemporary scientific consensus contrary to

19    standard of care.  I want to get to that in a minute, but it

20    has to be in the form of treatment or advice.

21         Now, you can answer this, if you can:  How could

22    information -- how could the conveying of information be in the

23    form of treatment or advice?  Give me an example, because he

24    wants to talk about how many mice were involved in the test.

25    Well, I don't know if that's treatment, telling somebody about

1   how many mice were involved in a test, and it's hard for me to

2   put these things together.

3           MS. LISKA:  I think a clear example, Your Honor, is

4   if a doctor says to a patient, "I don't think you should get

5   the vaccine because it contains microchips," that is advice,

6   information that's then conveyed to the patient, the vaccine

7   contains microchips, through the form of the advice the

8   doctor's giving.

9           So I think the statute is getting at where doctors

10  are giving advice to patients, recommendations, treating

11  patients and conveying information as part of their explanation

12  for why they've done things.

13          THE COURT:  Okay, that's good.  I'm glad you answered

14  that because that does help me; in other words, there's two

15  parts to what that doctor said in the hypothetical you just

16  gave.  Number 1 is I don't think you should do something and

17  Number 2 is because.

18          MS. LISKA:  Yes.

19          THE COURT:  It's the "because" that contains the

20  information.  And it's the "I don't think you should do

21  something," that is the treatment or advice.

22          MS. LISKA:  Yes, Your Honor.

23          THE COURT:  So that's what this statute proscribes.

24          MS. LISKA:  Well, yes, I think the concern the

25  legislature was getting at is where doctors are providing

1   patients with information that is demonstrably false, I think,

2   again, the examples given are the extreme statements, like the

3   vaccine contains microchips.

4           THE COURT:  So is there anything in any of the

5   examples that the plaintiffs have provided here of things that

6   they intend to say that they think might result in a violation?

7   Is there any example that meets that definition that you've

8   just given me here?

9           MS. LISKA:  I know you're not going to be thrilled

10  with this answer, but some of the examples are a more

11  conclusory statement.  It's very difficult to say if a doctor

12  says to a specific patient, "Don't take the vaccine or don't

13  wear a mask," if that's going to be a problem or not.  I think

14  my colleague on the other side has pointed out that whether or

15  not -- there are granularities to specific patients.  Each

16  patient is an individual.  So it can be difficult to say what

17  specific statement is or is not okay without knowing the

18  context it was given in, the underlying basis and who that

19  patient is.

20          THE COURT:  So you're telling me, then, consistent

21  with the statute, that it may be permissible under some

22  circumstances for doctors to tell their patients not to take

23  the vaccine?

24          MS. LISKA:  I think that that is entirely true, Your

25  Honor.  I think there are definitely situations where the

1   medical standard of care would be to advise a patient not to

2   take the vaccine.  I'm not a doctor.  I cannot necessarily

3   opine on where those are, but it occurs to me that if you had a

4   patient you know would die if they took the vaccine, it

5   probably would be unwise to recommend that they get it.

6           THE COURT:  Well, I don't think the people that wrote

7   the statute would ever admit that somebody is going to die

8   because they took the vaccine.

9           MS. LISKA:  I mean, somebody who has an extreme

10  allergic reaction who could potentially go into anaphylaxis

11  that could cause death, I don't think the legislature would

12  dispute that there are people who could have allergic reactions

13  that are that extreme.

14          But again, I would prefer not to get deep into the

15  weeds of this because I think it's relevant to think about what

16  it means to act especially contrary to the standard of care.

17          THE COURT:  Contrary to the standard of care.  I've

18  struggled with this, and I'll put it out to you:  This

19  definition of "misinformation" doesn't make sense to me.  To

20  put it bluntly, it is nonsense.

21          False information that is contradicted by

22  contemporary scientific consensus contrary to the standard of

23  care.  What does the phrase "contrary to the standard of care"

24  modify in that sentence?

25          MS. LISKA:  The information, Your Honor.

1          THE COURT:  Information.  Information is not contrary

2     to standard of care.  Information is information.

3          MS. LISKA:  Our reading of the statute is that there

4     are three elements that would apply for a doctor's conduct to

5     violate it:  The information conveyed would need to be false.

6     The information would need to be contradicted by the

7     contemporary scientific consensus and relating that information

8     we need to render the doctor's treatment or care under the

9     applicable standard of care.

10          THE COURT:  That's rewriting the sentence in a way

11     that they probably should have written it in the first place if

12     they wanted to accomplish what you are suggesting, because it

13     doesn't say that the relating of that information is contrary

14     to the standard of care, it doesn't say anything about that. It

15     just says "contrary to the standard of care."  I don't know

16     whether it means the information, the consensus or what.

17          MS. LISKA:  Your Honor, I sort of have two responses

18     to that, if I may.  The initial response, we don't think that

19     an "and" was necessarily needed.  There were times where two

20     different factors will be listed without an "and."  For

21     instance, a school policy that said it governs activities that

22     take place on school grounds during school hours.  That would

23     be read intuitively as creating two different conditions even

24     if there is no "and."

25          But as a further matter, I think that looking both to

1    the legislative history, which indicates that the reason that

2    that phrase "contrary to the standard of care" was added was

3    because it wanted to tie what violated AB 2098 to an

4    established standard, which is the standard of care, makes it

5    clear that that should be considered sort of as a third

6    distinct element, and this argument would be buttressed by the

7    fact that courts will construe statutes in ways that they can

8    be read if there is unclarity that help minimize constitutional

9    concerns.

10          We think that it helps alleviate concerns over

11    vagueness to make clear or to read the statute as imposing

12    three distinct requirements that the information is false.

13    It's contradicted by the scientific consensus, and that in so

14    conveying that information, the doctor's conduct has fallen

15    below the standard of care.

16          THE COURT:  All right.  Now, go to the question of

17    the definition of "consensus" because there's been a lot of

18    discussion about that.  What is your definition of "consensus"?

19          MS. LISKA:  We would read "contradicted by the

20    scientific consensus" to mean that the scientific community has

21    reached an agreement on whether or not something is, in fact,

22    true.  It's certainly possible and probably highly likely with

23    a new and novel situation like COVID, that there simply was not

24    a scientific consensus on many things, but there are things

25    that the scientific community sort of understands to be true.

1   COVID is a virus would be an example.  We list others in our

2   brief.  So that where there is an agreement in the scientific

3   community that something is true and established, that that's

4   what that refers to.

5           THE COURT:  What constitutes an agreement?  Would it

6   be a majority?  Would it be certain percentage?  What would be

7   the definition of an "agreement"?

8           MS. LISKA:  You know, I don't know precisely how this

9   would go down in a specific hearing.  Of course the burden is

10  on the Board, if there is disciplinary proceeding to show this.

11  I think it is sort of helpful maybe to step back and say maybe

12  there is less clarity than some might find ideal with respect

13  to that term, but that, first, vagueness doesn't look to

14  whether or not it would be difficult to prove a specific term.

15  It's whether or not it's clear what it prohibits, and second,

16  to the extent that there is concern over that specific element,

17  doctors can easily know that their conduct is fine if they are

18  complying with the standard of care.  And it's really

19  difficult --

20          THE COURT:  Well, that would mean that the only part

21  of this thing that really makes any sense is "contrary to the

22  standard of care."  The rest of it is surplusage, if that's the

23  test.

24          MS. LISKA:  I think the false information plays a

25  role.  Courts routinely have to deal with questions of falsity.

1   Falsity, for instance, is the defense in the libel -- truth is

2   a defense in cases of libel or slander.  So there is a false

3   element, and I think that there are certainly -- if you are

4   looking at the spectrum of whether or not a fact is, you know,

5   established or not, there are certainly issues at both ends.

6   There are things that people just generally know are not true,

7   and things that the scientific community would say that are not

8   true and things they would say are true.  There are probably

9   many things in the middle that --

10  THE COURT:  But when it comes to COVID, I don't know

11  that you can give me the examples on that.  They're in their

12  affidavits, and, you know, first thing we heard about masks was

13  that you shouldn't wear them.  The next thing we heard about

14  masks is that you should wear two of them.  And those two

15  statements came out from the same person just a few months

16  apart from each other.  How are the doctors that are advising

17  their patients to know what is the contemporary scientific

18  consensus on a simple question like that?

19  MS. LISKA:  I think that in a situation where there

20  is a lot of information coming from a lot of different sources

21  that is at odds, the answer is that there is no contemporary

22  scientific consensus.

23  THE COURT:  Well, my example came from the same

24  person, the most knowledgeable person in the country about this

25  subject.

1          MS. LISKA:  I understand that there are concerns

2    about this raised, but again, I just do want to pull back that

3    this is just one element of a multi-part statute, that the rest

4    of the statute is sufficiently clear, and the Ninth Circuit has

5    stated that -- and I don't know if I cite these cases in our

6    brief.  If you will excuse me, sometimes I mix up the four

7    different cases we have on this -- the Ninth Circuit has said

8    if there is unclarity on some terms, the fact that others have

9    very clearly established meanings could help buttress that.

10          Finally, what we didn't argue in our brief, should

11   you wish it, we would be happy to discuss the severability

12   aspect too should you be deeply concerned about that specific

13   phrase.

14          THE COURT:  Well, I appreciate what you are saying,

15   and I would observe that if this part of the sentence that

16   states "contradicted by contemporary scientific consensus" were

17   not in the act, it would be a lot easier argument for to you

18   make because it would simply then say the communication of

19   false information, the communication of which is contrary to

20   the standard of care, and I think plaintiffs would have a much

21   harder argument to make that that was vague.

22          The big problem here comes from this use of the term

23   "contradicted by contemporary scientific consensus," and

24   they're having problems knowing what the scientific consensus

25   is.

1          MS. LISKA:  Again, Your Honor, I think we're focusing

2     so much on issues that fall in the middle area where there's

3     grayness where there may be difficulty or nonestablished

4     scientific consensus.  The legislative history shows that the

5     legislature was really concerned a lot about what was going out

6     with the outlying edges.  The examples they point to you about,

7     you know, the sort of patently false information that I don't

8     even think plaintiffs would say is true about vaccines that

9     have been pedaled at the margins.  I think that there are some

10    things that are going to be clearly contradicted by the

11    scientific consensus, and if there is concerns, a doctor can

12    always take care by the fact that one truth will be a defense.

13    So if a doctor wants to cite a study in JAMA that says X and

14    can pull out a study and say, Here's the study published by

15    John Doe that says X, that would be a true fact.

16         THE COURT:  One of the arguments that I think the

17    plaintiffs made, although it might have been in amicus brief,

18    was that the kind of thing you're talking about that's so

19    clearly outside the standard of care, would be covered in the

20    existing definition of "unprofessional conduct" which includes

21    gross negligence, repeated negligence acts or incompetence.

22    Saying that there are microchips in your vaccine would probably

23    qualify as at least gross negligence.

24         MS. LISKA:  Possibly.  Again, I'm hesitant to sort of

25    opine on specific statements.  There is a chance that that

1    would be the case.  I think that the legislature was concerned

2    that this little act of negligence would not give rise to

3    unprofessional conduct under existing regulation, and that even

4    one act of negligence could cause great harm to a patient and

5    that we'd prefer to avoid that if possible.

6            THE COURT:  I think their argument was if it gets to

7    be so bad that it comes within the definition of those things

8    that you are now suggesting to the Court are beyond dispute,

9    and you, nevertheless, have a doctor who advises his or her

10   patients contrary to that, that that would clearly constitute

11   gross negligence.

12           MS. LISKA:  It may with respect to those specific

13   statements.  Again, I'm hesitant to sort of state either way

14   categorically on the record what would fall where without or

15   sort of the full context with which a statement is being made.

16           I think, if I recall correctly, gross negligence

17   involved the want of even scant care.  There could even be a

18   possibility that a doctor is negligent without falling into

19   gross negligence and that a single instance of that, as I said,

20   could be very harmful to a specific patient and that is

21   certainly reasonable to want to ensure, you know, that no

22   single patient faces an issue of negligence that could cause

23   them harm.

24           THE COURT:  All right.  So let's go back to

25   plaintiffs' counsel, respond to what is Ms. Liska has just

1    observed with regard to your vagueness arguments.

2            MS. YOUNES:  So a few things.  The law is nonsensical

3    for a reason and that's because the point is that it's to

4    intimidate these doctors, it's to silence doctors who don't tow

5    the party line on COVID.

6            The legislative history, the proponents of this bill,

7    the doctors who have been targeting my clients on social media

8    saying, you know, we can't wait to get your license taken away

9    once AB 2098 becomes law, some of the people who are

10   responsible for getting the bill passed, shows that that's the

11   point of this.

12           This isn't about, you know, the microchips, which as

13   you rightly pointed out, is already covered under the existing

14   Business and Professions Code 2234.

15           The single act of negligence, well, if that's a

16   problem, why don't they amend the Business and Professions Code

17   2234 to talk about a single act of negligence; why is that only

18   a problem in the context of COVID?  I think that shows, again,

19   that this is viewpoint-based.  This is about silencing doctors

20   who have a different view from the State.

21           This really can't be looked at in a vacuum.  I think

22   everybody knows this is a very political issue, that people who

23   have dissented on these topics have faced quite a bit of

24   persecution, and there have been great efforts to silence them.

25           Another thing I want to point out is the concept of a

1    truth as a defense, and once you are dragged before the board,

2    you could explain why you abided by the standard of care.  That

3    shifts the burden, I mean -- and the threat of this discipline

4    hanging over your head has a chilling effect already.  So

5    that's a problem in and of itself.  Doctors shouldn't be

6    required to have to face this threat of discipline and then go

7    in and prove their innocence.

8              THE COURT:  Mr. Jaffe?

9              MR. JAFFE:  Well, first, Your Honor, on the truth of

10   the defense, that's what the DEA argued in *Conant*.  And Judge

11   Kozinski's language, which is in my written reply brief, the

12   bottom line here is there is another thing criminal defense

13   lawyers say, which is, "If you have to go to court you already

14   lost."

15             The purpose of this bill -- look, let's be realistic.

16   The purpose of the bill is to, let's call it caution, make sure

17   that physicians are extremely cautious with challenging the

18   narrative that every, every patient should take every shot and

19   every booster, and they should only take mainstream medicine.

20             The notion, the mere fact of the bill -- circling

21   back to standing, the mere fact that physicians have to worry

22   about that, that's the chilling effect.

23             I look at it -- I'm not a constitutional lawyer, I'm

24   a board lawyer.  I have a little different approach, which is

25   people come to me for advice about what they can do.  At the

1    end of my reply brief, you might recall there is some kind of

2    hypothetical statement of what I think doctors can say under

3    the bill.  I can't be a witness in the case, but I'm here to

4    tell you that's not hypothetical.  I think the goal of doctors

5    is to avoid being brought before the board.  The goal of

6    lawyers is to protect doctors' interests, and if you have to go

7    to court, you've already lost.  You can beat the rap, but you

8    can't beat the ride.  It's just as Kozinski says.

9         I think the practical effect is that what the bill

10   does and what it intends to do is stop doctors from giving any

11   information -- and the bill is about information -- any

12   information that will not further the desires of what was

13   referred to in *NIFLA*, quoting Judge Pryor, as the best interest

14   of the volk.

15        I think that ultimately you have to take into

16   consideration what Judge Thomas said in his main opinion on

17   *NIFLA*, and what Judge Kennedy said.  Both of them were super

18   concerned with medical authoritarianism, that's what their

19   concern is.

20        What this bill does -- there's no doubt about it.

21   What this bill does is if a patient asks a question about any

22   of these issues, 40 pages of issues that we brought up before

23   the Court, what you have to say is that you have to take every

24   shot.  You have to take every booster.  You can only take an

25   FDA approved drug, and if you don't do that, that could be

1   construed as COVID misinformation, and what you get is a ticket

2   to a very disconcerting and expensive board procedure and that

3   goes against the First Amendment.  I think --

4           THE COURT:  You know, that's really -- if that's

5   really their objective here, you're not going to get around it

6   by striking this bill.  They'll just call it incompetence.

7   They'll just call it repeated negligent acts because the doctor

8   is advising more than one patient, and they'll do exactly what

9   you've just complained about.  Don't you have to have some

10  trust in the Board?

11          MR. JAFFE:  Funny you should mention it, Judge,

12  because the Board -- this may get into the weeds, but the Board

13  took the position in the legislative history -- and I know this

14  is like a monkey wrench, I don't know which way it goes, but

15  they already took the position -- they already had the power to

16  do all this stuff, even the original stuff, which is to stop

17  people from speaking out in public.

18          My view is if 2270 is vague, apart from the fact that

19  "contemporary scientific consensus" doesn't make any sense, if

20  it's vague, then I don't see how you could take an even more

21  vague statute, which talks nothing about information, and turn

22  that into sanctioning people for COVID misinformation.  The

23  reason is because we know from *Pickup*, even if *Pickup* is still

24  good law -- and by the way, you might have gotten the

25  impression, even before you were on the case, that I'm obsessed

1   with *Pickup* and *Tingley*.  I just have no idea how these people

2   did *Tingley* after *NIFLA* -- but I think the most important point

3   is even under *Pickup*, *Pickup* says that information and

4   opinions, even recommendations for a treatment that's contrary

5   to the standard of care, right, a treatment that's contrary to

6   the standard of care, that still gets intermediate scrutiny.

7          The Ninth in *NIFLA* says *Pickup* doesn't say that, but

8   we're saying that here in *NIFLA*.  But again, the operative

9   practical point, and circling back to the first elephant in the

10  room, which is Judge Slaughter, the notion that a court -- that

11  this Court should use rational relationship is certainly not

12  consistent with professional speech, but it's not consistent

13  with all the authority in this circuit.

14         In my view, *Pickup* and *NIFLA* -- *Pickup* and *Tingley*

15  means that a statute which bars SOCE therapy, that is speech

16  with the conduct, conduct with the speech, and that holding

17  exists, but that's not the case we're here about, as you

18  pointed out.  We're here to talk about information.

19         So I think the bottom line is, again, just to get

20  practical, right, you got to determine some level of scrutiny.

21  I think that Judge Slaughter's off the table, and the

22  difference is whether you do -- basically whether you apply the

23  same cases, which you did in *Welsh*, which you could charge me

24  with plagiarism, I took your analysis and applied it here,

25  that's the analysis that courts do:  Content, viewpoint, they

1    apply the cases, and the only issue is the fact that *NIFLA*

2    didn't cite *O'Brien*.  So that's the precise issue before the

3    Court apart from vagueness.

4          If I could just make one point about vagueness.  The

5    vagueness is established by the fact that page after page, 20

6    pages of single-spaced citations to the literature, they can't

7    give you an answer as you stand here today, whether any of

8    these very specific facts would constitute COVID

9    misinformation, and if they can't give you an answer, I think

10   that's all you have to determine in terms of vagueness.

11         I mean, they could have had a declaration, and I

12   think the Court can draw an inference in terms of lack of

13   evidence.  So I think the vagueness point is established by the

14   defendant's response, respectfully.

15         THE COURT:  What they have said is they need more

16   facts, and you don't have a lot of facts in your declarations.

17   So that's their response to that.  We need to know the patient.

18   We need to know more about the facts.

19         MR. JAFFE:  Well, Judge, let me push back a little

20   bit on that, Judge.  If I -- if I make the statement, We don't

21   live in a vacuum, anybody who's been watching CNN for the last

22   couple years, in our papers --

23         THE COURT:  I haven't been watching CNN.

24         MR. JAFFE:  In any event, on TV, everywhere there are

25   concerns of certain issues that come up in terms of the safety

1    or appropriateness of the latest booster.  I don't know if you

2    are aware of that. but that's a big issue now and, indeed,

3    that's the big issue that people want to ask doctors about.  Do

4    I need the fourth, fifth or sixth booster?  I think that's the

5    world we live in, that's the air we breathe.  How many boosters

6    do you have to take to get protection?

7               THE COURT:  None of that is mentioned in any of these

8    declarations.  None of them say, I want to inform my clients

9    not to take more than five boosters, or whatever it is.

10              MS. YOUNES:  Your Honor, in our Supplemental

11   Declarations we did make that allegation.

12              THE COURT:  Which one?

13              MS. YOUNES:  Dr. Hoeg, and I believe Dr. Mazolewski

14   talked about how he would recommend against the vaccine before

15   surgery.

16              THE COURT:  Before surgery, yeah, right.

17              MS. YOUNES:  Yeah.

18              THE COURT:  That's a different question.  He's

19   talking about people going to their doctors and saying how many

20   of these boosters do you want me to take?

21              MS. YOUNES:  Right.  Dr. Hoeg specifically talked

22   about that in her Supplemental Declaration.  She said

23   especially for men in the 18 to 29 age group, she might

24   recommend --

25              THE COURT:  That's different.

1           MR. JAFFE:  Judge.

2           THE COURT:  I've read those.

3           MR. JAFFE:  How about my Declaration for the

4     plaintiff?

5           THE COURT:  Specific to individual types of patients.

6           MS. YOUNES:  Sure.  As opposed to --

7           THE COURT:  -- general statements, how many boosters

8     do you need?  Do I have to keep watching television to see how

9     many boosters the president takes to know?  Go ahead.

10          MR. JAFFE:  I would say that maybe you've answered my

11    question.  I mean, the Hoang Declaration says, One of the

12    things many patients want to discuss with the current vaccine

13    booster and whether they should take it, in addition to

14    advising the patients that the booster has been authorized for

15    use by the FDA, I advise patients there's always been testing

16    for this one vaccine by two dozen mice.  That's specific

17    information.

18          Can I suggest that there might be cases where the

19    information about prior boosters for a specific patient might

20    be relevant, and the main thing would be whether a prior shot

21    has resulted in an anaphylactic reaction which would be a

22    contraindication, but the reality is the commonality -- I mean,

23    what I want to know as a person, you know, if I've had two

24    shots, do I really need -- two boosters, do I have to take the

25    second or third booster?  It could be that there might be a

1   fact that might be relevant to me, but in general, there is a

2   general issue as to the fact that these vaccine boosters only

3   last four or five or six months, and then, you know, whether

4   people in general should have to take them, and maybe it

5   depends on age, but there are -- it's a general issue.

6           I don't think that we have to set forth the

7   particular patient with the particular facts.  It's just the

8   problem is -- the problem is you can't tell from the statute

9   what you can say, and despite the opportunity to have educated

10  the Court to give some kind of guidance, we don't have any.

11          And what we don't have -- Judge, I've had occasion to

12  deal with the entity that -- the main entity that deals with

13  information and what you can disseminate and that's called the

14  FTC.  You might have had some experience with that yourself.

15          THE COURT:  We have a lot of FTC cases.

16          MR. JAFFE:  For sure.  What is interesting, what the

17  FTC has is they have these guidance documents.  They tell

18  you -- they tell you, for example, the statement "Chaparral was

19  used as a treatment by Native American Indians," is a false

20  statement by the FTC.

21          My concern in this case, my specific concern which

22  I've raised in the papers is I think the way the government is

23  going to interpret this statute is interpreting true

24  information as false information, sort of the way the FTC does

25  when they use the notion of what they call implied claim.

1          THE COURT:  That's too far afield.

2          MR. JAFFE:  But anyway, that's the problem.  The

3     problem is we don't have any idea.  The only data point we know

4     is that under the bill calling it an emergency-use authorized

5     drug "experimental" is a truthful statement, but is COVID

6     misinformation, that's Exhibit A, that's what we know.

7     I think -- I don't think -- this is my speculation, I don't

8     think the boards want to try to figure this out until they get

9     some doctors before them, and I think that's really the

10    vagueness argument.

11         If they can't come here and tell you that any of the

12    40 statements that we made, and we rely on the fact that well,

13    specific, if they can't tell you what the doctor can say and

14    what they can't say, then how in the world does that satisfy

15    heightened specificity?  That's the whole point.  A reasonable

16    person can't know what they could do, so the result is you

17    can't say anything, which is called physician censorship,

18    that's our point.

19         THE COURT:  Mr. Jaffe has hit on this issue of scope

20    of review, whether to apply strict scrutiny.  Let's go on from

21    vagueness here.  Maybe we need to take a break first.

22         MS. LISKA:  Your Honor could I just reply real

23    briefly to the latest point; is that okay?

24         THE COURT:  Sure.

25         MS. LISKA:  Again, I just want to pull back a little

1   bit and maybe help provide some clarity to the Court on this

2   idea of what a doctor can or cannot say.

3          AB 2098 is not about general statements.  It's about

4   what a specific doctor says to a specific patient and that's

5   why it's difficult to say, telling a patient you shouldn't get

6   a booster is or is not a violation because it's going to depend

7   on the specifics.  But it is not a violation if a doctor says

8   to a patient that there is a study that was published in JAMA

9   that says X if there is a study that was published in JAMA that

10  says X, conveying that to a patient is not a violation of AB

11  2098.

12          THE COURT:  But then take the step in, and the

13  patient says, "Fine, Doctor, I'm not a medical expert, what

14  does that study mean?"  Where does that lead you, then how does

15  the doctor answer the next question?

16          MS. LISKA:  If the doctor then gives an opinion that

17  is consistent with the standard of care, the doctor's conduct

18  is not a violation.

19          I understand that this is -- I'm sympathetic to

20  plaintiffs and their point, and this is going to be difficult

21  to know, but this is a problem with any situation where the

22  standard of care is the governing standard.  It's what is the

23  care that a reasonable doctor would use in similar

24  circumstances.

25          THE COURT:  Okay.  Good, good, because that is a

1   standard that is well tested in the law.

2           MS. LISKA:  It is.

3           THE COURT:  I've had numerous medical malpractice

4   cases, and we know the definition of the standard of care.  We

5   know how it works.  Doctors understand that term.  Lawyers

6   understand that term.  Judges hopefully understand it.  But

7   when you get to the consensus, that's injecting a new concept

8   into this analysis that doctors are not familiar with.  They

9   tell us they are not familiar with it.  They give us examples

10  of consensus that's been used in different ways in different

11  contexts.  They don't know how to apply that term.  They know

12  how to apply the standard of care.  They provide what it means.

13  They don't know how to apply this new term that you have

14  interjected into this discussion.

15          MS. LISKA:  Again, Your Honor, that is a separate

16  element from the "contrary to standard of care."  So as long as

17  a doctor is in conformance with the standard of care, they know

18  that they're in compliance with AB 2098.

19          THE COURT:  No, no, that's the heart of this argument

20  here.  They don't.  You just said it was an "and."  You said an

21  "and" ought to go between these two things, both of them have

22  to be present.

23          MS. LISKA:  Correct.

24          THE COURT:  It has to be consistent with the standard

25  of care, and it has to be consistent with contemporary

1     consensus.

2              MS. LISKA:  That is the Attorney General and the

3     medical board's understanding and interpretation of the

4     statute.

5              THE COURT:  Then if a doctor knows that she has

6     complied with the standard of care, she still doesn't know

7     whether she's in violation of the statute because she also has

8     to be in compliance with --

9              MS. LISKA:  No, Your Honor.  It's unprofessional

10    conduct if it's false information and contradicted by the

11    scientific consensus and contrary to the standard of care.

12    There are three elements and each must be met.  That is our

13    understanding of the statute.

14             MR. JAFFE:  Yes, but they're subjective.  And you

15    have to -- how does a doctor know whether or not he complies

16    with the consensus because we have 40 pages of saying the

17    consensus is not real?  The conjunctive, the three elements

18    means that you have to know whether you -- whether you proved

19    the opposite of the three.  How do you know that they haven't

20    complied or have complied with the consensus?

21             THE COURT:  You've turned your argument around here.

22             MS. LISKA:  I apologize if that's not clear, Your

23    Honor.  That's how we read the statute from the beginning.

24             THE COURT:  No, let's go back to the statute.

25    "Misinformation" is defined as false information that is

1  contradicted by contemporary scientific consensus contrary to

2  the standard of care.

3         MS. LISKA:  Yes.  Three elements must be met to show

4  that there's been misinformation.  I believe -- I don't have

5  any opposition in front of me, but I believe we specifically

6  state that in one of our oppositions, that there are three

7  elements to proving -- the Board would have to prove a

8  violation of AB 2098.  To do so it would need to establish

9  three elements:  False information, contrary to the scientific

10  consensus -- contradicted by the scientific consensus and

11  contrary to the standard of care.

12         MS. YOUNES:  Your Honor, very briefly.  I mean, the

13  term "and" is not there as you noted.  I think it's not there

14  for a reason.  I think it's not there to confuse doctors for

15  the reasons that we discussed.

16         Also, very briefly I would like to mention, I mean,

17  standard of care is typically used to apply to treatment and

18  conduct, not speech.

19         I mean, I'm not saying there aren't any situations,

20  although I think they are very rare, but typically it's used

21  when something bad happens to someone rather than speech that

22  occurs in a doctor's office.  So that's a really different

23  situation.  It's just not a concept that typically applies to

24  pure speech as it does here.

25         THE COURT:  Well, sometimes it does.

1          MR. JAFFE:  Judge, I think technically the argument

2     would be --

3          THE COURT:  They tell somebody they don't have

4     cancer, that could be in violation of the standard of care,

5     that's speech.  Sometimes it is.

6          MS. YOUNES:  I agree, then I think that would be also

7     actionable under the other Business and Professions Code 2234.

8          THE COURT:  I'm still trying to digest her

9     interpretation of this statute.

10          MS. LISKA:  It's on Page 20 of our opposition.

11          THE COURT:  I could go back and read it.  I'm just

12     trying to make sure I understand it.

13          MR. JAFFE:  Could I suggest, Judge, just as a matter

14     of interpretation of the statute, and what it says is that in

15     vagueness, if a defined term that is a requisite of a key

16     element as to whether or not the physician is chargeable or

17     disciplinable is vague, it seems to me it's vague under any

18     standard of scrutiny of heightened specificity, and I think

19     what they're asking you to do, I think if you had the power --

20     I think you suggested, if you had the power to strike out that

21     phrase, that might make a lot more sense.  But I think -- I

22     would respectfully suggest, I don't think a Court could just

23     edit out a phrase which obviously -- I mean, I think that

24     phrase was referenced even in the first -- in the first bill,

25     right, the initial bill.  So I think what they're saying is if

1    you feel that the phrase "contemporary scientific consensus" is

2    vague, I don't see how you can do anything but say the

3    definition of "misinformation" is vague, and if the definition

4    of "misinformation" is vague, then the operative part which is

5    2270(a), it doesn't provide a reasonable physician to know

6    whether what he is going to say violates the law, and the

7    supplemental evidence is despite ample opportunity to do so,

8    the defendants have given the Court no clarity on the issue.

9         MS. YOUNES:  If it's just about standard of care,

10   then what's the point of "scientific consensus" in the statute?

11   Obviously it's there for a reason.

12        THE COURT:  That was the reason I questioned counsel

13   a little bit more.

14        MR. JAFFE:  So that's really the vagueness issue that

15   I think we've hit and come to the nub of the problem.

16        MS. LISKA:  Your Honor, just to kind of wrap this up

17   because I sense that you, at least on my end, I think you'd

18   like to move on.  We say on Page 20 of our opposition brief in

19   the Hoang matter, I believe this is the one I have.

20        THE COURT:  Hoang matter.

21        MS. LISKA:  My apologies to Dr. Hoang.  There are

22   three requirements for conduct to fall within the scope of

23   AB 2098:  That is false.  Second, contradicted by the contrary

24   to scientific consensus.  Third, contrary to the standard of

25   care.  That is also how Judge Slaughter read the statute in his

1   opinion in the *McDonald* matter, that there are three components

2   required for it to be a violation.

3           THE COURT:  Now that we're there, the doctors'

4   confusion as to the second element, that you've now called it,

5   still exists.  They may know that what they're doing -- all

6   right, let me think it through.  Let me think it through.

7           Shall we take a break now?  How much time do you want

8   to discuss the remaining issues?

9           MS. LISKA:  I will talk as much or as little as the

10  Court would like to hear.

11          MR. JAFFE:  You know, Judge, we put in dozens and

12  hundreds of pages.  We've done a lot of talking.  I'm really

13  curious to hear what you have to say or what questions you have

14  for us.

15          THE COURT:  I think I've asked a lot of them.

16          MR. JAFFE:  Do you have --

17          THE COURT:  I don't have a lot of questions on the

18  other issues in the case.

19          MR. JAFFE:  Well, then, would you agree that between

20  the brief and the oral argument, and you've written a decision

21  on this issue already, that's really -- the main concern I have

22  is I think the First Amendment issue is very clear and well

23  briefed by all sides in the case.

24          THE COURT:  So how much time would you like to

25  discuss the First Amendment issue?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1          MS. LISKA:  If Your Honor has specific questions, I'm

2     happy to answer.

3          THE COURT:  I don't.

4          MS. LISKA:  Otherwise just a few minutes.

5          THE COURT:  I want to hear what you think is

6     important.

7          MS. LISKA:  Just a few minutes maybe to respond to

8     some of the points raised in the reply or that plaintiffs'

9     counsel has.

10         THE COURT:  All right.  Why don't we take a 15-minute

11    break, and we'll come back, and let's say we have another 15 or

12    20 minutes on the matter.

13         (Recess taken at 3:00 p.m. to 3:18 p.m.)

14         THE CLERK:  Court's in session.

15         THE COURT:  All right.  On the remaining issues in

16    the case, who would like to begin?

17         MS. YOUNES:  Your Honor, my clients have advised me

18    that they would like to testify, at least one of them, and

19    answer some of your questions about how the law affects them if

20    it would help your decision.

21         THE COURT:  Well, I would take it more as expert

22    advice rather than some facts that might need

23    cross-examination.  What would you say if they wanted to call

24    one of his doctors?

25         MS. LISKA:  We don't know what they would be speaking

1   to.  Our understanding is they wanted to speak to issues with

2   respect to standing, and I'm not sure what more they have to

3   add beyond what's in their supplemental briefs.  And if they're

4   going to speak to anything beyond that, we would very much

5   object because we've had no opportunity as to even get a

6   proffer as to what they would say.

7         THE COURT:  I like to give everybody the assurance

8   that they've been heard.  How long would it take to tell me

9   what she wants to say?

10        MS. YOUNES:  It's up to you, Your Honor.  She'll

11   abide by any time limitations.  Let's say 15 minutes.

12        MS. LISKA:  Your Honor, we would just ask again, we

13   have not had an opportunity to prepare any response to anything

14   beyond questions that relate to standing.  We were only

15   informed that witnesses would be called to speak to that issue.

16        THE COURT:  Could I have an offer of proof as to what

17   subject he's going to testify on?

18        MS. YOUNES:  She would like to testify about the

19   types of advice, specific examples of what she's told patients

20   in the past, more specific sort of in line with Your Honor's

21   questions and what sort of advice she would give in the future

22   that she either believes would fall under AB 2098 or might fall

23   under AB 2098.

24        THE COURT:  Have you talked to her enough to know

25   what she's going to tell me?  You could make your

1    representation to the Court.

2            MS. YOUNES:  We weren't able to get to the specific

3    examples in depth.

4            THE COURT:  You are going to call a witness and ask

5    her questions and you don't know what answer she is going to

6    give?

7            MS. YOUNES:  I have a good idea.

8            THE COURT:  I think I'm doing you a favor if I don't

9    allow this.

10           MS. YOUNES:  I have a pretty good idea.  I wouldn't

11   want to give the specific scientific examples myself because

12   I'm not sure that I'm qualified to talk about that topic, and I

13   think she would be able to put it into a better perspective

14   given her background.

15           MR. JAFFE:  Could I ask you a question?  I'm a

16   neutral party, I don't have a witness in this.  Can I ask,

17   Judge, is there anything that you think in answer to any of

18   your questions today that might be helpful from an actual

19   doctor?  We've tried to cover as much as we could in either

20   declarations of plaintiffs.  Let's assume it's not about

21   standing.  We have a couple of doctors here.  I guess, would

22   anything help you in analyzing the case to hear from a doctor?

23   I think that's the critical question.

24           THE COURT:  I can't think of anything.  Well, there

25   is a matter of curiosity that comes to mind as a result of

certain things they've said in their declarations, but I can't think of anything I would need to know beyond what is set forth in these declarations.

MS. YOUNES: If Your Honor is satisfied, then we won't press the matter.

THE COURT: All right. I think that's the best way to proceed. But I'll hear whatever else you want to say.

MS. YOUNES: Viewpoint discrimination we're going to?

THE COURT: I said whatever else you want to talk about. I've read the briefs, and we've had a discussion about certain issues. Is there anything you want to say about any other issues that are raised in the briefs?

MS. YOUNES: Yes.

THE COURT: Within the constraints of time, I'll hear what you will have to say.

MS. YOUNES: Yes, thank you, Your Honor. I would just like to talk about the viewpoint discrimination a little bit.

I think it's really important to note that the statute actually talks specifically about treatment or advice, and that advice is -- separate from treatment means that we're talking about speech. If we were talking about speech that takes the form of treatment, for instance like in *Pickup* or *Tingley* --

THE COURT: We'll get to him.

1            MS. YOUNES:  -- then the advice obviously is talking

2    about something different, or there would have been no need for

3    that word in the statute.  And recommendations also are

4    considered, you know, part of advice, and those are -- those

5    are considered pure speech and are subject to strict scrutiny.

6    This is obviously a viewpoint discriminatory statute because

7    it's targeting physicians who have certain ideas about COVID.

8    I think we all know the doctors they don't think anybody should

9    get the vaccine are not going to -- sorry, are not going to be

10   protected under the law.  It's the physicians who perhaps have

11   doubts about it or who say that some patients shouldn't get the

12   vaccine or whether the people don't need to wear masks.  So

13   this is clearly a viewpoint discriminatory law.

14           THE COURT:  You really don't know that.  We've all

15   sort of assumed certain things, but if you just look to the

16   language of the act itself, it could be used to discipline

17   somebody that was a little bit too favorable to the

18   Government's position on vaccines.

19           MS. YOUNES:  Sure.  Maybe that would happen in the

20   future with a different administration, but I think we know

21   that's probably not what it's going to be used for under the

22   current -- under the current political --

23           THE COURT:  That's what I mean.  You really don't

24   know that by looking at the statute.

25           MS. YOUNES:  Sure.  But it's also, you know, as we've

1    talked about many times, the legislative record makes clear

2    what the purpose of the statute was, and it's about ensuring

3    that everybody gets the vaccine.  It's about targeting doctors

4    who cast doubt on that notion.  There's no other way to read

5    the record.

6            THE COURT:  One of the tenets of statutory

7    construction is if the statute is clear on its face, you don't

8    even look to the legislative history.

9            MS. YOUNES:  But the statute is not clear on its

10   face, that's the whole vagueness issue.

11           The point also is that the example you gave would

12   also be a viewpoint discrimination.  It might not be what we

13   think the law would be used for right now, but it would also be

14   problematic and could be challenged on that basis as well.

15           In the end, of course it's -- under the current

16   political regime, I think it's going to be used to target

17   people who have doubts about the masks and vaccines and other

18   things related to COVID, but in the future it could be used for

19   different reasons, and that's again why it's problematic

20   because it's viewpoint discriminatory.

21           I think that's all I have to say that I haven't

22   already said.

23           THE COURT:  Mr. Jaffe, on the other issues.

24           MR. JAFFE:  Yeah.  I think one thing that I haven't

25   maybe made clear enough is that we know -- we know how the bill

1    originated, which is essentially by the Federation of State

2    Medical Board's press release, and we know what the bill

3    originally targeted, which was primarily, if not exclusively,

4    the public speech.

5         I think part of the problem we're having here today

6    and part of the problem with the bill is that the bill itself

7    originally was targeting what my friends in *Pickup* said was

8    soapbox speech, which clearly -- I mean, I believe there is a

9    per se rule against soapbox speech as evidenced in *Pickup*

10   citing Judge Jackson and *White*.  So we know that.

11        So what happened with this bill in terms of the

12   legislative history, they couldn't effectuate the Federation's

13   policy of stopping people like Dr. Gold from speaking out in

14   public.  The bill is not for -- is not really a treatment bill.

15   It's not an advice bill.  It was really meant to stop people

16   from speaking out in public, hence the word "spreading,

17   disseminate."

18        "Disseminate" comes from seed.

19        The whole point of the bill was to stop people

20   talking on social media, and what they did in the subsequent

21   amendment is try to use a word that really doesn't apply on

22   "disseminate," which means broadcast, to apply to a patient

23   interaction.  That's a semantic point, but it's an important

24   point because what it shows is under a *Brown* analysis, and

25   whoever came up with the idea of applying *Brown* analysis, that

1    would be you, Judge, in *Welsh*, the point is you look at the

2    problem to be solved.  It is indisputable that the problem to

3    be solved by AB 2098 was to stop people from Simone Gold, not

4    from what she said to patients, but what she was broadcasting

5    in public and everything about the bill, and then to

6    incorporate the standard of care to public speech.

7           Then they used these other vague terms like "false

8    information," which I think I've shown you based on the

9    experimental investigational status, is what they mean -- is

10   really that's Orwell.  One of the judges in one of these cases

11   cited Orwell as news speak.  When you look at experimental

12   speech and see what they say that means, "experimental

13   medicine" and see that that's false information, that's the

14   target.

15          Why I think that's important is ultimately even if

16   you apply strict scrutiny, right, and that probably means the

17   bill is unconstitutional, there's just no way in the world that

18   there's a fit between the actual problem to be solved and what

19   they did, because what we now know that the problem to be

20   solved was not even addressed in the bill.

21          So just on the basic concept, you have fit.  Whatever

22   the level of fit is, it's got to fit, and it doesn't fit

23   because they had to gut the bill and give up the very thing

24   they were trying to do.

25          In that regard, just to prove my point, I need to

1  caution the Court, there is a finding in the statute concerning

2  the Federation's statement, right.  They cite the Federation of

3  State Medical Boards, that would be A1AF [sic].  The point is

4  that statement itself is incorrect.  I could read it to you, I

5  have a copy of the bill if that would help, Judge.

6      THE COURT:  Just read it to me.

7      MR. JAFFE:  Here's what it says, "The Federation of

8  State Medical Boards has released a statement warning that

9  physicians who engage in the dissemination of COVID-19 vaccine

10  misinformation or disinformation risk losing their medical

11  license, and that physicians have a duty to provide their

12  patients with accurate science-based information."  That's

13  good.  That makes it look like the bill is targeted at

14  patients.  But what is in the record -- I actually copied -- I

15  downloaded the actual Federation statement.  What they didn't

16  put in the statute is actually the first sentence in the press

17  release.

18      Here's the first sentence of this Federation press

19  release, and this sentence is in the record in the case and is

20  cited in my reply brief, "The Federation of State Medical

21  Board's board of directors released the following statement in

22  response to a dramatic increase in the dissemination of

23  COVID-19 vaccine misinformation and disinformation by

24  physicians and other healthcare professionals on social media,

25  online and in the media."

1          That's actually the first sentence of that, which is

2    not in the actual finding, and I think that statement shows you

3    what they were trying to do or the *Brown* problem.  And that's

4    ultimately the problem with the bill, which should be the

5    decision point, because even after -- under almost any level of

6    scrutiny, if you pass a bill that doesn't target the conduct

7    you're looking for, that means under the job judges have to do,

8    it doesn't fit, and arguably it's vague because it doesn't do

9    what it's supposed to do.  I think that's something that I

10    hadn't broadcast to you, disseminated to you, appropriately

11    enough, and I just wanted to make that point and to caution you

12    in your decision not simply to rely on that statement as to the

13    purpose of the bill.

14          The other thing they did is they mischaracterized the

15    end of the statement as well.  I don't know that you need to

16    know that, but the statement itself is 1F, is not an accurate

17    representation of the press release.  Just as an officer of the

18    court, for us, against us, it's something that it needs to be

19    pointed out to the Court.

20          THE COURT:  Thank you.  Ms. Liska.

21          MS. LISKA:  Just a few things, Your Honor.  I don't

22    want to repeat what's in the briefs, I'm sure you've read them

23    and you are clearly well prepared.

24          I do want to touch real quick on this issue that came

25    up in the reply at the hearing about intermediate scrutiny

1    versus rational basis.  The *Tingley* decision applies to a

2    rational basis, and that's what we have cited to and that's why

3    we think it would apply since this is a regulation of conduct

4    and not speech.

5              Or alternatively, under the second part of *Tingley's*

6    analysis, which hasn't had much air time, which is the

7    conclusion by the Ninth Circuit that there is a long tradition

8    of regulating the practice of medicine, what doctors can and

9    cannot do in the course of practice.

10             THE COURT:  You really think it's clear that this is

11   a regulation of conduct and not speech?

12             MS. LISKA:  We would argue that it is insofar as it

13   targets the treatment and advice that doctors are giving and

14   that that is inextricably twined into the practice of medicine,

15   that the conduct of the doctor is to take care of and treat

16   patients, and that when they provide advice and

17   recommendations, that is a part of the treatment and care they

18   provide.  So we're regulating the practice of speech as the

19   practice of medicine, not speech as speech.

20             THE COURT:  Even though it refers to information?

21             MS. LISKA:  You know, I think that that part of how

22   you regulate the practice of medicine has to encompass that.  I

23   mean, that's how medical malpractice works.  That's how, you

24   know, other laws governing doctors' conduct work besides the

25   statutes from other states.

1          THE COURT:  But some law governing doctors' conduct

2     governs speech and some don't.

3          MS. LISKA:  I think that within the context of the

4     provision of advice, that that is quintessentially the practice

5     of medicine, that that's the conduct that is being taken at

6     here.

7          MS. YOUNES:  I'm sorry.

8          MS. LISKA:  Please go ahead.

9          THE COURT:  No, you finish.

10          MS. LISKA:  Last little bit again, just to return to

11     this vagueness point because I did want to make this point:

12     First, I'm sympathetic to the Court's desire, plaintiffs'

13     desire to have clear guidance on what statements are or are not

14     a problem, but ultimately, when dealing with medical care and

15     treatment, it's difficult to do things in the generality.

16     You know, if a person were to say, Should I take Advil if my

17     head hurts?  Well, do you have an underlying health condition

18     that makes that dangerous?  How much Advil have you taken?

19     It's difficult to give very general statements because medical

20     care -- what's appropriate for a patient is so very

21     individualized, and the standard of care looks at those

22     individualized factors in determining it.

23          And then just again, I think *Tingley* talks a bit

24     about this, but if the State can't say to a doctor the advice

25     you give, the information you are conveying, you need to do so

1    in a way that's not substandard.  You need to provide adequate

2    care, that does call into question how all of medical practice

3    is regulated.  The entire medical malpractice system is based

4    upon this idea that doctors need to give adequate care; care

5    that rises to the level of the standard of care and that that's

6    what this statute does.

7              THE COURT:  All right.

8              MS. YOUNES:  Your Honor, if I may.  First of all, the

9    treatment and speech being inextricably intertwined, that's

10   obviously not the case here.  *Tingley*, *Pickup* and *Conant*, for

11   instance, in those cases they were talking about doctors --

12   they specifically distinguished doctors engaging in the conduct

13   of like gay conversion therapy or prescribing medical marijuana

14   from advising their clients to seek gay conversion therapy

15   elsewhere after they turn 18 or for advising them to take

16   marijuana.  This clearly targets speech that's much more along

17   the lines of making those recommendations.  So this clearly the

18   falls on the speech divide.

19             In terms of a long tradition of regulating in the

20   medical profession, yes, there is a tradition of regulation,

21   but not of speech, that's why the Court in *NIFLA* said, We can't

22   regulate this kind of speech, this is not conduct.  That's much

23   more akin to what we have going on here.

24             THE COURT:  All right.  Thank you.  We will take the

25   motion under submission and you can expect a decision shortly.

1     MS. YOUNES:  Thank you very much, Your Honor.

2     MS. LISKA:  Thank you.

3     MR. JAFFE:  Thank you.

4     THE CLERK:  Court's adjourned.

5        (Proceedings adjourned at 3:36 p.m.)

6

7                    C E R T I F I C A T E

8

9     I certify that the foregoing is a true and correct

10    transcript of the record of proceedings in the above-entitled

11    matter.

12

13

14    MARYANN VALENOTI, RMR, CRR              1/28/2023
      Official Court Reporter                   DATE
15    CA CSR #11266

16

17

18

19

20

21

22

23

24

25

          MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275